ADRMOP,RELATE

# U.S. District Court
## California Northern District (San Francisco)
## CIVIL DOCKET FOR CASE #: 3:23-cv-05234-EMC

| | |
|---|---|
| J.S. et al v. 23andMe, Inc. et al | Date Filed: 10/12/2023 |
| Assigned to: Judge Edward M Chen | Jury Demand: Plaintiff |
| Referred to: Magistrate Judge Nathanael M. Cousins | Nature of Suit: 190 Contract: Other |
| Relate Case Case: 3:23-cv-05147-EMC | Jurisdiction: Diversity |
| Cause: 28:1332 Diversity-Tort/Non-Motor Vehicle | |

**Plaintiff**

**J.S.**                                        represented by **Sharon Jessica Zinns**
                                                Zinns Law, LLC
                                                Zinns Law, LLC
                                                4243 Dunwoody Club Drive
                                                Suite 104
                                                Atlanta, GA 30350
                                                404-882-9002
                                                Email: Sharon@zinnslaw.com
                                                *ATTORNEY TO BE NOTICED*

**Plaintiff**

**J.T.**                                        represented by **Sharon Jessica Zinns**
                                                (See above for address)
                                                *ATTORNEY TO BE NOTICED*

**Plaintiff**

**A.L.**                                        represented by **Sharon Jessica Zinns**
*individually and on behalf of all others*      (See above for address)
*similarly situated*                            *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**23andMe, Inc.**                               represented by **Rebekah Susanne Strawn Guyon**
                                                Greenberg Traurig, LLP
                                                1840 Century Park East, 19th Floor
                                                Los Angeles, CA 90067
                                                (310) 586-7700
                                                Fax: (310) 586-7800
                                                Email: Guyonr@gtlaw.com
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

                                                **Ian Ballon**
                                                Greenberg Traurig LLP

1900 University Avenue
5th Floor
East Palo Alto, CA 94303
650 328 8500
Fax: 650 328 8508
Email: ballon@gtlaw.com
*ATTORNEY TO BE NOTICED*

**Kristin Louise O'Carroll**
Greenberg Traurig
CA
101 2nd St.
Suite 2200
San Francisco, CA 94105
415-655-1300
Email: ocarrollK@gtlaw.com
*ATTORNEY TO BE NOTICED*

**Defendant**
**23ANDME Holding Co**                    represented by   **Rebekah Susanne Strawn Guyon**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ian Ballon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kristin Louise O'Carroll**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**
**23ANDME Pharmacy Holdings, Inc.**       represented by   **Rebekah Susanne Strawn Guyon**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ian Ballon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kristin Louise O'Carroll**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/12/2023 | 1 | COMPLAINT against 23ANDME HOLDING CO, 23ANDME PHARMACY HOLDINGS, INC., 23andMe, Inc. ( Filing fee $ 402, receipt number ACANDC-18733603.). Filed by J.S., A.L., J.T.. (Attachments: # 1 Civil Cover Sheet)(Zinns, Sharon) (Filed on 10/12/2023) (Entered: 10/12/2023) |

| 10/12/2023 | 2 | Proposed Summons. (Zinns, Sharon) (Filed on 10/12/2023) (Entered: 10/12/2023) |
|---|---|---|
| 10/12/2023 | 3 | Proposed Summons. (Zinns, Sharon) (Filed on 10/12/2023) (Entered: 10/12/2023) |
| 10/12/2023 | 4 | Proposed Summons. (Zinns, Sharon) (Filed on 10/12/2023) (Entered: 10/12/2023) |
| 10/12/2023 | 5 | Case assigned to Magistrate Judge Nathanael M. Cousins.<br><br>Counsel for plaintiff or the removing party is responsible for serving the Complaint or Notice of Removal, Summons and the assigned judge's standing orders and all other new case documents upon the opposing parties. For information, visit *E-Filing A New Civil Case* at http://cand.uscourts.gov/ecf/caseopening.<br><br>Standing orders can be downloaded from the court's web page at www.cand.uscourts.gov/judges. Upon receipt, the summons will be issued and returned electronically. A scheduling order will be sent by Notice of Electronic Filing (NEF) within two business days. Consent/Declination due by 10/26/2023. (bw, COURT STAFF) (Filed on 10/12/2023) (Entered: 10/13/2023) |
| 10/13/2023 | 6 | **Initial Case Management Scheduling Order with ADR Deadlines: Case Management Statement due by 1/3/2023. Initial Case Management Conference set for 1/10/2023 10:00 AM in San Jose, Courtroom 5, 4th Floor. (dhm, COURT STAFF) (Filed on 10/13/2023) (Entered: 10/13/2023)** |
| 10/13/2023 | 7 | Summons Issued as to 23ANDME PHARMACY HOLDINGS, INC.. (dhm, COURT STAFF) (Filed on 10/13/2023) (Entered: 10/13/2023) |
| 10/13/2023 | 8 | Summons Issued as to 23andMe, Inc.. (dhm, COURT STAFF) (Filed on 10/13/2023) (Entered: 10/13/2023) |
| 10/13/2023 | 9 | Summons Issued as to 23ANDME HOLDING CO. (dhm, COURT STAFF) (Filed on 10/13/2023) (Entered: 10/13/2023) |
| 10/24/2023 | 10 | SUMMONS Returned Executed by J.S., A.L., J.T.. 23ANDME HOLDING CO served on 10/18/2023, answer due 11/8/2023. (Zinns, Sharon) (Filed on 10/24/2023) (Entered: 10/24/2023) |
| 10/24/2023 | 11 | SUMMONS Returned Executed by J.S., A.L., J.T.. 23ANDME PHARMACY HOLDINGS, INC. served on 10/18/2023, answer due 11/8/2023. (Zinns, Sharon) (Filed on 10/24/2023) (Entered: 10/24/2023) |
| 10/25/2023 | 12 | CONSENT/DECLINATION to Proceed Before a US Magistrate Judge by A.L., J.S., J.T... (Zinns, Sharon) (Filed on 10/25/2023) (Entered: 10/25/2023) |
| 10/25/2023 | 13 | CLERK'S NOTICE OF IMPENDING REASSIGNMENT TO A U.S. DISTRICT COURT JUDGE: The Clerk of this Court will now randomly reassign this case to a District Judge because a party has not consented to the jurisdiction of a Magistrate Judge. You will be informed by separate notice of the district judge to whom this case is reassigned.<br><br>ALL HEARING DATES PRESENTLY SCHEDULED BEFORE THE CURRENT MAGISTRATE JUDGE ARE VACATED AND WILL BE RE-NOTICED FOR HEARING BEFORE THE JUDGE TO WHOM THIS CASE IS REASSIGNED.<br><br>*This is a text only docket entry; there is no document associated with this notice.* (lmh, COURT STAFF) (Filed on 10/25/2023) (Entered: 10/25/2023) |
| 10/25/2023 | 14 | SUMMONS Returned Executed by J.S., A.L., J.T.. 23andMe, Inc. served on 10/18/2023, answer due 11/8/2023. (Zinns, Sharon) (Filed on 10/25/2023) (Entered: 10/25/2023) |

| 10/25/2023 | 15 | **ORDER REASSIGNING CASE. Case reassigned using a proportionate, random, and blind system pursuant to General Order No. 44 to Judge Beth Labson Freeman for all further proceedings. Notice: The assigned judge participates in the Cameras in the Courtroom Pilot Project. See General Order No. 65 and http://cand.uscourts.gov/cameras. Magistrate Judge Nathanael M. Cousins remains as referral judge assigned to case. Reassignment Order signed by Clerk on 10/25/2023. (bw, COURT STAFF) (Filed on 10/25/2023) (Entered: 10/25/2023)** |
|---|---|---|
| 10/26/2023 | 16 | **CLERK'S NOTICE RESETTING CASE MANAGEMENT CONFERENCE AFTER REASSIGNMENT.**<br>**Case Management Statement due by 2/15/2024. Initial Case Management Conference set for 2/22/2024 11:00 AM before Judge Beth Labson Freeman.**<br>***(This is a text-only entry generated by the court. There is no document associated with this entry.)* (tsh, COURT STAFF) (Filed on 10/26/2023) (Entered: 10/26/2023)** |
| 11/07/2023 | 17 | STIPULATION re 1 Complaint, *To Extend Time to Respond to Complaint* filed by 23ANDME HOLDING CO, 23ANDME PHARMACY HOLDINGS, INC., 23andMe, Inc.. (Guyon, Rebekah) (Filed on 11/7/2023) (Entered: 11/07/2023) |
| 11/08/2023 | | Electronic filing error. **NOTICE TO COUNSEL: Kristin O'Carroll.** Please update your personal profile on ECF (Bar Id # shows name as Kristin Louise Williams) Re: 17 Stipulation filed by 23andMe, Inc., 23ANDME Pharmacy Holdings, Inc., 23ANDME Holding Co (dhm, COURT STAFF) (Filed on 11/8/2023) (Entered: 11/08/2023) |
| 11/08/2023 | 18 | **ORDER APPROVING 17 STIPULATION TO EXTEND TIME TO RESPOND TO COMPLAINT. Signed by Judge Beth Labson Freeman on 11/8/2023. (blflc3, COURT STAFF) (Filed on 11/8/2023) (Entered: 11/08/2023)** |
| 11/14/2023 | 19 | **SUA SPONTE JUDICIAL REFERRAL FOR PURPOSE OF DETERMINING RELATIONSHIP. Signed by Judge Beth Labson Freeman on 11/14/2023. (blflc3, COURT STAFF) (Filed on 11/14/2023) (Entered: 11/14/2023)** |
| 11/30/2023 | 20 | **ORDER RELATING CASES. Signed by Judge Edward M. Chen on 11/30/2023. (vla, COURT STAFF) (Filed on 11/30/2023) (Entered: 11/30/2023)** |
| 12/01/2023 | 21 | **ORDER REASSIGNING CASE. Case reassigned to Judge Edward M Chen for all further proceedings re Related Case Order. Notice: The assigned judge participates in the Cameras in the Courtroom Pilot Project. See General Order No. 65 and http://cand.uscourts.gov/cameras. Judge Beth Labson Freeman no longer assigned to case. Reassignment Order signed by Clerk on 12/1/2023. (Attachments: # 1 Notice of Eligibility for Video Recording)(bw, COURT STAFF) (Filed on 12/1/2023) (Entered: 12/01/2023)** |

| **PACER Service Center** | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 12/21/2023 07:30:25 | | | |
| **PACER Login:** | lindsaykschuyler | **Client Code:** | 178849.010700 |
| **Description:** | Docket Report | **Search Criteria:** | 3:23-cv-05234-EMC |
| **Billable Pages:** | 4 | **Cost:** | 0.40 |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| J.S., J.T., and A.L., individually and on behalf of all others similarly situated, ) ) ) ) | |
| Plaintiffs, ) ) | |
| v. ) ) | Case No. 5:23-cv-5234 |
| 23ANDME, INC., ) ) | |
| Serve Registered Agent: ) | |
| Corporation Service Company d/b/a CSC – Lawyers Incorporating Service 2710 Gateway Oaks Dr. Sacramento, CA 95833 ) ) ) ) ) ) | |
| and ) ) | |
| 23ANDME HOLDING CO., ) ) | |
| Serve Registered Agent: ) | |
| Corporation Service Company 251 Little Falls Dr. Wilmington, DE 19808 ) ) ) ) | |
| and ) ) | |
| 23ANDME PHARMACY HOLDINGS, INC. ) ) | |
| Serve Registered Agent: ) | |
| Incorporating Services, Ltd. 3500 S Dupont Hwy Dover, DE 19901 ) ) ) ) | |
| Defendants. ) | |

## CLASS ACTION COMPLAINT

COME NOW Plaintiffs J.S., J.T., and A.L., individually and on behalf of all others

similarly situated, and on behalf of the general public, upon personal knowledge of facts

pertaining to them and upon information and belief as to all other matters, and by and through undersigned counsel, hereby brings this Class Action Complaint against Defendants (hereinafter "23ANDME") and alleges as follows:

**INTRODUCTION**

1.      Plaintiffs bring this action on behalf of themselves and all other individuals similarly situated ("Class Members") against Defendants for their failure to secure and safeguard the personal health information ("PHI") and personally identifiable information ("PII") of at least million individuals who are customers of Defendants.[1]

2.      23ANDME, Inc., 23ANDME Holding Co., and 23ANDME Pharmacy Holdings, Inc. are headquartered in San Francisco, California specializing in personal genomics and biotechnology. In the regular course of its business, 23ANDME is required to maintain reasonable and adequate security measures to secure, protect, and safeguard their customers' PHI and PII against unauthorized access and disclosure.

3.      Every year, millions of Americans have their most valuable PHI and PII stolen and sold online because of data breaches. Despite the dire warnings about the severe impact of data breaches on Americans of all economic strata, companies, including Defendants, still fail to make the necessary investments to implement important and adequate security measures to protect their customers' and employees' data.

4.      Defendants required its customers to provide them with their sensitive PHI and PII and failed to protect it. Defendants had an obligation to secure their customers'

---

[1] https://www.wired.com/story/23andme-credential-stuffing-data-stolen/

2

PHI and PII by implementing reasonable and appropriate data security safeguards. This was part of the bargain between Plaintiffs and Class Members and Defendants.

5. As reported by Defendants, anonymous hackers found their way into Defendants' systems, stealing both former and current customer names, email addresses, photos, birth dates, and DNA ancestry (the "Data Breach").[2]

6. Defendants required their customers to provide them with their sensitive PHI and PII and failed to protect it. Defendants had an obligation to secure their customers' PHI and PII by implementing reasonable and appropriate data safeguards. This was part of the bargain between Plaintiffs and Class Members and Defendants.

7. As a result of Defendants' failure to provide reasonable and adequate data security, Plaintiffs' and the Class Members' unencrypted, non-redacted PHI and PII has been exposed to unauthorized third parties. Plaintiffs and the Class are now at much higher risk of identity theft and cybercrimes of all kinds, especially considering the highly sensitive PHI and PII stolen here and the fact that the compromised PHI and PII is already being sold on the dark web. This risk constitutes a concrete injury suffered by Plaintiffs and the Class as they no longer have control over their PHI and PII, which PHI and PII is now in the hands of third-party cybercriminals. This substantial and imminent risk of identity theft has been recognized by numerous courts as a concrete injury sufficient to establish standing.

---

[2] *Id.*

3

8. Plaintiffs and the Class will have to incur costs to pay a third-party credit and identity theft monitoring service for the rest of their lives as a direct result of the Data Breach.

9. Plaintiffs brings this action on behalf of themselves and those similarly situated to seek redress for the lifetime of harm they will now face, including, but not limited to, reimbursement of losses associated with identity theft and fraud, out-of-pocket costs incurred to mitigate the risk of future harm, compensation for time and effort spent responding to the Data Breach, the costs of extending credit monitoring services, services to help treat the fear of physical harm because of the nature of the data stolen – that is, relating to religious ancestry - and identity theft insurance, and injunctive relief requiring Defendants to ensure that its third-party vendors implement and maintain reasonable data security practices going forward.

## THE PARTIES

10. Plaintiff J.S. is a resident of St. Ann, St. Louis County, Missouri, whose Personal Information was compromised in the Data Breach.

11. Plaintiff J.T. is a resident of Basehor, Leavenworth County, Kansas, whose Personal Information was compromised in the Data Breach.

12. Plaintiff A.L. is a resident of Omaha, Douglas County, Nebraska whose Personal Information was compromised in the Data Breach

13. Defendant 23ANDME, Inc. is a Delaware corporation, with its principal place of business at 223 N Mathilda Ave., Sunnydale, CA 94086. It can be served through its registered agent: Corporation Service Company d/b/a CSC – Lawyers Incorporating Service at 2710 Gateway Oaks Dr., Sacramento, CA 95833.

4

14.     Defendant 23ANDME Holding Co., is a Delaware corporation, with its principal place of business at 349 Oyster Point Blvd., South San Francisco, CA 94080. It can be served through its registered agent: Corporation Service Company, 251 Little Falls Dr., Wilmington, DE 19808.

15.     Defendant 23ANDME Pharmacy Holdings, Inc. is a Delaware corporation, with its principal place of business at 349 Oyster Point Blvd., South San Francisco, CA 94080. It can be served through its registered agent: Incorporating Services, Ltd., 3500 S Dupont Hwy, Dover, DE 19901.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1332(d) because there are more than 100 Class Members, at least one class member is a citizen of a state different from that of Defendants, and the amount in controversy exceeds $5 million, exclusive of interest and costs.

17.     Venue is likewise proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendants conduct much of their business in this District and Defendants have caused harm to Class Members residing in this District.

## GENERAL ALLEGATIONS COMMON TO ALL COUNTS

18.     This is a class action brought by Plaintiffs, individually and on behalf of all citizens who are similarly situated (i.e., the Class Members), seeking to redress Defendants' willful and reckless and violations of their privacy rights. Plaintiffs and the other Class Members were customers of Defendants.

19.     On or about October 6, 2023, an anonymous, unauthorized third party accessed and downloaded Plaintiffs' and the Class Members' PHI and PII.

20. This action pertains to Defendants' unauthorized disclosures of the Plaintiff's PHI and PII that occurred in October of 2023.

21. Defendants disclosed Plaintiffs' and the other Class Members' PHI and PII to unauthorized persons as a direct and/or proximate result of Defendants' failure to safeguard and protect their PHI and PII.

22. By obtaining, collecting, and storing the PHI and PII of Plaintiffs and Class Members, Defendants assumed legal and equitable duties and knew or should have known it was responsible for protecting the PHI and PII from unauthorized disclosures.

23. Defendants failed to assess and monitor their security safeguards to protect Plaintiff's and the Class Members' PHI and PII.

24. Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their PHI and PII and relied on Defendants to keep their PHI and PII confidential and maintained securely, to use this information for business purposes only, to make only authorized disclosures of this information, and to ensure that its third-party vendors take similar steps.

### *The Data Breach*

### *The Data Breach was Preventable*

25. Had Defendants insured that they maintained industry-standard safeguards to monitor, assess, and update security controls and related system risks, they could have ensured sensitive customer data was not transferred to a vendor that was unequipped to protect it. Defendants' lack of oversight of their security controls, and their implementation of enhanced security measures only after the Data Breach are inexcusable.

6

26.     Defendants were at all times fully aware of their obligation to protect their customers' PHI and PII and the risks associated with failing to do so. Defendants observed frequent public announcements of data breaches affecting finance and insurance industries and knew that information of the type collected, maintained, and stored by Defendants is highly coveted and a frequent target of hackers.

27.     This exposure, along with the fact that the compromised PHI and PII is potentially already being sold on the dark web, is tremendously problematic. Cybercrime is rising at an alarming rate, as shown in the FBI's Internet Crime Complaint statistics chart shown below:



28.     By 2013, it was being reported that nearly one out of four data breach notification recipients becomes a victim of identity fraud.[3]

---

[3] Pascual, Al, "2013 Identity Fraud Report: Data Breaches Becoming a Treasure Trove for Fraudsters," *Javelin* (Feb. 20, 2013).

29.     Stolen PHI and PII is often trafficked on the dark web. Law enforcement has difficulty policing the dark web due to this encryption, which allows users and criminals to conceal identities and online activity.

30.     When malicious actors infiltrate companies and copy and exfiltrate the PHI and PII that those companies store, that stolen information often ends up on the dark web because the malicious actors buy and sell that information for profit.[4]

31.     In April 2023, NationsBenefits, "disclosed that thousands of its members had their personal information compromised in a late-January ransomware attached targeting Fortra's Anywhere platform, a file-transfer software that the firm was using. According to the news reports, the ransomeware gang CLOP claimed responsibility for the attack, saying it took advantage of a previously known vulnerability."[5]

32.     In mid-April 2023, "the second largest health insurer [Point32Health], in Massachusetts, suffered major technical outages resulting from a ransomware attack. The incident brought down the company's systems that it uses to service members and providers, resulting in some members having difficulty contacting their insurers."[6]

33.     In May 2023, MCNA Insurance Company disclosed that "personal health information of nearly nine million patients was compromised in a cyber incident discovered in March. In a data breach notification letter filed with the Maine state attorney general's office dated May 26, the firm said that it detected unauthorized access to its

---

[4] *Shining a Light on the Dark Web with Identity Monitoring*, IdentityForce, Dec. 28, 2020, *available at:* https://www.identityforce.com/blog/shining-light-dark-web-identity- monitoring (last accessed July 28, 2021).

[5] https://www.insurancebusinessmag.com/us/guides/the-insurance-industry-cyber-crime-report-recent-attacks-on-insurance-businesses-448429.aspx (Last visited August 22, 2023)
[6] *Id.*

systems on March 6, with some found to be infected with malicious code…According to MCNA, the hackers were successful in accessing patient personal information."[7]

34.    In April 2020, ZDNet reported in an article titled, "Ransomeware mentioned in 1,000+ SEC filings over the past year", that "[r]ansomeware gangs are now ferociously aggressive in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporate information on dark web portals, and even tip journalists to generate negative news complaints as revenge against those who refuse to pay."[8]

35.    In September 2020, the United States Cybersecurity and Infrastructure Security Agency published online a "Ransomeware Guide" advising that "[m]alicious actors have adjusted their ransomeware tactics over time to include pressuring victims for payment by threatening to release stolen data if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion."[9]

36.    Another example is when the U.S. Department of Justice announced its seizure of AlphaBay in 2017. AlphaBay had more than 350,000 listings, many of which concerned stolen and fraudulent documents that could be used to assume another person's identity. Other marketplaces, similar to the now-defunct AlphaBay, "are awash with [PII] belonging to victims from countries all over the world. One of the key challenges of protecting PII online is its pervasiveness. As data breaches in the news continue to show, PII about employees, customers, and the public is housed in all kinds of organizations, and

---

[7] *Id.*
[8] https://www.zdnet.com/article/ransomeware-mentioned-in-1000-sec-filings-over-the-past-year/ (Last visited August 22, 2023).
[9] https://www.cisa.gov/sites/default/files/2023-01-CISA_MS-ISAC_Ransomware%20Guide_8508C.pdf (Last visited August 22, 2023).

9

the increasing digital transformation of today's businesses only broadens the number of

potential sources for hackers to target."[10]

37.    The PHI and PII of consumers remains of high value to criminals, as

evidenced by the price they will pay through the dark web. Numerous sources cite dark

web pricing for stolen identity credentials. For example, personal information can be sold

at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[11]

Experian reports that a solen credit or debit card number can sell for $5 to $110 on the dark

web.[12] Criminals can also purchase access to entire company data breaches from $900 to

$4,500.[13]

38.    Social Security numbers, for example, are among the worst kind of personal

information to have stolen because they may be put to a variety of fraudulent uses and are

difficult for an individual to change. The Social Security Administration stresses that the

loss of an individual's Social Security number, as is the case here, can lead to identity theft

and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other
> personal information about you. Identity thieves can use your number and your
> good credit to apply for more credit in your name. Then, they use the credit cards
> and don't pay the bills, it damages your credit. You may not find out that someone
> is using your number until you're turned down for credit, or you begin to get calls

---

[10] *Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web*, Armor, April 3, 2018, *available at:*
https://www.armor.com/resources/blog/stolen-
pii-ramifications- identity-theft-fraud-dark-web/
(Last visited July 28, 2021).

[11] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019,
*available at*: https://www.digitaltrends.com/computing/personal- data-sold-on-the-dark-web-how-much-it-
costs/ (Last visited July 28, 2021).

[12] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017,
*available at*: https://www.experian.com/blogs/ask- experian/heres-how-much-your-personal-information-is-
selling-for-on-the-dark-web/ (Last visited July 28, 2021).

[13] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-
browsing/in-the- dark/ (Last visited July 28, 2021).

from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number assuming your identity can cause a lot of problems.[14]

39.     What is more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventative action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraudulent activity to obtain a new number.

40.     Even then, a new Social Security number may not be effective. According to July Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[15]

41.     Because of this, the information comprised in the Data Breach here is significantly more harmful to lose than the loss of, for example, credit card information in a retailer payment card breach because victims can simply cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

42.     The PHI and PII compromised in the Data Breach demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal,

---

[14] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf (Last visited August 22, 2023).
[15] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen- by-anthem-s-hackers-has-millionsworrying- about-identity-theft (last visited July 28, 2021).

explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10 times on the black market."[16]

43.    Once PHI and PII is sold, it is often used to gain access to various areas of the victim's digital life, including bank accounts, social media, credit card, and tax details. This can lead to additional PHI and PII being harvested from the victim, as well as PHI and PII from family, friends, and colleagues of the original victim.

44.    According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses in 2019, resulting in more than $3.5 billion in losses to individuals and business victims.

45.    Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts. In this case, victims of this data breach may be subject to physical harm or fear thereof from disclosure of their specific Ashkenazi ancestry.

46.    Data breaches facilitate identity theft as hackers obtain consumers' PHI and PII and thereafter use it to siphon money from current accounts, open new accounts in the names of their victims, or sell consumers' PHI and PII to others who do the same.

47.    For example, the United States Government Accountability Office noted in a June 2007 report on data breaches (the "GAO Report") that criminals use PII to open financial accounts, receive government benefits, and make purchases and secure credit in

---

[16] Time Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells- for- 10x-price-of-stolen-credit-card-numbers.html (last visited July 28, 2021).

a victim's name.[17] The GAO Report further notes that this type of identity fraud is the most harmful because it may take some time for a victim to become aware of the fraud, and can adversely impact the victim's credit rating in the meantime. The GAO Report also states that identity theft victims will fact, "substantial costs and inconveniences repairing damage to their credit records… [and their] good name."[18]

48.     The exposure of Plaintiffs' and Class Members' PHI and PII to cybercriminals will continue to cause substantial risk of future harm, including identity theft, that is continuing and imminent in light of the many different avenues of fraud and identity theft utilized by third-party cybercriminals to profit off this highly sensitive information.

### *Defendants Failed to Comply with the Federal Trade Commission*

49.     Federal and State governments have established security standards and issued recommendations to minimize data breaches and the resulting harm to individuals and financial institutions. The Federal Trade Commission ("FTC") has issued numerous guides for businesses that highlight the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[19]

50.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business,* which established guidelines for fundamental data security principals

---

[17] *See* Government Accountability Office, *Personal Information: Data Breaches are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent is Unknown* (June 2007), https://www.gao.gov/assets/gao- 07-737.pdf (last visited July 28, 2021).
[18] *Id.*
[19] *See* Federal Trade Commission, *Start With Security* (June 2015), https://www.ftc.gov/system/files/documents/plain- language/pdf0205-startwithsecurity.pdf (last visited July 28, 2021).

for business.[20] Among other things, the guidelines note businesses should properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted form the system; and have a response plan ready in the event of a breach.[21]

51.     Additionally, the FTC recommends that companies limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[22]

52.     Highlighting the importance of protecting against phishing and other types of data breaches, the FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect PII, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

---

[20] *See* Federal Trade Commission, *Protecting Personal Information: A Guide for Business* (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited August 22, 2023).
[21] *Id.*
[22] Federal Trade Commission, *Start With Security*, *supra footnote 17*.

### *The Impact of Data Breach on Victims*

53.     Defendants' failure to keep Plaintiffs' and Class Members' PHI and PII secure has severe ramifications. Given the highly sensitive nature of the PHI and PII stolen in the Data Breach, email addresses, photos, first and last names, and dates of birth, DNA ancestry, hackers can commit identity theft, financial fraud, and other identity-related fraud against Plaintiffs and Class Members now and into the indefinite future. As a result, Plaintiffs have suffered injury and faces an imminent and substantial risk of further injury including identity theft and related cybercrimes due to the Data Breach.

54.     The PHI and PII exposed in the Data Breach is highly coveted and valuable on underground markets. Identity thieves can use the PHI and PII to: (a) commit insurance fraud; (b) obtain a fraudulent driver's license or ID card in the victim's name; (c) obtain fraudulent government benefits; (d) file a fraudulent tax return using the victim's information; (e) commit medical and healthcare-related fraud; (f) access financial and investment accounts and records; (g) engage in mortgage fraud; and/or (h) commit any number of other frauds, such as obtaining a job, procuring housing, or giving false information to police during an arrest.

55.     Further, malicious actors often wait months or years to use the PHI and PII obtained in data breaches, as victims often become complacent and less diligent in monitoring their accounts after a significant period has passed. These bad actors will also re-use stolen PHI and PII, meaning individuals can be victims of several cybercrimes stemming from a single data breach.

56.     Given the confirmed exfiltration of Defendants' customers' PHI and PII from their servers, many victims of the Data Breach have likely already experienced significant harms as the result of the Data Breach, including, but not limited to, identity theft and fraud. Plaintiffs and Class Members have also spent time, money, and effort dealing with the fallout of the Data Breach, including purchasing credit monitoring services, reviewing financial and insurance statements, checking credit reports, and spending time and effort searching for unauthorized activity.

57.     It is no wonder, then, that identity theft exacts a severe emotional toll on its victims. The 2021 Identity Theft Resource Center survey evidences the emotional suffering experienced by victims of identity theft:

    a.  84% reported anxiety;

    b.  76% felt violated;

    c.  32% experienced financial related identity problems;

    d.  83% reported being turned down for credit or loans;

    e.  32% reported problems with family members as a result of the breach;

    f.  10% reported feeling suicidal.[23]

58.     Identity theft can also exact a physical toll on its victims. The same survey reported that respondents experienced physical symptoms stemming from their experience with identity theft:

    a.  48% reported sleep disturbances;

    b.  37.1% reported an inability to concentrate/lack of focus;

---

[23] https://www.idtheftcenter.org/wp-content/uploads/2021/09/ITRC_2021_Consumer_Aftermath_Report.pdf (Last visited August 22, 2023).

16

c.  28.7% reported they were unable to go to work because of physical

symptoms;

d.  23.1 reported new physical illnesses (aches and pains, heart palpitations,

sweating, stomach issues); and

e.  12.6% reported a start or relapse into unhealthy or addictive behaviors.[24]

59.  Annual monetary losses from identity theft are in the billions of dollars.

According to a Presidential Report on identity theft produced in 2007:

> In addition to the losses that result when identity thieves fraudulently open
> accounts…individual victims often suffer indirect financial costs,
> including the costs incurred in both civil litigation initiated by creditors
> and in overcoming the many obstacles they face in obtaining or retaining
> credit. Victims of non-financial identity theft, for example, health-related
> or criminal record fraud, face other types of harm and frustration.
>
> In addition to out-of-pocket expenses that can reach thousands of dollars
> for the victims of new account identity theft, and the emotional toll
> identity theft can take, some victims have to spend what can be a
> considerable amount of time to repair the damage caused by the identity
> thieves. Victims of new account identity theft, for example, must correct
> fraudulent information in their credit reports and monitor their reports for
> future inaccuracies, close existing bank accounts and open new ones, and
> dispute charges with individual creditors.

60.  The unauthorized disclosure of sensitive PHI and PII to data thieves also

reduces its inherent value to its owner, which has been recognized by courts as an

independent form of harm.[25]

---

[24] *Id.*

[25] *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md.
2020) ("Neither should the Court ignore what common sense compels it to acknowledge—that the
value that personal identifying information has in our increasingly digital economy. Many
companies, like Marriott, collect personal information.
Consumers too recognize the value of their personal information and offer it in exchange for goods and
services.").

61.     Consumers are injured every time their data is stolen and/or traded on underground markets, even if they have been victims of previous data breaches. Indeed, the dark web is comprised of multiple discrete repositories of stolen information that can be aggregated together or accessed by different criminal actors who intent to use it for different fraudulent purposes. Each data breach increases the likelihood that a victim's personal information will be exposed to more individuals who are seeking to misuse it at the victim's expense.

62.     As a result of the wide variety of injuries that can be traced to the Data Breach, Plaintiffs and Class Members have and will continue to suffer economic loss and other actual harm for which they are entitled to damages, including, but not limited to, the following:

a.   The unconsented disclosure of confidential information to a third party;

b.   Unauthorized use of their PHI and PII without compensation;

c.   Losing the value of the explicit and implicit promises of data security;

d.   Losing the value of access to their PHI and PII permitted by Defendants without their permission;

e.   Identity theft and fraud resulting from the theft of their PHI and PII;

f.   Costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

g.   Anxiety, emotional distress, and loss of privacy;

h.   The present value of ongoing credit monitoring and identity theft protection services necessitated by the Data Breach;

i.   Unauthorized charges and loss of use of and access to their accounts;

j.   Lowered credit scores resulting from credit inquiries following fraudulent activities;

k. Costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to mitigate and address the actual and future consequences of the Data Breach, including searching for fraudulent activity, imposing withdrawal and purchase limits on compromised accounts, and the stress, nuisance, and annoyance of dealing with the repercussions of the Data Breach; and

l. The continued, imminent, and certainly impending injury flowing from potential fraud and identity theft posed by their PHI and PII being in the possession of one or more unauthorized third parties.

63.     Even in instances where an individual is reimbursed for a financial loss due to identity theft or fraud, that does not make that individual whole again as there is typically significant time and effort associated with seeking reimbursement. The Department of Justice's Bureau of Justice Statistics found that identity theft victims, "reported spending an average of about 7 hours clearing up the issues" relating to identity theft or fraud.[26]

64.     Plaintiffs and Class Members place significant value in data security. According to a survey conducted by cyber-security company FireEye Mandiant, approximately 50% of consumers consider data security to be a main or important consideration when making purchasing decisions and nearly the same percentage would be willing to pay more to work with a provider that has better data security. Seventy percent of consumers would provide less personal information to organizations that suffered a data breach.[27]

---

[26] E. Harrell, U.S. Department of Justice, *Victims of Identity Theft, 2014* (revised Nov. 14, 2017), http://www.bjs.gov/content/pub/pdf/vit14.pdf (Last visited August 22, 2023).

[27] https://web.archive.org/web20220205174527/https://www.fireeye.com/blog/executive-perspective/2016/05/beyong_the_bottomli.html (Last visited August 15, 2023).

65.     Plaintiffs and Class Members have a direct interest in Defendants' promises and duties to protect their PHI and PII, i.e., that Defendants *not increase* their risk of identity theft and fraud. Because Defendants failed to live up to its promises and duties in this respect, Plaintiffs and Class Members seek the present value of ongoing identity protection services to compensate them for the present harm and present and continuing increased risk of harm caused by Defendants' wrongful conduct. Through this remedy, Plaintiffs seek to restore themselves and Class Members as close to the same position as they would have occupied but for Defendants' wrongful conduct, namely its failure to adequately protect Plaintiffs' and the Class Members' PHI and PII.

66.     Plaintiffs and Class Members further seek to recover the value of the unauthorized access to their PHI and PII permitted through Defendants' wrongful conduct. This measure of damages is analogous to the remedies for the unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's PHI and PII is non-rivalrous—the unauthorized use by. Another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a Plaintiff may generally recover the reasonable use of the value of the IP—i.e., a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a nonpracticing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of damages is appropriate here under common law damages principles authorizing recovery of rental or use value. This measure is appropriate because: (a) Plaintiffs and Class Members have a protectible property interest in their PHI and PII; (b) the minimum damages measure for the

unauthorized use of personal property is its rental value; (c) rental value is established with reference to market value, i.e., evidence regarding the value of similar transactions.

67. Plaintiffs and Class Members have an interest in ensuring their PHI and PII is secured and not subject to further theft because Defendants continue to hold their PHI and PII.

## CLASS ACTION ALLEGATIONS

68. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs brings this action on behalf of himself and the following proposed Nationwide class, defined as follows:

### Nationwide Class

All persons residing in the United States who are current or former customers of 23ANDME or any 23ANDME affiliate, parent, or subsidiary, and had their PHI and/or PII compromised by an unknown third-party cybercriminal as a result of the Data Breach.

In addition, Plaintiff J.S. brings this action on behalf of the following proposed Missouri Subclass, defined as follows:

### Missouri Subclass

All persons residing in the State of Missouri who are current or former customers of 23ANDME or any 23ANDME affiliate, parent, or subsidiary, and had their PHI and/or PII compromised by an unknown third-party cybercriminal as a result of the Data Breach.

In addition, Plaintiff J.T. brings this action on behalf of the following proposed Kansas Subclass, defined as follows:

### Kansas Subclass

All persons residing in the State of Kansas who are current or former customers of 23ANDME or any 23ANDME affiliate, parent, or subsidiary, and had their PHI

and/or PII compromised by an unknown third-party cybercriminal as a result of the Data Breach.

In addition, Plaintiff A.L. brings this action on behalf of the following proposed Missouri Subclass, defined as follows:

**Nebraska Subclass**

All persons residing in the State of Nebraska who are current or former customers of 23ANDME or any 23ANDME affiliate, parent, or subsidiary, and had their PHI and/or PII compromised by an unknown third-party cybercriminal as a result of the Data Breach.

69.     The proposed Nationwide Class and the proposed Missouri, Kansas, and Nebraska Subclasses will be collectively referred to as the Class, except where it is necessary to differentiate them.

70.     Excluded from the proposed Class are any officer or director of Defendants; any officer or director of any affiliate, parent, or subsidiary of 23ANDME, or anyone employed by counsel in this action; and any judge to whom this case is assigned, his or her spouse, and members of the judge's staff.

71.     **Numerosity.** Members of the proposed Class likely number in the tens of thousands and are thus too numerous to practically join in a single action. Membership in the Class is readily ascertainable from Defendants' own records.

72.     **Commonality and Predominance.** Common questions of law and fact exist as to the proposed Class Members and predominate over questions affecting only individual Class Members. These common questions include:

        a.     Whether Defendants engaged in the wrongful conduct alleged herein;

22

b.      Whether Defendants' inadequate data security measures were a cause of the Data Breach;

c.      Whether Defendants owed a legal duty to Plaintiffs and the other Class Members to exercise due care in collecting, storing, and safeguarding their PHI and PII;

d.      Whether Defendants negligently or recklessly breached legal duties owed to Plaintiffs and the Class Members to exercise due care in collecting, storing, and safeguarding their PHI and PII;

e.      Whether Plaintiffs and the Class are at an increased risk for identity theft because of the Data Breach;

f.      Whether Defendants failed to implement and maintain reasonable security procedures and practices for Plaintiffs' and Class Members' PHI and PII in violation of Section 5 of the FTC Act;

g.      Whether Plaintiffs and the other Class Members are entitled to equitable relief, including, but not limited to, injunctive relief and restitution.

73.      Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs, individually, and on behalf of the other Class Members. Similar or identical statutory and common violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quantity and quality, to the numerous questions that dominate this action.

74.      **Typicality:** Plaintiffs' claims are typical of the claims of the Members of the Class. All Class Members were subject to the Data Breach and had their PHI and PII accessed by and/or disclosed to unauthorized third parties. Defendants' misconduct affected all Class Members in the same manner.

75.      **Adequacy of Representation:** Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the other Class Members they seek to represent; they have retained counsel competent and experienced in complex

class action litigation, and Plaintiffs will prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

76.     **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class action. The damages, harm, or other financial detriment suffered individually by Plaintiffs and the other Class Members are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against Defendants, making it impracticable for Class Members to individually seek redress for Defendants' wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation would create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## COUNT I
## OUTRAGEOUS CONDUCT
### (On behalf of Plaintiffs and the Class)

77.     Plaintiffs and the other Class Members incorporate by reference the allegations of the foregoing paragraphs as though set forth fully herein.

78.     At all times relevant hereto, Defendants owe a duty to Plaintiffs and the other Class Members to keep its customers' PHI and PII private, and not reveal PHI and PII to third parties without first obtaining the customer's expressed consent.

79.     Defendants disclosed Plaintiffs' and other Class Members' highly sensitive PHI and PII to the public either intentionally or with reckless disregard for Plaintiffs and

the other Class Members.

80. Defendants' conduct was extreme and outrageous and caused Plaintiffs and the other Class Members extreme and severe mental distress.

81. As a direct result of Defendants' actions Plaintiffs suffered harms, including, without limitation, loss of the benefit of the bargain, exposure to heightened future risk of identity theft, increased infiltrations into their privacy through spam and/or attempted identity theft, loss of privacy, loss of confidentiality, embarrassment, emotional distress, humiliation, and loss of enjoyment of life.

## COUNT II
## BREACH OF IMPLIED CONTRACT
### (On behalf of Plaintiffs and the Class)

82. The preceding factual statements and allegations are incorporated herein by reference.

83. Plaintiffs and the other Class Members, as part of their agreement with Defendants, provided Defendants their PHI and PII.

84. Defendants offered products and services to current or former customers, including Plaintiffs and Class Members, in exchange for monetary payment.

85. As a condition of the purchase, Defendants required Plaintiffs and Class Members to provide their PHI and PII, including names, addresses, dates of birth, Social Security numbers, driver's license numbers, and other personal information. Implied in these exchanges was a promise by Defendants to ensure that the PHI and PII of Plaintiffs and Class Members in its possession was only used to provide the agreed-upon products and services from Defendants.

86. These exchanges constituted an agreement between the parties: Plaintiffs

and Class Members would provide their PHI and PII in exchange for the products and services provided by Defendants.

87.     It is clear by these exchanges that the parties intended to enter into an agreement. Plaintiffs and Class Members would not have disclosed their PHI and PII to Defendants but for the prospect of Defendants' promise of providing the products and services purchased by Plaintiffs and the Class. Conversely, Defendants presumably would not have taken Plaintiffs' and Class Members' PHI and PII if it did not intend to provide Plaintiffs and Class Members with the bargained-for products and services.

88.     In providing such PHI and PII, Plaintiffs and the other Class Members entered into an implied contract with Defendants, whereby Defendants became obligated to reasonably safeguard Plaintiffs' and the other Class Members' PHI and PII.

89.     Under the implied contract, Defendants were obligated to not only safeguard the PHI and PII, but also to provide Plaintiffs and Class Members with prompt, adequate notice of any Data Breach or unauthorized access of said information.

90.     Defendants breached the implied contract with Plaintiffs and the other Class Members by failing to take reasonable measures to safeguard their PII.

91.     As a direct result of Defendants' breach of their duty of confidentiality and privacy and the disclosure of Plaintiffs' and the members of the Class confidential information, Plaintiffs and the members of the Class suffered damages, including, without limitation, loss of the benefit of the bargain, exposure to heightened future risk of identity theft, increased infiltrations into their privacy through spam and/or attempted identity theft, loss of privacy, loss of confidentiality, embarrassment, emotional distress, humiliation and loss of enjoyment of life.

26

92.     Plaintiffs and the other Class Members suffered and will continue to suffer damages including, but not limited to:  (i) the untimely and/or inadequate notification of the Breach; (ii) improper disclosure of their PHI and PII; (iii) loss of privacy; (iv) out-of-pocket expenses incurred to mitigate the increased risk of identity theft and/or identity fraud pressed upon them by the Breach; (v) the value of their time spent mitigating identity theft and/or identity fraud and/or the increased risk of identity theft and/or identity fraud; (vi) the increased risk of identity theft; and, (vii) emotional distress. At the very least, Plaintiffs and Class Members are entitled to nominal damages.

### COUNT III
### NEGLIGENCE
### (On behalf of Plaintiffs and the Class)

93.     The preceding factual statements and allegations are incorporated herein by reference.

94.     Defendants owed a duty to Plaintiffs and the Class to exercise reasonable care in obtaining, securing, safeguarding, storing, and protecting Plaintiffs' and Class Members' PHI and PII from being compromised, lost, stolen, and accessed by unauthorized persons. This duty includes, among other things, designing, maintaining, and testing its data security systems to ensure that Plaintiffs' and Class Members' PHI and PII in Defendants' possession was adequately secured and protected.

95.     Defendants owed, and continues to owe, a duty to Plaintiffs and the other Class Members to safeguard and protect their PHI and PII.

96.     Defendants breached their duty by failing to exercise reasonable care and failing to safeguard and protect Plaintiffs' and the other Class Members' PHI and PII.

27

97.    It was reasonably foreseeable that Defendants' failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and the other Class Members' PHI and PII would result in an unauthorized third-party gaining access to such information for no lawful purpose.

98.    As a direct result of Defendants' breach of their duty of confidentiality and privacy and the disclosure of Plaintiffs' and the member of the Class confidential information, Plaintiffs and the members of the Class suffered damages, including, without limitation, loss of the benefit of the bargain, exposure to heightened future risk of identity theft, increased infiltrations into their privacy through spam and/or attempted identity theft, loss of privacy, loss of confidentiality, embarrassment, emotional distress, humiliation and loss of enjoyment of life.

99.    By engaging in the negligent acts and omissions alleged herein, which permitted an unknown third party to access Defendants' systems containing the PHI and PII at issue, Defendants failed to meet the data security standards set forth under Section 5 of the FTC Act, which prohibits "unfair…practices in or affecting commerce." This prohibition includes failing to have adequate data security measures, which Defendants have failed to do as discussed herein.

100.    Defendants' failure to meet this standard of data security established under Section 5 of the FTC Act is evidence of negligence.

101.    Neither Plaintiffs nor other Class Members contributed to the Data Breach as described in this Complaint.

102.    Plaintiffs and the other Class members suffered and will continue to suffer damages including, but not limited to:  (i) the untimely and/or inadequate notification of

28

the Breach; (ii) improper disclosure of their PII; (iii) loss of privacy; (iv) out-of-pocket expenses incurred to mitigate the increased risk of identity theft and/or identity fraud pressed upon them by the Breach; (v) the value of their time spent mitigating identity theft and/or identity fraud and/or the increased risk of identity theft and/or identity fraud; (vi) the increased risk of identity theft; and, (vii) emotional distress. At the very least, Plaintiffs and the other Class members are entitled to nominal damages.

103.    Defendants' wrongful actions and/or inaction and the resulting Breach (as described above) constituted (and continue to constitute) negligence at common law.

## COUNT IV
## <u>INVASION OF PRIVACY BY PUBLIC DISCLOSURE OF PRIVATE FACTS</u>
### (On behalf of Plaintiffs and the Class)

104.    The preceding factual statements and allegations are incorporated herein by reference.

105.    Plaintiffs' and the other Class Members' PHI and PII was (and continues to be) sensitive and personal private information.

106.    By virtue of Defendants' failure to safeguard and protect Plaintiffs' and the other Class Members' PHI and PII and the resulting Breach, Defendants wrongfully disseminated Plaintiffs' and the other Class Members' PHI and PII to unauthorized persons.

107.    Dissemination of Plaintiffs' and the other Class Members' PHI and PII is not of a legitimate public concern; publicity of their PHI and PII was, is and will continue to be offensive to Plaintiffs, the other Class Members and all reasonable people. The unlawful disclosure of same violates public mores.

29

108.     As a direct result of Defendants' breach of its duty of confidentiality and privacy and the disclosure of Plaintiffs' and the member of the Class confidential information, Plaintiffs and the members of the Class suffered damages, including, without limitation, loss of the benefit of the bargain, exposure to heightened future risk of identity theft, increased infiltrations into their privacy through spam and/or attempted identity theft, loss of privacy, loss of confidentiality, embarrassment, emotional distress, humiliation and loss of enjoyment of life.

109.     Plaintiffs and the other Class members suffered and will continue to suffer damages including, but not limited to:  (i) the untimely and/or inadequate notification of the Breach; (ii) improper disclosure of their PHI and PII; (iii) loss of privacy; (iv) out-of-pocket expenses incurred to mitigate the increased risk of identity theft and/or identity fraud pressed upon them by the Breach; (v) the value of their time spent mitigating identity theft and/or identity fraud and/or the increased risk of identity theft and/or identity fraud; (vi) the increased risk of identity theft; and, (vii) emotional distress. At the very least, Plaintiffs and the other Class Members are entitled to nominal damages.

110.     Defendants' wrongful actions and/or inaction and the resulting Breach (as described above) constituted (and continue to constitute) an invasion of Plaintiffs' and the other Class Members' privacy by publicly and wrongfully disclosing their private facts (*i.e.*, their PII) without their authorization or consent.

## COUNT V
## BREACH OF FIDUCIARY DUTY OF CONFIDENTIALITY
### (On behalf of Plaintiffs and the Class)

111. Plaintiffs incorporate the foregoing paragraphs as though fully set forth herein.

112. At all times during Plaintiffs' and Class Members' interactions with Defendants as its customers, Defendants were fully aware of the confidential and sensitive nature of Plaintiffs' and the Class Members' PHI and PII that Plaintiffs and Class Members provided to Defendants.

113. Plaintiffs' and Class Members' PHI and PII constitute confidential and novel information. Indeed, Plaintiffs' and Class Members' Social Security numbers can be changed only with great difficulty and time spent, which still enables a threat actor to exploit that information during the interim; additionally, an individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventative action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual ongoing fraudulent activity to obtain a new number.

114. As alleged herein and above, Defendants' relationship with Plaintiffs and Class Members was governed by terms and expectations that Plaintiffs' and Class Members' PHI and PII would be collected, stored, and protected in confidence, and would not be disclosed to unauthorized third parties.

115. Plaintiffs and Class Members provided their respective PHI and PII to Defendants with the explicit and implicit understandings that Defendants would protect and not permit the PHI and PII to be disseminated to any unauthorized parties.

116.    Defendants voluntarily received in confidence Plaintiffs' and Class Members' PHI and PII with the understanding that the PHI and PII would not be disclosed or disseminated to the public or any unauthorized third parties.

117.    Due to Defendants' failure to prevent, detect, and avoid the Data Breach from occurring by, *inter alia*, not following best information security practices and by not providing proper employee training to secure Plaintiffs' and Class Members' PHI and PII, Plaintiff' 'and Class Members' PHI and PII was disclosed and misappropriated to unauthorized third parties beyond Plaintiffs' and Class Members' confidence, and without their express permission.

118.    As a direct and proximate cause of Defendants' actions and/or omissions, Plaintiffs and Class Members have suffered damages.

119.    But for Defendants' disclosure of Plaintiffs' and Class Members' PHI and PII, in violation of the parties' understanding of confidentiality, Plaintiffs' and Class Members' PHI and PII would not have been compromised, stolen, viewed, accessed, and used by unauthorized third parties. Defendants' Data Breach was the direct and legal cause of the theft of Plaintiffs' and Class Members' PHI and PII, as well as the resulting damages.

120.    The disclosure of Plaintiffs' and Class Members' PHI and PII constituted a violation of Plaintiffs' and Class Members' understanding that Defendants would safeguard and protect the confidential and novel PHI and PII that Plaintiffs and Class Members were required to disclose to Defendants.

121.    The concrete injury and harm Plaintiffs and Class Members suffered was the reasonably foreseeable result of Defendants' unauthorized disclosure of Plaintiffs' and Class Members' PHI and PII. Defendants knew their data security procedures for accepting

32

and securing Plaintiffs' and Class Members' PHI and PII had numerous security and other vulnerabilities that placed Plaintiffs' and Class Members' PHI and PII in jeopardy.

122.    As a direct and proximate result of Defendants' breaches of confidence, Plaintiffs and Class Members have suffered and/or are at a substantial risk of suffering from damages including, but not limited to: (i) the untimely and/or inadequate notification of the Breach; (ii) improper disclosure of their PHI and PII; (iii) loss of privacy; (iv) out-of-pocket expenses incurred to mitigate the increased risk of identity theft and/or identity fraud pressed upon them by the Breach; (v) the value of their time spent mitigating identity theft and/or identity fraud and/or the increased risk of identity theft and/or identity fraud; (vi) the increased risk of identity theft; and, (vii) emotional distress. At the very least, Plaintiffs and the other Class Members are entitled to nominal damages.

## COUNT VI
## NEGLIGENT TRAINING AND SUPERVISION
### (On behalf of Plaintiffs and the Class)

123.    The preceding factual statements and allegations are incorporated herein by reference.

124.    At all times relevant hereto, Defendants owe a duty to Plaintiffs and the Class to hire competent employees and agents, and to train and supervise them to ensure they recognize the duties owed to their customers.

125.    Defendants breached their duty to Plaintiffs and the member of the Class by allowing its employees and agents to give access to customer PHI and PII to unauthorized users.

126.    As a direct result of Defendants' breach of its duty of confidentiality and privacy and the disclosure of Plaintiffs' and the member of the Class confidential information, Plaintiffs and the members of the Class suffered damages, including, without limitation, loss of the benefit of the bargain, exposure to heightened future risk of identity theft, increased infiltrations into their privacy through spam and/or attempted identity theft, loss of privacy, loss of confidentiality, embarrassment, emotional distress, humiliation and loss of enjoyment of life.

127.    Plaintiffs and the other Class members suffered and will continue to suffer damages including, but not limited to:  (i) the untimely and/or inadequate notification of the Breach; (ii) improper disclosure of their PHI and PII; (iii) loss of privacy; (iv) out-of-pocket expenses incurred to mitigate the increased risk of identity theft and/or identity fraud pressed upon them by the Breach; (v) the value of their time spent mitigating identity theft and/or identity fraud and/or the increased risk of identity theft and/or identity fraud; (vi) the increased risk of identity theft; and, (vii) emotional distress. At the very least, Plaintiffs and the other Class Members are entitled to nominal damages.

128.    Defendants' wrongful actions and/or inaction and the resulting Breach (as described above) constituted (and continue to constitute) an invasion of Plaintiffs' and the other Class Members' privacy by publicly and wrongfully disclosing their private facts (*i.e.*, their PII) without their authorization or consent.

## COUNT VII
## <u>BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING</u>
### (On behalf of Plaintiffs and the Class)

129.    Plaintiffs incorporate the foregoing paragraphs as though fully set forth herein.

130.    As described above, when Plaintiffs and the Class Members provided their PHI and PII to Defendants, they entered into implied contracts in which Defendants agreed to comply with its statutory and common law duties and industry standards to protect Plaintiffs' and Class Members' PHI and PII and to timely detect and notify them in the event of a data breach.

131.    These exchanges constituted an agreement between the parties: Plaintiffs and Class Members were required to provide their PHI and PII in exchange for products and services provided by Defendants as well as an implied covenant by Defendants to protect Plaintiffs' PHI and PII in its possession.

132.    It was clear by these exchanges that the parties intended to enter into an agreement. Plaintiffs and Class Members would not have disclosed their PHI and PII to Defendants but for the prospect of Defendants' promise of certain products and services. Conversely, Defendants presumably would not have taken Plaintiffs' and Class Members' PHI and PII if it did not intend to provide Plaintiffs and Class Members with the products and services it was offering.

133.    Implied in these exchanges was a promise by Defendants to ensure that the PHI and PII of Plaintiffs and Class Members in its possession was only used to provide the agreed-upon products and services.

134.    Plaintiffs and Class Members therefore did not receive the benefit of the bargain with Defendants, because they provided their PHI and PII in exchange for Defendants' implied agreement to keep it safe and secure.

135. While Defendants had discretion in the specifics of how they met the applicable laws and industry standards, this discretion was governed by an implied covenant of good faith and fair dealing.

136. Defendants breached this implied covenant when it engaged in acts and/or omissions that are declared unfair trade practices by the FTC and state statutes and regulations. These acts and omissions included: omitting, suppressing, and concealing the material fact of the inadequacy of the privacy and security protections for Plaintiffs' and Class Members' PHI and PII; storing the PHI and PII of former customers, despite any valid purpose for the storage thereof having ceased upon the termination of the business relationship with those individuals; and failing to disclose to Plaintiffs and Class Members at the time they provided their PHI and PII to it that Defendants' data security systems failed to meet applicable legal and industry standards.

137. Plaintiffs and Class Members did all or substantially all the significant things that the contract required them to do.

138. Likewise, all conditions required for Defendants' performance were met.

139. Defendants' acts and omissions unfairly interfered with Plaintiffs' and Class Members' rights to receive the full benefit of their contracts.

140. Plaintiffs and Class Members have been or will be harmed by Defendants' breach of this implied covenant in the many ways described above, including actual identity theft and/or imminent risk of certainly impending and devastating identity theft that exists now that cyber criminals have their PHI and PII, and the attendant long-term expense of attempting to mitigate and insure against these risks.

141. Defendants are liable for its breach of these implied covenants, whether or not it is found to have breached any specific, express contractual term.

142. Plaintiffs and Class Members are entitled to damages, including compensatory damages and restitution, declaratory and injunctive relief, and attorneys' fees, costs, and expenses.

### COUNT VIII
### INVASION OF PRIVACY
### Cal. Const. ART. 1 § 1
### (On Behalf of Plaintiff and the Class)

143. Plaintiff re-alleges and incorporates by reference herein all of the allegations contained in the preceding paragraphs as though fully set forth herein. Plaintiff brings this Count on their own behalf and on behalf of the Class (the "Class" for the purposes of this Count).

144. California established the right to privacy in Article I, Section I of the California Constitution.

145. Plaintiff and the Class had a legitimate expectation of privacy to their PII and PHI and were entitled to the protection of this information against disclosure to unauthorized third parties.

146. Defendants owed a duty to its patients, including Plaintiff and the Class, to keep their Private Information contained as a part thereof, confidential.

147. Defendants failed to protect and released to unknown and unauthorized third parties the PII and PHI of Plaintiff and the Class.

148. Defendants allowed unauthorized and unknown third parties access to and examination of the Private Information of Plaintiff and the Class, by way of Defendants' failure to protect the PII and PHI.

149. The unauthorized release to, custody of, and examination by unauthorized third parties of the Private Information of Plaintiff and the Class is highly offensive to a reasonable person.

150. The intrusion was into a place or thing, which was private and is entitled to be private. Plaintiff and the Class disclosed their Private Information to Defendants as part of their medical care with Defendants, but privately with an intention that the Private Information would be kept confidential and would be protected from unauthorized disclosure. Plaintiff and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

151. The Data Breach at the hands of Defendants constitutes an intentional interference with Plaintiff's and the Class's interest in solitude or seclusion, either as to their persons or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

152. Defendants acted with a knowing state of mind when they permitted the Data Breach to occur because they were with actual knowledge that its information security practices were inadequate and insufficient.

153. Because Defendants acted with this knowing state of mind, they had notice and knew the inadequate and insufficient information security practices would cause injury and harm to Plaintiff and the Class.

154.    As a proximate result of the above acts and omissions of Defendants, the Private Information of Plaintiff and the Class was disclosed to third parties without authorization, causing Plaintiff and the Class to suffer damages.

155.    Unless and until enjoined, and restrained by order of this Court, Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class in that the PII and PHI maintained by Defendants can be viewed, distributed, and used by unauthorized persons for years to come. Plaintiff and the Class have no adequate remedy at law for the injuries in that a judgment for monetary damages will not end the invasion of privacy for Plaintiff and the Class.

**COUNT IX**
**CALIFORNIA CONFIDENTIALITY OF MEDICAL INFORMATION ACT**
**Cal. Civ. Code § 56, *et seq*.**
**(On Behalf of Plaintiff and the Class)**

156.    Plaintiff re-alleges and incorporates by reference herein all of the allegations contained in the preceding paragraphs as though fully set forth herein.

a.  Plaintiff brings this Count on her own behalf and on behalf of the Class (the "Class" for the purposes of this Count).

b.  Defendants are "provider[s] of health care," as defined in Cal. Civ. Code §56.05(m), and is therefore subject to the requirements of the CMIA, Cal. Civ. Code §56.10(a), (d) and (e), 56.36(b), 56.101(a) and (b).

c.  At all relevant times, Defendants were health care providers because they had the "purpose of maintaining medical information to make the information available to the individual or to a provider of health care at the request of the individual or a provider of health care, for purposes of

39

allowing the individual to manage his or her information, or for the diagnosis or treatment of the individual."

157. As a provider of health care or a contractor, Defendants are required by the CMIA to ensure that medical information regarding patients is not disclosed or disseminated or released without patient's authorization, and to protect and preserve the confidentiality of the medical information regarding a patient, under Civil Code §§ 56.06, 56.10, 56.13, 56.20, 56.245, 56.26, 56.35, 56.36, and 56.101.

158. As a provider of health care or a contractor, Defendants are required by the CMIA not to disclose medical information regarding a patient without first obtaining an authorization under Civil Code §§ 56.06, 56.10, 56.13, 56.20, 56.245, 56.26, 56.35, and 56.104.

159. Defendants are persons licensed under California under California's Business and Professions Code, Division 2. *See* Cal. Bus. Prof. Code § 4000, *et seq.*

160. Plaintiff and Class Members are "patients" as defined in CMIA, Cal. Civ. Code §56.05(k) ("'Patient' means any natural person, whether or not still living, who received health care services from a provider of health care and to whom medical information pertains."). Furthermore, Plaintiff and Class Members, as patients and customers of Defendants, had their individually identifiable "medical information," within the meaning of Civil Code § 56.05(j), created, maintained, preserved, and stored on Defendants' computer network, and were patients on or before the date of the Data Breach.

161. Defendants disclosed "medical information," as defined in CMIA, Cal. Civ. Code § 56.05(j), to unauthorized persons without first obtaining consent, in violation of Cal. Civ. Code § 56.10(a). The disclosure of information to unauthorized

40

individuals in the Data Breach resulted from the affirmative actions of Defendants' employees, which allowed the hackers to see and obtain Plaintiff's and Class Members' medical information.

162.   Defendants negligently created, maintained, preserved, stored, and then exposed Plaintiff's and Class Members' individually identifiable "medical information," within the meaning of Cal. Civ. Code § 56.05(j), including Plaintiff's and Class Members' names, addresses, medical information, and health insurance information, that alone or in combination with other publicly available information, reveals their identities. Specifically, Defendants knowingly allowed and affirmatively acted in a manner that allowed unauthorized parties to access and actually view Plaintiff's and Class Members' confidential Private Information.

163.   Defendants' negligence resulted in the release of individually identifiable medical information pertaining to Plaintiff and Class Members to unauthorized persons and the breach of the confidentiality of that information. Defendants' negligent failure to maintain, preserve, store, abandon, destroy, and/or dispose of Plaintiff's and Class Members' medical information in a manner that preserved the confidentiality of the information contained therein, in violation of Cal. Civ. Code §§ 56.06 and 56.101(a).

164.   Defendants also violated Sections 56.06 and 56.101 of the CMIA, which prohibit the negligent creation, maintenance, preservation, storage, abandonment, destruction or disposal of confidential personal medical information.

165. Plaintiff's and Class Members' medical information was accessed, removed and actually viewed by hackers and other unauthorized parties during and following the Data Breach.

166. Plaintiff's and Class Members' medical information that was the subject of the Data Breach included "electronic medical records" or "electronic health records" as referenced by Civil Code § 56.101(c) and defined by 42 U.S.C. § 17921(5).

167. Defendants' computer systems did not protect and preserve the integrity of electronic medical information in violation of Cal. Civ. Code § 56.101(b)(1)(A). As a direct and proximate result of Defendants' above-noted wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach, and violation of the CMIA, Plaintiff and the Class Members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, inter alia,

    a. present, imminent, immediate and continuing increased risk of identity theft, identity fraud and medical fraud –risks justifying expenditures for protective and remedial services for which they are entitled to compensation,

    b. invasion of privacy,

    c. breach of the confidentiality of the PHI,

    d. statutory damages under the California CMIA,

    e. deprivation of the value of their PHI, for which there is well-established national and international markets, and/or,

42

f. the financial and temporal cost of monitoring their credit, monitoring their financial accounts, and mitigating their damages.

168. As a direct and proximate result of Defendants' wrongful actions, inaction, omission, and want of ordinary care that directly and proximately caused the release of Plaintiff's and Class Members' Private Information, Plaintiff and Class Members' personal medical information was viewed by, released to, and disclosed to third parties without Plaintiff's and Class Members' written authorization.

169. Defendants' negligent failure to maintain, preserve, store, abandon, destroy, and/or dispose of Plaintiff's and Class Members' medical information in a manner that preserved the confidentiality of the information contained therein violated the CMIA.

170. Plaintiff's and the Class Members were injured and have suffered damages, as described above, from Defendants' illegal and unauthorized disclosure and negligent release of their medical information in violation of Cal. Civ. Code §§56.10 and 56.101, and therefore seek relief under Civ. Code §§ 56.35 and 56.36, which allows for actual damages, nominal statutory damages of $1,000, punitive damages of $3,000, injunctive relief, and attorneys' fees, expenses and costs.

**COUNT X**
**VIOLATION OF THE CALIFORNIA CONSUMER PRIVACY ACT**
**Cal. Civ. Code § 1798, *et seq.***

**(On behalf of Plaintiff and the Class)**

171.     Plaintiff re-alleges and incorporates by reference herein all of the allegations contained in the preceding paragraphs as though fully set forth herein.

172.     Plaintiffs bring this Count on thier own behalf and on behalf of the Class (the "Class" for the purposes of this Count).

173.     As more personal information about consumers is collected by businesses, consumers' ability to properly protect and safeguard their privacy has decreased. Consumers entrust businesses with their personal information on the understanding that businesses will adequately protect it from unauthorized access and disclosure. The California Legislature explained: "The unauthorized disclosure of personal information and the loss of privacy can have devasting effects for individuals, ranging from financial fraud, identity theft, and unnecessary costs to personal time and finances, to destruction of property, harassment, reputational damage, emotional stress, and even potential physical harm."

174.     As a result, in 2018, the California Legislature passed the CCPA, giving consumers broad protections and rights intended to safeguard their personal information. Among other things, the CCPA imposes an affirmative duty on businesses that maintain personal information about California residents to implement and maintain reasonable security procedures and practices that are appropriate to the nature of the information collected. Defendants failed to implement such procedures which resulted in the Data Breach.

175.     It also requires "[a] business that discloses personal information about a California resident pursuant to a contract with a nonaffiliated third party . . . [to] require

44

by contract that the third party implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the personal information from unauthorized access, destruction, use, modification, or disclosure." Cal. Civ. Code § 1798.81.5(c).

176.    Section 1798.150(a)(1) of the CCPA provides: "Any consumer whose nonencrypted or nonredacted personal information, as defined [by the CCPA] is subject to an unauthorized access and exfiltration, theft, or disclosure as a result of the business' violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information may institute a civil action for" statutory or actual damages, injunctive or declaratory relief, and any other relief the court deems proper.

177.    Plaintiff and the Class Members are "consumer[s]" as defined by Civ. Code § 1798.140(g) because they are "natural person[s] who [are] California resident[s], as defined in Section 17014 of Title 18 of the California Code of Regulations, as that section read on September 1, 2017."

178.    Defendants are "business(es)" as defined by Civ. Code § 1798.140(c) because Defendant:

      a.  is a "sole proprietorship, partnership, limited liability company, corporation, association, or other legal entity that is organized or operated for the profit or financial benefit of its shareholders or other owners";

      b.  "collects consumers' personal information, or on the behalf of which is collected and that alone, or jointly with others, determines the purposes and means of the processing of consumers' personal information";

45

c.  does business in California; and

d.  has annual gross revenues in excess of $299 million; annually buys, receives for the business' commercial purposes, sells or shares for commercial purposes, alone or in combination, the personal information of 50,000 or more consumers, households, or devices; or derives 50 percent or more of its annual revenues from selling consumers' personal information.

179.  The Private Information taken in the Data Breach is personal information as defined by Civil Code § 1798.81.5(d)(1)(A) because it contains Plaintiff's and the Class Members' unencrypted first and last names and Social Security numbers among other information.

180.  Plaintiff and the Class's Private Information was subject to unauthorized access and exfiltration, theft, or disclosure because their Private Information, including name and contact information was wrongfully taken, accessed, and viewed by unauthorized third parties.

181.  The Data Breach occurred as a result of Defendants' failure to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect Plaintiff's and the Class Members' Private Information. Defendants failed to implement reasonable security procedures to prevent an attack on their server or network, including its email system, by hackers and to prevent unauthorized access of Plaintiff's and Class Members' PII as a result of this attack.

182.  As a result of Defendants' failure to implement and maintain reasonable security procedures and practices that resulted in the Data Breach, Plaintiff

46

seeks injunctive relief, including public injunctive relief, declaratory relief, and any other relief as deemed appropriate by the Court.

## COUNT XI
## CALIFORNIA UNFAIR COMPETITION LAW
### Cal. Bus. & Prof. Code § 17200, *et seq.*
### (On Behalf of Plaintiff and the Class)

183.    Plaintiff re-alleges and incorporates by reference herein all of the allegations contained in the preceding paragraphs as though fully set forth herein.

184.    Plaintiffs bring this Count on their own behalf and on behalf of the Class.

185.    Defendants' acts and omissions as alleged herein emanated and directed from California.

186.    By reason of the conduct alleged herein, Defendants engaged in unlawful and unfair business practices within the meaning of California's Unfair Competition Law ("UCL"), Business and Professions Code § 17200, *et seq.*

187.    Defendants stored the Private Information of Plaintiff and Class Members in its computer systems.

188.    Defendants knew or should have known they did not employ reasonable, industry standard, and appropriate security measures that complied with federal regulations and that would have kept Plaintiff's and Class Members' PII secure and prevented the loss or misuse of that Private Information.

189.    Defendants did not disclose at any time that Plaintiff's and Class Members' Private Information was vulnerable to hackers because Defendants' data security measures were inadequate and outdated, and Defendants were the only ones in possession of that material information, which Defendants had a duty to disclose.

**Unlawful Business Practices**

190.     As noted above, Defendants violated Section 5(a) of the FTC Act (which is a predicate legal violation for this UCL claim) by misrepresenting, by omission, the safety of their computer systems, specifically the security thereof, and its ability to safely store Plaintiff's and the Class Members' Private Information.

191.     Defendants also violated Section 5(a) of the FTC Act by failing to implement reasonable and appropriate security measures or follow industry standards for data security.

192.     If Defendants had complied with these legal requirements, Plaintiff and Class Members would not have suffered the damages related to the Data Breach, and consequently from Defendants' failure to timely notify Plaintiff and Class Members of the Data Breach.

193.     Defendants' acts and omissions as alleged herein were unlawful and in violation of, inter alia, Section 5(a) of the FTC Act.

194.     Defendants also violated the CMIA, as described above.

195.     Plaintiff and Class Members suffered injury in fact and lost money or property as the result of Defendants' unlawful business practices. In addition, Plaintiff's and Class Members' Private Information was taken and is in the hands of those who will use it for their own advantage, or is being sold for value, making it clear that the hacked information is of tangible value. Plaintiff and Class Members have also suffered consequential out of pocket losses for procuring credit freeze or protection services, identity theft monitoring, and other expenses relating to identity theft losses or protective measures.

**Unfair Business Practices**

196.    Defendants engaged in unfair business practices under the "balancing test." The harm caused by Defendants' actions and omissions, as described in detail above, greatly outweigh any perceived utility. Indeed, Defendants' failure to follow basic data security protocols and failure to disclose inadequacies of Defendants' data security cannot be said to have had any utility at all. All of these actions and omissions were clearly injurious to Plaintiff and Class Members, directly causing the harms alleged below.

197.    Defendants engaged in unfair business practices under the "tethering test." Defendants' actions and omissions, as described in detail above, violated fundamental public policies expressed by the California Legislature. See, e.g., Cal. Civ. Code § 1798.1 ("The Legislature declares that . . . all individuals have a right of privacy in information pertaining to them.    The increasing use of computer has greatly magnified the potential risk to individual privacy that can occur from the maintenance of personal information."); Cal. Civ. Code § 1798.81.5(a) ("It is the intent of the Legislature to ensure that personal information about California residents is protected."); Cal. Bus. & Prof. Code § 22578 ("It is the intent of the Legislature that this chapter [including the Online Privacy Protection Act] is a matter of statewide concern."). Defendants' acts and omissions thus amount to a violation of the law.

198.    Defendants engaged in unfair business practices under the "FTC test." The harm caused by Defendants' actions and omissions, as described in detail above, is substantial in that it affects thousands of Class Members and has caused those persons to suffer actual harms. Such harms include a substantial risk of identity theft, disclosure of

Plaintiff's and Class Members' Private Information to third parties without their consent, diminution in value of their Private Information, consequential out of pocket losses for procuring credit freeze or protection services, identity theft monitoring, and other expenses relating to identity theft losses or protective measures. This harm continues given the fact that Plaintiff's and Class Members' PII remains in Defendants' possession, without adequate protection, and is also in the hands of those who obtained it without their consent. Defendants' actions and omissions violated Section 5(a) of the Federal Trade Commission Act. See 15 U.S.C. § 45(n) (defining "unfair acts or practices" as those that "cause[ ] or [are] likely to cause substantial injury to consumers which [are] not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition"); *see also, e.g., In re LabMD, Inc.*, FTC Docket No. 9357, FTC File No. 102-3099 (July 28, 2016) (failure to employ reasonable and appropriate measures to secure personal information collected violated § 5(a) of FTC Act).

199.    Plaintiff and Class Members suffered injury in fact and lost money or property as the result of Defendants' unfair business practices. Plaintiff's and Class Members' Private Information was taken and is in the hands of those who will use it for their own advantage, or is being sold for value, making it clear that the hacked information is of tangible value. Plaintiff and Class Members have also suffered consequential out of pocket losses for procuring credit freeze or protection services, identity theft monitoring, and other expenses relating to identity theft losses or protective measures.

200.    As a result of Defendants' unlawful and unfair business practices in violation of the UCL, Plaintiff and Class Members are entitled to damages, injunctive relief, and reasonable attorneys' fees and costs.

## COUNT XII
## VIOLATIONS OF MISSOURI MERCHANDISING PRACTICES ACT, MO. REV. STAT. § 407.010 et seq.
## <u>(On Behalf of Plaintiff and the Missouri Class)</u>

201. The preceding factual statements and allegations are incorporated herein by reference.

202. RSMo. 407.020 prohibits the use of any "deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce"…

203. An "unfair practice" is defined by Missouri law, 15 CSR 60-8.020, as any practice which:

(A) Either-

1. Offends any public policy as it has been established by the Constitution, statutes or common law of this state, or by the Federal Trade Commission, or its interpretive decisions; or

2. Is unethical, oppressive or unscrupulous; and

(B) Presents a risk of, or causes, substantial injury to consumers.

204. An "unfair practice is defined by Missouri law,

15 CSR 60-8.020 (1)(B) provides that an "Unfair Practice in General" is

(1) An unfair practice is any practice which –

(A) Either –

1. <u>Offends any public policy</u> as it has been established by the Constitution, <u>statutes</u> or common law of this state, or by the Federal Trade Commission, or its interpretive decisions; or

51

2. Is unethical, oppressive or unscrupulous; and

(B) Presents a risk of, or causes, substantial injury to consumers.

15CSR 60-8.040 provides that an "Unfair Practice is:

An unfair practice for any person in connection with the advertisement or sale of merchandise to violate the duty of good faith in solicitation, negotiation and performance, or in any manner fail to act in good faith.

205. Plaintiff and Defendants are "persons" within the meaning of section 407.010 (5).

206. Merchandise is defined by the MMPA, to include the providing of "services" and, therefore, encompasses Healthcare services. Healthcare services are a good.

207. Efforts to maintain the privacy and confidentiality of medical records are part of the healthcare services associated with a good.

208. Maintenance of medical records are "merchandise" within the meaning of section 407.010(4).

209. Plaintiff's goods and services purchased from Defendants were for "personal, family or household purposes" within the meaning of the Missouri Merchandising Practices Missouri Revised Statutes.

210. As set forth herein, Defendants' acts, practices and conduct violate section 407.010(1) in that, among other things, Defendants have used and/or continues to use unfair practices, concealment, suppression and/or omission of material facts in connection with the advertising, marketing, and offering for sale of services associated with healthcare

services.  Such acts offend the public policy established by Missouri statute and constitute an "unfair practice" as that term is used in Missouri Revised Statute 407.020(1).

211.    Defendants' unfair, unlawful and deceptive acts, practices and conduct include: (1) representing to their patients that it will not disclose their sensitive personal health information to an unauthorized third party or parties; (2) failing to implement security measures such as securing the records in a safe place; and (3) failing to train personnel.

212.    Defendants' conduct also violates the enabling regulations for the MMPA because it: (1) offends public policy; (2) is unethical, oppressive and unscrupulous; (3) causes substantial injury to consumers; (4) it is not in good faith; (5) is unconscionable; and (6) is unlawful.  *See* Mo Code Regs. Ann tit. 15, Section 60-8.

213.    As a direct and proximate cause of Defendants' unfair and deceptive acts, Plaintiff has suffered damages in that he (1) paid more for medical record privacy protections than he otherwise would have, and (2) paid for medical record privacy protections that he did not receive.  In this respect, Plaintiff have not received the benefit of the bargain and have suffered an ascertainable loss.

214.    Plaintiff seeks actual damages for all monies paid to Defendants in violation of the MMPA.  In addition, Plaintiff seeks attorneys' fees.

## COUNT XIII
## DECLARATORY AND INJUNCTIVE RELIEF
### (On behalf of Plaintiffs and the Class)

215.    Plaintiffs incorporate the foregoing paragraphs as though fully set forth herein.

216. This Count is brought under the federal Declaratory Judgment Act, 28 U.S.C. § 2201.

217. As previously alleged, Plaintiffs and Class Members entered into an implied contract that required Defendants to provide adequate security for the PHI and PII they collected from Plaintiffs and Class Members.

218. Defendants owe a duty of care to Plaintiffs and Class Members requiring it to adequately secure their PHI and PII.

219. Defendants still possess Plaintiffs' and Class Members' PHI and PII.

220. Since the Data Breach, Defendants have announced few, if any, changes to its data security infrastructure, processes, or procedures to fix the vulnerabilities in its computer systems and/or security practices which permitted the Data Breach to occur and, thereby, prevent future attacks.

221. Defendants have not satisfied its contractual obligations and legal duties to Plaintiffs and Class Members, in fact, now that Defendants' insufficient data security is known to hackers, the PHI and PII in Defendants' possession is even more vulnerable to cyberattack.

222. Actual harm has arisen in the wake of the Data Breach regarding Defendants' contractual obligations and duties of care to provide security measures to Plaintiffs and Class Members. Further, Plaintiffs and Class Members are at risk of additional or further harm due to the exposure of their PHI and PII and Defendants' failure to address the security failings that led to such exposure.

223.   There is no reason to believe that Defendants' security measures are any more adequate now than they were before the Data Breach to meet Defendants' contractual obligations and legal duties.

224.   Plaintiffs, therefore, seek a declaration (1) that Defendants' existing security measures do not comply with its contractual obligations and duties of care to provide adequate security, and (2) that to comply with its contractual obligations and duties of care, Defendants must implement and maintain reasonable security measures, including, but not limited to:

a. Ordering that Defendants engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

b. Ordering that Defendants engage third-party security auditors and internal personnel to run automated security monitoring;

c. Ordering that Defendants audit, test, and train their security personnel regarding any new or modified procedures;

d. Ordering that Defendants segment data by, among other things, creating firewalls and access controls so that if one area of Defendants' systems is compromised, hackers cannot gain access to other portions of Defendants' systems;

e. Ordering that Defendants purge, delete, and destroy in a reasonably secure manner customer data not necessary for its provisions of services;

f. Ordering that Defendants conduct regular computer system scanning and security checks;

g. Ordering that Defendants routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

h. Ordering Defendants to meaningfully educate its current, former, and prospective customers about the threats they face as a result of the loss of their PHI and PII to third parties, as well as the steps they must take to protect themselves.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other members of the Class proposed in this Petition, respectfully request that the Court enter judgment in their favor and against Defendants, as follows:

A. Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiffs as Class Representatives and appointing Plaintiffs' counsel as Lead Counsel for the Class;

B. Declaring that Defendants' conduct was extreme and outrageous;

C. Declaring that Defendants breached their implied contract with Plaintiffs and Class Members;

D. Declaring that Defendants negligently disclosed Plaintiffs' and the Class Members PHI and PII;

E. Declaring that Defendants have invaded Plaintiffs' and Class Members' privacy;

F. Declaring that Defendants breached their implied contract with Plaintiffs and the Class Members;

G. Declaring that Defendants were negligent by negligently training and supervising its employees and agents;

H. Declaring that Defendants violated the Missouri Merchandising Practices Act;

I. Declaring that Defendants violated the California Medical Information Act;

J. Declaring that Defendants violated the California Consumer Privacy Act;

K. Ordering Defendants to pay actual damages to Plaintiffs and the Class Members;

L.      Ordering Defendants to properly disseminate individualized notice of the Breach to all Class Members;

M.      For an Order enjoining Defendants from continuing to engage in the unlawful business practices alleged herein;

N.      Ordering Defendants to pay attorneys' fees and litigation costs to Plaintiffs;

O.      Ordering Defendants to pay both pre- and post-judgment interest on any amounts awarded; and

P.      Ordering such other and further relief as may be just and proper.


Respectfully submitted,


Sharon J. Zinns
CA Bar No. 241476
ZINNS LAW, LLC
4243 Dunwoody Club Drive
Suite 104
Atlanta, Georgia 30350
(404) 882-9002
sharon@zinnslaw.com

AND

Maureen M. Brady      MO#55780
Lucy McShane           MO#57957
(Pro hac vice to be filed)
MCSHANE & BRADY, LLC
1656 Washington Street, Suite 120
Kansas City, MO 64108
Telephone:  (816) 888-8010
Facsimile:  (816) 332-6295
E-mail: mbrady@mcshanebradylaw.com
            lmcshane@mcshanebradylaw.com


**ATTORNEYS FOR PLAINTIFFS**