ADRMOP,RELATE

# U.S. District Court
## California Northern District (San Francisco)
## CIVIL DOCKET FOR CASE #: 3:23-cv-05579-EMC

Schutz et al v. 23andMe, Inc.

Assigned to: Judge Edward M Chen

Demand: $5,000,000

Relate Case Case: 3:23-cv-05147-EMC

Cause: 28:1332 Diversity-Contract Dispute

Date Filed: 10/30/2023

Jury Demand: Plaintiff

Nature of Suit: 190 Contract: Other

Jurisdiction: Diversity

**Plaintiff**

**Michael Schutz**                       represented by   **Laurence D. King**
                                                          Kaplan Fox & Kilsheimer LLP
                                                          1999 Harrison Street, Suite 1560
                                                          Oakland, CA 94612
                                                          (415) 772-4700
                                                          Fax: (415) 772-4707
                                                          Email: lking@kaplanfox.com
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Blair Elizabeth Reed**
                                                          Kaplan Fox & Kilsheimer LLP
                                                          1999 Harrison Street, Suite 1560
                                                          94612
                                                          Oakland, CA 94612
                                                          415-772-4700
                                                          Email: breed@kaplanfox.com
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Matthew B. George**
                                                          Kaplan Fox & Kilsheimer LLP
                                                          1999 Harrison Street, Suite 1560
                                                          Oakland, CA 94612
                                                          (415) 772-4700
                                                          Fax: (415) 772-4707
                                                          Email: mgeorge@kaplanfox.com
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Cody Vogel**                           represented by   **Laurence D. King**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Blair Elizabeth Reed**
                                                          (See above for address)

*ATTORNEY TO BE NOTICED*

**Matthew B. George**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Eileen Mullen**                    represented by   **Laurence D. King**
*individually and on behalf of all others*                    (See above for address)
*similarly situated*                    *LEAD ATTORNEY*
                    *ATTORNEY TO BE NOTICED*

                    **Blair Elizabeth Reed**
                    (See above for address)
                    *ATTORNEY TO BE NOTICED*

                    **Matthew B. George**
                    (See above for address)
                    *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**23andMe, Inc.**

| Date Filed | # | Docket Text |
|---|---|---|
| 10/30/2023 | 1 | COMPLAINT against 23andMe, Inc. ( Filing fee $ 402, receipt number ACANDC-18785884.). Filed by Michael Schutz, Eileen Mullen, Cody Vogel. (Attachments: # 1 Civil Cover Sheet)(King, Laurence) (Filed on 10/30/2023) (Entered: 10/30/2023) |
| 10/30/2023 | 2 | Proposed Summons. (King, Laurence) (Filed on 10/30/2023) (Entered: 10/30/2023) |
| 10/30/2023 | 3 | Case assigned to Magistrate Judge Donna M. Ryu. <br><br>Counsel for plaintiff or the removing party is responsible for serving the Complaint or Notice of Removal, Summons and the assigned judge's standing orders and all other new case documents upon the opposing parties. For information, visit *E-Filing A New Civil Case* at http://cand.uscourts.gov/ecf/caseopening. <br><br>Standing orders can be downloaded from the court's web page at www.cand.uscourts.gov/judges. Upon receipt, the summons will be issued and returned electronically. A scheduling order will be sent by Notice of Electronic Filing (NEF) within two business days. Consent/Declination due by 11/13/2023. (ark, COURT STAFF) (Filed on 10/30/2023) (Entered: 10/30/2023) |
| 10/31/2023 | 4 | **Initial Case Management Scheduling Order with ADR Deadlines: Case Management Statement due by 1/24/2024. Initial Case Management Conference set for 1/31/2024 01:30 PM. (mcl, COURT STAFF) (Filed on 10/31/2023) (Entered: 10/31/2023)** |
| 10/31/2023 | 5 | Summons Issued as to 23andMe, Inc. (mcl, COURT STAFF) (Filed on 10/31/2023) (Entered: 10/31/2023) |
| 11/02/2023 | 6 | WAIVER OF SERVICE Returned Executed filed by Michael Schutz, Eileen Mullen, Cody Vogel. Service waived by 23andMe, Inc. waiver sent on 11/2/2023, answer due 1/2/2024. |

| | | |
|---|---|---|
| | | (George, Matthew) (Filed on 11/2/2023) (Entered: 11/02/2023) |
| 11/06/2023 | 7 | NOTICE by Eileen Mullen, Michael Schutz, Cody Vogel *(Notice of Filing of Administrative Motion to Consider Whether Cases Should be Related)* (Attachments: # 1 Administrative Motion to Consider Whether Cases Should be Related, # 2 Declaration of Laurence D. King, # 3 Proposed Order, # 4 Certificate/Proof of Service)(King, Laurence) (Filed on 11/6/2023) (Entered: 11/06/2023) |
| 11/14/2023 | 8 | CLERK'S NOTICE TO PLAINTIFFS Re: Consent or Declination: Plaintiffs shall file a consent or declination to proceed before a magistrate judge. Note that any party is free to withhold consent to proceed before a magistrate judge without adverse substantive consequences. The forms are available at: http://cand.uscourts.gov/civilforms. Consent/Declination due by 11/28/2023. (ig, COURT STAFF) (Filed on 11/14/2023) (Entered: 11/14/2023) |
| 11/14/2023 | 9 | CONSENT/DECLINATION to Proceed Before a US Magistrate Judge by Eileen Mullen, Michael Schutz, Cody Vogel.. (George, Matthew) (Filed on 11/14/2023) (Entered: 11/14/2023) |
| 11/15/2023 | 10 | CLERK'S NOTICE OF IMPENDING REASSIGNMENT TO A U.S. DISTRICT COURT JUDGE: The Clerk of this Court will now randomly reassign this case to a District Judge because either (1) a party has not consented to the jurisdiction of a Magistrate Judge, or (2) time is of the essence in deciding a pending judicial action for which the necessary consents to Magistrate Judge jurisdiction have not been secured. You will be informed by separate notice of the district judge to whom this case is reassigned.<br><br>ALL HEARING DATES PRESENTLY SCHEDULED BEFORE THE CURRENT MAGISTRATE JUDGE ARE VACATED AND SHOULD BE RE-NOTICED FOR HEARING BEFORE THE JUDGE TO WHOM THIS CASE IS REASSIGNED.<br><br>*This is a text only docket entry; there is no document associated with this notice.* (ig, COURT STAFF) (Filed on 11/15/2023) (Entered: 11/15/2023) |
| 11/16/2023 | 11 | **ORDER REASSIGNING CASE. Case reassigned using a proportionate, random, and blind system pursuant to General Order No. 44 to Judge Charles R. Breyer for all further proceedings. Chief Magistrate Judge Donna M. Ryu no longer assigned to case. Notice: The assigned judge participates in the Cameras in the Courtroom Pilot Project. See General Order No. 65 and http://cand.uscourts.gov/cameras. Signed by The Clerk on 11/16/2023. (Attachments: # 1 Notice of Eligibility for Video Recording) (bar, COURT STAFF) (Filed on 11/16/2023) (Entered: 11/16/2023)** |
| 11/20/2023 | 12 | CLERK'S NOTICE: A Joint Case Management Statement due by 2/2/2024. Initial Case Management Conference set for 2/9/2024 at 8:30 AM in San Francisco, Courtroom 06, 17th Floor. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (ls, COURT STAFF) (Filed on 11/20/2023) (Entered: 11/20/2023) |
| 11/20/2023 | 13 | **ORDER GRANTING ADMINISTRATIVE MOTION TO CONSIDER WHETHER CASES SHOULD BE RELATED PURSUANT TO CIVIL LOCAL RULES 3-12 AND 7-11. Signed by Judge Edward M. Chen on 11/20/2023. (vla, COURT STAFF) (Filed on 11/20/2023) (Entered: 11/20/2023)** |
| 11/20/2023 | 14 | **ORDER REASSIGNING CASE. Case reassigned to Judge Edward M Chen for all further proceedings. Judge Charles R. Breyer no longer assigned to case, Notice: The assigned judge participates in the Cameras in the Courtroom Pilot Project. See General Order No. 65 and http://cand.uscourts.gov/cameras.. Signed by Clerk on** |

| | | |
|---|---|---|
| | | **11/20/2023. (Attachments: # 1 Notice of Eligibility for Video Recording)(ark, COURT STAFF) (Filed on 11/20/2023) (Entered: 11/20/2023)** |
| 11/30/2023 | 15 | **ORDER RELATING CASES. Signed by Judge Edward M. Chen on 11/30/2023. (vla, COURT STAFF) (Filed on 11/30/2023) (Entered: 11/30/2023)** |

<table>
<tr><td colspan="4" align="center"><strong>PACER Service Center</strong></td></tr>
<tr><td colspan="4" align="center"><strong>Transaction Receipt</strong></td></tr>
<tr><td colspan="4" align="center">12/21/2023 08:09:16</td></tr>
<tr><td><strong>PACER Login:</strong></td><td>lindsaykschuyler</td><td><strong>Client Code:</strong></td><td>178849.010700</td></tr>
<tr><td><strong>Description:</strong></td><td>Docket Report</td><td><strong>Search Criteria:</strong></td><td>3:23-cv-05579-EMC</td></tr>
<tr><td><strong>Billable Pages:</strong></td><td>3</td><td><strong>Cost:</strong></td><td>0.30</td></tr>
</table>

**KAPLAN FOX & KILSHEIMER LLP**
Laurence D. King (SBN 206423)
Matthew B. George (SBN 239322)
Blair E. Reed (SBN 316791)
1999 Harrison Street, Suite 1560
Oakland, CA 94612
Telephone: 415-772-4700
Facsimile:  415-772-4707
Email: *lking@kaplanfox.com*
          *mgeorge@kaplanfox.com*
          *breed@kaplanfox.com*

**BARNOW AND ASSOCIATES, P.C.**
Ben Barnow (*pro hac vice forthcoming*)
Anthony Parkhill (*pro hac vice forthcoming*)
205 W. Randolph Street, Suite 1630
Chicago, IL 60606
Telephone: 312-621-2000
Email: *b.barnow@barnowlaw.com*
          *aparkhill@barnowlaw.com*

*Attorneys for Plaintiffs and the Putative Class*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL SCHUTZ, CODY VOGEL, and EILEEN MULLEN, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>23ANDME, INC.,<br><br>Defendant. | Case No. 3:23-cv-05579<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Michael Schutz, Cody Vogel, and Eileen Mullen ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through undersigned counsel, bring this class action against Defendant 23andMe, Inc. ("23andMe" or "Defendant") and complain and allege upon personal knowledge as to themselves and upon information and belief as to all other matters.

## **INTRODUCTION**

1.      Plaintiffs bring this action against 23andMe for its failure to secure and safeguard their and approximately 1.5 million similarly situated individuals' personally identifiable information ("PII") and personal genetic information ("PGI"), including, but not limited to, first and last name, sex, and genetic and ancestry information.

2.      23andMe provides a direct-to-consumer genetic testing service, wherein customers provide a saliva sample to 23andMe which is then analyzed in a laboratory to determine customers' genetic information, including ancestry and certain health predispositions.

3.      On or about October 6, 2023, 23andMe reported that certain customer information was compiled and stolen from 23andMe by unauthorized persons (the "Data Breach"). Plaintiffs and Class members are customers of 23andMe whose sensitive PII/PGI was stolen in the Data Breach.

4.      During the Data Breach, and due to 23andMe's data security and privacy shortcomings, unauthorized persons were able to gain access to and remove the PII/PGI of Plaintiffs and Class members.

5.      23andMe owed a duty to Plaintiffs and Class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII/PGI against unauthorized access and disclosure. 23andMe breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect their PII/PGI from unauthorized access and disclosure.

6.      As a result of 23andMe's inadequate security measures and breach of its duties and obligations, the Data Breach occurred, and Plaintiffs' and Class members' PII/PGI was accessed and disclosed. This action seeks to remedy these failings and their consequences. Plaintiffs bring this action on behalf of themselves and all 23andMe customers whose PII/PGI was compromised as a result of the Data Breach.

7.      Plaintiffs, on behalf of themselves and all other Class members, assert claims for negligence, negligence per se, breach of implied contract, unjust enrichment, violations of the California Consumer Protection Act, Cal. Civ. Code §§ 1798.100 *et seq.*, violations of the California Unfair Competition Law, Cal. Civ. Code. §§ 1798.100 *et seq.*, violations of Oregon's Genetic Privacy Law, Or. Rev. Stat. §§ 192.531 *et seq.*, violations of the Illinois Genetic Information Privacy Act, 410 ILCS 513/1 *et seq.*, and seek declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

## PARTIES

***Plaintiff Michael Schutz***

8.      Plaintiff Michael Schutz is a citizen of the State of California.

9.      Plaintiff Schutz purchased 23andMe's Health + Ancestry Service in or about 2021.

10.     In connection with using 23andMe's services, Plaintiff Schutz provided a DNA sample to 23andMe and authorized 23andMe to analyze that sample. Plaintiff Schutz also provided other sensitive personally identifiable information to 23andMe in connection with the same.

11.     Plaintiff Schutz used 23andMe's DNA Relatives feature.

12.     Based on representations made by 23andMe, Plaintiff Schutz believed that 23andMe had implemented and maintained reasonable security and practices to protect his PII/PGI. With this belief in mind, Plaintiff Schutz provided his PII/PGI to 23andMe in connection with receiving genetic testing services provided by 23andMe.

13.     At all relevant times, 23andMe stored and maintained Plaintiff Schutz's PII/PGI on its network systems.

14.     Plaintiff Schutz takes great care to protect his PII/PGI. Had he known that 23andMe does not adequately protect the PII/PGI in its possession, he would not have obtained genetic testing services from 23andMe or agreed to entrust it with his PII/PGI.

15.     Plaintiff Schutz received an email from 23andMe notifying him that his PII/PGI was affected in the Data Breach.

16.     As a direct result of the Data Breach, Plaintiff Schutz has suffered injury and damages including, *inter alia*, a substantial and imminent risk of identity theft and medical identity theft; the

wrongful disclosure and loss of confidentiality of his highly sensitive PII/PGI; deprivation of the value of his PII/PGI; and overpayment for services that did not include adequate data security.

***Plaintiff Cody Vogel***

17.     Plaintiff Cody Vogel is a citizen of the State of Oregon.

18.     Plaintiff Vogel purchased 23andMe's Ancestry Service in or about December 2017.

19.     In connection with using 23andMe's services, Plaintiff Vogel provided a DNA sample to 23andMe and authorized 23andMe to analyze that sample. Plaintiff Vogel also provided other sensitive personally identifiable information to 23andMe in connection with the same.

20.     Plaintiff Vogel used 23andMe's DNA Relatives feature.

21.     Based on representations made by 23andMe, Plaintiff Vogel believed that 23andMe had implemented and maintained reasonable security and practices to protect his PII/PGI. With this belief in mind, Plaintiff Vogel provided his PII/PGI to 23andMe in connection with receiving genetic testing services provided by 23andMe.

22.     At all relevant times, 23andMe stored and maintained Plaintiff Vogel's PII/PGI on its network systems.

23.     Plaintiff Vogel takes great care to protect his PII/PGI. Had he known that 23andMe does not adequately protect the PII/PGI in its possession, he would not have obtained genetic testing services from 23andMe or agreed to entrust it with his PII/PGI.

24.     Plaintiff Vogel received an email from 23andMe notifying him that his PII/PGI was affected in the Data Breach.

25.     As a direct result of the Data Breach, Plaintiff Vogel has suffered injury and damages including, *inter alia*, a substantial and imminent risk of identity theft and medical identity theft; the wrongful disclosure and loss of confidentiality of his highly sensitive PII/PGI; deprivation of the value of his PII/PGI; and overpayment for services that did not include adequate data security.

***Plaintiff Eileen Mullen***

26.     Plaintiff Eileen Mullen is a citizen of the State of Illinois.

27.     Plaintiff Mullen purchased 23andMe's Health + Ancestry Service in or about 2017.

28.     In connection with using 23andMe's services, Plaintiff Mullen provided a DNA sample to 23andMe and authorized 23andMe to analyze that sample. Plaintiff Mullen also provided other sensitive personally identifiable information to 23andMe in connection with the same.

29.     Plaintiff Mullen used 23andMe's DNA Relatives feature.

30.     Based on representations made by 23andMe, Plaintiff Mullen believed that 23andMe had implemented and maintained reasonable security and practices to protect her PII/PGI. With this belief in mind, Plaintiff Mullen provided her PII/PGI to 23andMe in connection with receiving genetic testing services provided by 23andMe.

31.     At all relevant times, 23andMe stored and maintained Plaintiff Mullen's PII/PGI on its network systems.

32.     Plaintiff Mullen takes great care to protect her PII/PGI, including using a VPN to help protect her information. Had she known that 23andMe does not adequately protect the PII/PGI in its possession, she would not have obtained genetic testing services from 23andMe or agreed to entrust it with her PII/PGI.

33.     Plaintiff Mullen received an email from 23andMe notifying her that her PII/PGI was affected in the Data Breach.

34.     As a direct result of the Data Breach, Plaintiff Mullen has suffered injury and damages including, *inter alia*, a substantial and imminent risk of identity theft and medical identity theft; the wrongful disclosure and loss of confidentiality of her highly sensitive PII/PGI; deprivation of the value of her PII/PGI; and overpayment for services that did not include adequate data security.

***Defendant 23andMe, Inc.***

35.     Defendant 23andMe, Inc., is a Delaware corporation with its principal place of business located at 349 Oyster Point Boulevard, South San Francisco, California 94080.

## JURISDICTION AND VENUE

36.     The Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332(d)(2), because (a) there are 100 or more Class members, (b) at least one Class member is a citizen of a state that is diverse from Defendants' citizenship, and (c) the matter in controversy exceeds

$5,000,000, exclusive of interest and costs. Further, greater than two-thirds of the Class Members reside in states other than the states in which Defendants are citizens.

37.     The Court has personal jurisdiction over Defendant 23andMe, Inc. because it has its principal place of business in California and transacts significant business in California.

38.     Venue properly lies in this District because, *inter alia*, Defendant 23andMe, Inc.'s principal place of business is located in this District, Defendant transacts substantial business in this District, and a substantial part of the conduct giving rise to Plaintiffs' claims occurred in this District.

## **FACTUAL ALLEGATIONS**

### ***Overview of 23andMe***

39.     23andMe is a biotechnology company whose mission is "help people access, understand, and benefit from the human genome."[1] 23andMe "pioneered direct-to-consumer genetic testing, giving consumers unique, personalized information about their genetic health risks, ancestry, and traits."[2] 23andMe had over 14.1 million customers as of March 31, 2023.[3]

40.     23andMe sells kits with instructions and materials for customers to collect a saliva sample from themselves, which they send to 23andMe for analysis.[4] The saliva contains DNA, which 23andMe's laboratory extracts and processes "on a genotyping chip that reads hundreds of thousands of locations in [a customer's] genome."[5] The genetic data is analyzed and a personalized report is generated for the customer.[6] 23andMe's analysis focuses "on the variations that are known to be associated with important health conditions, ancestry and traits."[7]

---

[1] 23andMe Holding Co., Annual Report (Form 10-K), at 1 (May 25, 2023), https://www.sec.gov/ix?doc=/Archives/edgar/data/1804591/000095017023024232/me-20230331.htm#item_1_business [hereinafter "Form 10-K"].

[2] *Id.*

[3] *Id.* at 69.

[4] *See Still have questions about how it works?*, 23ANDME, https://www.23andme.com/howitworks/ (last accessed Oct. 26, 2023).

[5] *Id.*

[6] *About Us*, 23ANDME, https://www.23andme.com/genetic-science/ (last accessed Oct. 26, 2023).

[7] *Still have questions about how it works?*, *supra* note 4.

41.     23andMe sells three different services to its customers: Ancestry Service, Health + Ancestry Service and 23andMe+ Membership.[8] Its Ancestry Service "provides customers information about their genetic ancestral origins and how genetics may influence over 30 traits, such as physical features, sense perceptions, reactions to external stimuli and other traits."[9] 23andMe's "Ancestry Reports and features give [customers] the most comprehensive ancestry breakdown on the market, with up to 80+ personalized reports, coverage of more than 2000 geographic regions, and ancestry percentages to the 0.1%."[10]

42.     23andMe's Health + Ancestry service "builds upon [its] Ancestry Service to also provide reports relating to a customer's health predisposition (including certain cancers and other genetic health risks such as late-onset Alzheimer's disease), carrier status (including for cystic fibrosis, sickle cell anemia and hereditary hearing loss), and wellness (including for deep sleep, lactose intolerance and genetic weight)."[11]

43.     23andMe also offers a 23andMe+ premium subscription service, which "offers customers the Health + Ancestry Service plus pharmacogenetic reports, a hereditary prostate cancer genetic health risk report (HOXB13-related), over 30 personalized genetic health predisposition reports based on our research, such as migraine, depression, asthma, coronary artery disease, and lupus, and advanced ancestry and health features."[12]

44.     23andMe's customers can participate in its "DNA Relatives" feature, which allows them to "find and connect with genetic relatives and learn more about [their] family."[13] The feature works by "comparing [customers'] DNA with the DNA of other 23andMe members who are participating in the

---

[8] *Id.*

[9] Form 10-K, *supra* note 1, at 2.

[10] *Understanding Ancestry Features*, 23ANDME, https://www.23andme.com/topics/ancestry/ (last accessed Oct. 26, 2023).

[11] Form 10-K, *supra* note 1, at 2.

[12] *Id.*

[13] *DNA Relatives: The Genetic Relative Basics*, 23ANDME, https://customercare.23andme.com/hc/en-us/articles/115004659068-DNA-Relatives-The-Genetic-Relative-Basics (last accessed Oct. 26, 2023).

DNA Relatives feature."[14] By comparing similarities in the DNA, 23andMe is able to "estimate the genealogical relationship between two individuals."[15]

45.     23andMe states that by "finding groups of related people and either knowing how one person in the group is related to you or by sharing information about your family with each other, you may be able to discover how your DNA Relatives matches are connected to you and others, and even potentially identify your recent common ancestor."[16] According to 23andMe, "People with European or Ashkenazi ancestry typically have many matches."[17]

46.     Depending on a user's settings, a DNA Relatives participant may be able to view extensive information including "Your DNA Relatives display name"; "How recently you logged into your account"; "Your relationship labels (masculine, feminine, neutral)"; "Your predicted relationship and percentage of DNA shared with your matches"; "Your ancestry reports and matching DNA segments"; "Your location"; "Ancestor birth locations and family names"; "Your profile picture (optional)"; "Your birth year (optional)"; "A link to your Family Tree"; and "Anything you have added to the 'Introduce yourself!' Section."

47.     On its website, 23andMe acknowledges that "[w]hen you explore your DNA with 23andMe, you entrust us with important personal information."[18] 23andMe claims that "since day one, protecting your privacy has been our number one priority. We're committed to providing you with a safe place where you can learn about your DNA knowing your privacy is protected."[19]

48.     23andMe further states, "Your genetic information deserves the highest level of security, because without security, you can't have privacy."[20]

---

[14] *Id.*

[15] *DNA Relatives: Detecting Relatives and Predicting Relationships*, 23ANDME, https://customercare.23andme.com/hc/en-us/articles/212170958 (last accessed Oct. 26, 2023).

[16] *DNA Relatives In Common Report Feature*, 23ANDME, https://customercare.23andme.com/hc/en-us/articles/221689668-DNA-Relatives-In-Common-Report-Feature- (last accessed Oct. 26, 2023).

[17] *DNA Relatives: The Genetic Relative Basics*, 23ANDME, https://customercare.23andme.com/hc/en-us/articles/115004659068-DNA-Relatives-The-Genetic-Relative-Basics (last accessed Oct. 26, 2023).

[18] *Privacy*, 23ANDME, https://www.23andme.com/privacy/ (last accessed Oct. 26, 2023).

[19] *Id.*

[20] *Id.*

49.     23andMe asserts it "give[s] you full control to decide how your information is used and with whom it is shared."[21] It also claims to "encrypt all sensitive information and conduct regular assessments to identify security vulnerabilities and threats."[22] It states that it "encrypt[s] all sensitive information, both when it is stored and when it is being transmitted, so that we make it difficult for potential hackers to gain access."[23]

50.     23andMe promises, "You decide when and with whom you share your 23andMe information."[24]

51.     23andMe also promises that "your personally identifiable information (such as your name and email) is stored in in a separate database from your genetic data so that no one but you (when you use your username and password) can connect the dots between the two."[25]

52.     23andMe's privacy webpage includes a quote from Jacquie Haggarty, 23andMe's "Vice President, General Counsel and Privacy Officer": "We believe it's our responsibility to provide a safe place for people to explore their DNA. Our commitment to privacy is built on a foundation of transparency and choice — our customers know that they are always in control of their data."[26]

53.     In its Privacy Statement, 23andMe claims to "implement physical, technical, and administrative measures aimed at preventing unauthorized access to or disclosure of your Personal Information."[27] It promises "Our team regularly reviews and improves our security practices to help ensure the integrity of our systems and your Personal Information."[28]

### The Data Breach

54.     On or about October 6, 2023, 23andMe announced that customer profile information for some customers was accessed and obtained by unauthorized persons, including information about those

---

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] *What You Should Know About Privacy at 23andMe*, 23ANDME, https://www.23andme.com/legal/privacy/ (last accessed Oct. 26, 2023).

[27] *Privacy Statement*, 23ANDME (Oct. 4, 2023), https://www.23andme.com/legal/privacy/full-version/.

[28] *Id.*

customers' DNA Relatives profiles.[29] 23andMe has yet to confirm what information was affected, but reports indicate the information exposed includes at least "full names, usernames, profile photos, sex, date of birth, genetic ancestry results, and geographical location."[30]

55.     Hackers claiming to be involved in the Data Breach have begun to advertise millions of pieces of data stolen from 23andMe on an online forum often used to advertise leaked data.[31] According to reports, on October 4, 2023, the hackers began to sell 23andMe profile information for $1–$10 each, depending on the amount purchased.[32] A portion of the data was published with claims it "contained 1 million data points exclusively about Ashkenazi Jews."[33]

56.     23andMe claims "threat actors were able to access certain accounts in instances where users recycled login credentials – that is, usernames and passwords that were used on 23andMe.com were the same as those used on other websites that have been previously hacked."[34] This access allowed the hackers to "scrape" data from other accounts using 23andMe's DNA Relatives feature.[35]

### 23andMe Knew that Criminals Target PII/PGI

57.     At all relevant times, 23andMe knew or should have known that the highly sensitive PII/PGI it collected and stored was a target for malicious actors.

58.     According to documents filed with the Security and Exchange Commission, 23andMe claimed to be "engaged in ongoing privacy compliance and oversight efforts, including in connection

---

[29] *Addressing Data Security Concerns*, 23ANDME (Oct. 6, 2023), https://blog.23andme.com/articles/addressing-data-security-concerns.

[30] Bill Toulas, *Genetics firm 23andMe says user data stolen in credential stuffing attack*, BLEEPINGCOMPUTER (Oct. 6, 2023 11:48 AM), https://www.bleepingcomputer.com/news/security/genetics-firm-23andme-says-user-data-stolen-in-credential-stuffing-attack/.

[31] Raphael Satter, *Hackers Advertise sale of 23andMe Data on Leaked Data Forum*, REUTERS (Oct. 6, 2023 4:28 PM), https://www.reuters.com/technology/hackers-advertise-sale-23andme-data-leaked-data-forum-2023-10-06/.

[32] *See* Lily Hay Newman, *23andMe User Data Stolen in Targeted Attack on Ashkenazi Jews*, WIRED (Oct. 6, 2023 5:53 PM), https://www.wired.com/story/23andme-credential-stuffing-data-stolen/; Toulas, *supra* note 30.

[33] Newman, *supra* note 32.

[34] *Addressing Data Security Concerns*, *supra* note 29.

[35] *See* Newman, *supra* note 32.

with the requirements of numerous local, state, federal and international laws, rules, and regulations relating to the privacy and security of directly or indirectly identifiable personal information."[36]

59. 23andMe admits that it is subject to data protection laws including "the California Consumer Privacy Act, as amended by the California Privacy Rights Act (collectively, the "CCPA"), the California Genetic Information Privacy Act ("GIPA"), California Confidentiality of Medical Information Act ("CMIA"), Section 5 of the Federal Trade Commission Act ("FTC Act"), the Telephone Consumer Protection Act of 1991 ("TCPA") and, in the event of a data breach, various data breach laws across the 50 states and territories."[37]

60. 23andMe is aware of the risk that it would be targeted in a data breach. For example, 23andMe acknowledges that it would be "required to provide notice to affected customers whose personal information has been disclosed as a result of a data breach."[38] Indeed, it further acknowledged it "will face legal, reputational, and financial risks if we fail to protect our customer and patient data from security breaches or cyberattacks."[39]

61. 23andMe admits:

> Security breaches, employee malfeasance, or human or technological error could lead to potential unauthorized disclosure of our customers' and patients' personal information. Even the perception that the privacy of personal information is not satisfactorily protected or does not meet regulatory requirements could inhibit sales of our solutions and any failure to comply with such laws and regulations could lead to significant fines, penalties or other liabilities.

> Increased global IT security threats and more sophisticated and targeted computer crime pose a risk to the security of our systems and networks and the confidentiality, availability, and integrity of our data. There have been several recent, highly publicized cases in which organizations of various types and sizes have reported the unauthorized disclosure of customer or other confidential information, as well as cyberattacks involving the dissemination, theft, and destruction of corporate information, IP, cash, or other valuable assets.[40]

---

[36] Form 10-K, *supra* note 1, at 13.

[37] *Id.*

[38] *Id.* at 14.

[39] *Id.* at 29.

[40] *Id.* at 50.

62.     23andMe was fully aware of the risk of a "security breach or privacy violation that leads to unauthorized disclosure or loss of . . . or otherwise impacts the confidentiality, security, or integrity of, sensitive, confidential, or proprietary information we or our third-party service providers maintain or otherwise process. . . . Additionally, a security compromise of our information systems . . . that results in confidential information being accessed by unauthorized or improper persons could harm our reputation and expose us to customer and patient attrition, and claims brought by our customers, patients, or others for breaching contractual confidentiality and security provisions or data protection laws."[41]

63.     Despite such knowledge, 23andMe failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiffs' and Class members' PII/PGI from cyberattacks that 23andMe should have anticipated and guarded against.

64.     It is well known amongst companies that store sensitive personally identifying information and genetic information that sensitive information is valuable and frequently targeted by criminals. In a recent article, Business Insider noted that "[d]ata breaches are on the rise for all kinds of businesses, including retailers . . . . Many of them were caused by flaws in . . . systems either online or in stores." [42]

65.     PII is a valuable property right.[43] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[44] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[45] PII is so valuable to identity thieves that once

---

[41] *Id.* at 51.

[42] Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, BUS. INSIDER (Nov. 19, 2019, 8:05 AM), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.

[43] *See* Marc van Lieshout, *The Value of Personal Data*, 457 INT'L FED. FOR INFO. PROCESSING 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible…"), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.

[44] OECD, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD ILIBRARY (April 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[45] IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, IAB.COM (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

it has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

66. As a result of the real and significant value of this material, identity thieves and other cyber criminals have openly posted credit card numbers, SSNs, PII/PGI, and other sensitive information directly on various Internet websites making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be readily aggregated and become more valuable to thieves and more damaging to victims.

67. Consumers place a high value on the privacy of their data, as they should. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[46]

68. All- inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, SSNs, and bank account information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[47] According to a report released by the Federal Bureau of Investigation's ("FBI") Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[48]

69. Criminals can use stolen PII/PGI to extort a financial payment by "leveraging details specific to a disease or terminal illness."[49] Quoting Carbon Black's Chief Cybersecurity Officer, one recent article explained: "Traditional criminals understand the power of coercion and extortion . . . By

---

[46] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior, An Experimental Study*, 22(2) INFO. SYS. RSCH. 254 (June 2011) https://www.jstor.org/stable/23015560?seq=1.

[47] *See* SC Staff, *Health Insurance Credentials Fetch High Prices in the Online Black Market*, SC MAG. (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-credentials-fetch-high-prices-in-the-online-black-market.

[48] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain* (April 8, 2014), https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf.

[49] Andrew Steager, *What Happens to Stolen Healthcare Data*, HEALTHTECH MAG. (Oct. 20, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon.

having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[50]

70.    Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII/PGI has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

### *Theft of PII/PGI Has Grave and Lasting Consequences for Victims*

71.    Theft of PII/PGI can have serious consequences for the victim. The FTC warns consumers that identity thieves use PII to receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[51][52]

72.    Experian, one of the largest credit reporting companies in the world, warns consumers that "[i]dentity thieves can profit off your personal information" by, among other things, selling the information, taking over accounts, using accounts without permission, applying for new accounts, obtaining medical procedures, filing a tax return, and applying for government benefits.[53]

73.    With access to an individual's PII/PGI, criminals can do more than just empty a victim's bank account—they can also commit all manner of fraud, including: obtaining a driver's license or official identification card in the victim's name but with the thief's picture; using the victim's name and SSN to obtain government benefits; or, filing a fraudulent tax return using the victim's information. In addition, identity thieves may even give the victim's personal information to police during an arrest.[54]

---

[50] Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk*, *supra* note 48.

[51] *See* Federal Trade Commission, *What to Know About Identity Theft*, FED. TRADE COMM'N CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed Oct. 26, 2023).

[52] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3(g).

[53] *See* Louis DeNicola, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN (May 21, 2023), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

[54] *See* Federal Trade Commission, *Warning Signs of Identity Theft*, IDENTITYTHEFT.GOV https://www.identitytheft.gov/Warning-Signs-of-Identity-Theft (last accessed Oct. 26, 2023).

74.     There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. For example, on average it takes approximately three months for consumers to discover their identity has been stolen and used, but it takes some individuals up to three years to learn that information.[55]

75.     Genetic information is highly sensitive because it "can communicate sensitive information about an individual, including a person's ancestry, familial relationships, presence at a crime scene, medical risk, and perhaps even behavioral tendencies."[56] It takes less than one hundred individual gene variations to identify and individual, making identifying someone based on genetic information "relatively trivial."[57] Indeed, genetic information combined with demographic information such as state of residence and age can be linked to individuals through data from information brokers.[58] Scientists have long warned of the possibility that even "coded" or "anonymized" DNA could be readily linked to individuals as genetic databases become more popular.[59] Genetic information such as that affected in the Data Breach or possessed by 23andMe "can now be categorized with respect to disease-related genes and linked to clinical, family, and social data."[60]

76.     It is within this context that Plaintiffs and Class members must now live with the knowledge that their PII/PGI is forever in cyberspace and was taken by and in the possession of people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black-market.

### Damages Sustained by Plaintiffs and Class Members

77.     Plaintiffs and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft—risk which justifies or

---

[55] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. OF SYSTEMICS, CYBERNETICS AND INFORMATICS 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

[56] Jessica L. Roberts, *Progressive Genetic Ownership*, 93 NOTRE DAME L. REV. 1105, 1122 (2018).

[57] Ellen W. Clayton, et al., *A Systematic Literature Review of Individuals' Perspectives on Privacy and Genetic Information in the United States*, PLoS ONE 13(10), 15 (2018), https://journals.plos.org/plosone/article/file?id=10.1371/journal.pone.0204417&type=printable.

[58] *Id.*

[59] Amy L. McGuire & Richard A. Gibbs, *No Longer De-Identified*, 312 SCIENCE 370, 370 (2006).

[60] William W. Lowrance & Francis S. Collins, *Identifiability in Genomic Research*, 317 SCIENCE MAG. 600, 600 (2007).

necessitates expenditures for protective and remedial services, for which they are entitled to compensation; (ii) the compromise, publication, and theft of their PII/PGI; (iii) breach of the confidentiality of their PII/PGI; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PGI; (v) deprivation of the value of their PII/PGI, for which there is a well-established national and international market; (vi) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (vii) the continued risk to their PII/PGI which remains in Defendants' possession; (viii) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PGI compromised as a result of the Data Breach; (ix) overpayment for services that were received without adequate data security; and (x) increased risk of targeted harassment.

## CLASS ALLEGATIONS

78.     This action is brought and may be properly maintained as a class action pursuant to Federal Rule of Civil Procedure 23.

79.     Plaintiffs bring this action on behalf of themselves and all members of the following National Class of similarly situated persons:

> All United States citizens whose PII/PGI was compromised by or disclosed to unauthorized persons in the Data Breach, including all who were sent a notice of the Data Breach.

80.     Plaintiffs also bring this action on behalf of the following subclasses:

> All citizens of California whose PII/PGI was compromised by or disclosed to unauthorized persons in the Data Breach, including all who were sent a notice of the Data Breach (the "California Subclass").

> All citizens of Oregon whose PII/PGI was compromised by or disclosed to unauthorized persons in the Data Breach, including all who were sent a notice of the Data Breach (the "Oregon Subclass").

> All citizens of Illinois whose PII/PGI was compromised by or disclosed to unauthorized persons in the Data Breach, including all who were sent a notice of the Data Breach (the "Illinois Subclass").

81.     Excluded from the Class is 23andMe, Inc., and its affiliates, parents, subsidiaries, officers, agents, and directors, as well as the judge(s) presiding over this matter and the clerks of said judge(s).

82.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

83.     The members of the Class are so numerous that joinder of each of the Class members in a single proceeding would be impracticable. While 23andMe has not confirmed the exact number of persons affected, reports indicate millions of people were impacted by the Data Breach.[61]

84.     Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

        a.      Whether 23andMe had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiffs' and Class members' PII/PGI from unauthorized access and disclosure;

        b.      Whether 23andMe had duties not to disclose the PII/PGI of Plaintiffs and Class members to unauthorized third parties;

        c.      Whether 23andMe failed to exercise reasonable care to secure and safeguard Plaintiffs' and Class members' PII/PGI;

        d.      Whether an implied contract existed between Class members and 23andMe, providing that 23andMe would implement and maintain reasonable security measures to protect and secure Class members' PII/PGI from unauthorized access and disclosure;

        e.      Whether 23andMe engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII/PGI of Plaintiffs and Class members; and

        f.      Whether Plaintiffs and Class members are entitled to damages and the measure of such damages and relief.

---

[61] *See, e.g.*, Lakshmi Varanasi, *User Data Stolen From Genetic Testing Giant 23andMe is Now For Sale on the Dark Web*, BUS. INSIDER (Oct. 7, 2023 3:35 PM), https://www.businessinsider.com/23andme-data-stolen-hacked-sold-dark-web-2023-10; Zeba Siddiqui, *23andMe Notifies Customers of Data Breach into its 'DNA Relatives' Feature*, REUTERS (Oct. 25, 2023 4:21 PM), https://www.reuters.com/world/us/23andme-notifies-customers-data-breach-into-its-dna-relatives-feature-2023-10-24/.

85.     23andMe engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs, on behalf of themselves and all other Class members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

86.     Plaintiffs' claims are typical of the claims of the Class. Plaintiffs, like all proposed members of the Class, had their PII/PGI compromised in the Data Breach. Plaintiffs and Class members were injured by the same wrongful acts, practices, and omissions committed by 23andMe, as described herein. Plaintiffs' claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class members.

87.     Plaintiffs will fairly and adequately protect the interests of the Class members. Plaintiffs are adequate representatives of the Class in that they have no interests adverse to, or that conflict with, the Class they seek to represent. Plaintiffs have retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

88.     A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiffs and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against 23andMe, so it would be impracticable for Class members to individually seek redress from 23andMe's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## **CAUSES OF ACTION**

### **COUNT I**
### **NEGLIGENCE**
### **On Behalf of the Class**

89.     Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

90. 23andMe owed a duty to Plaintiffs and Class members to exercise reasonable care in safeguarding and protecting the PII/PGI in 23andMe's possession, custody, or control.

91. 23andMe knew or should have known the risks of collecting and storing Plaintiffs' and Class members' PII/PGI and the importance of maintaining secure systems. 23andMe knew or should have known that it faced an increased threat of customer data theft, as judged by the many data breaches that targeted companies that stored PII/PGI in recent years.

92. Given the nature of 23andMe's business, the sensitivity and value of the PII/PGI it maintains, and the resources at its disposal, 23andMe should have identified the vulnerabilities to its systems and prevented the Data Breach from occurring.

93. 23andMe breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiffs and Class members' PII/PGI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII/PGI entrusted to it— including Plaintiffs' and Class members' PII/PGI.

94. It was or should have been reasonably foreseeable to 23andMe that its failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class members' PII/PGI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiffs' and Class members' PII/PGI to unauthorized individuals.

95. But for 23andMe's negligent conduct or breach of the above-described duties owed to Plaintiffs and Class members, their PII/PGI would not have been compromised.

96. As a result of 23andMe's above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiffs and Class members have suffered, and will continue to suffer, economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased and imminent risk of identity theft—risk justifying or necessitating expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII/PGI; (iii) breach of the confidentiality of their

PII/PGI; (iv) deprivation of the value of their PII/PGI, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risk of identity theft they face and will continue to face; and (vi) overpayment for the services that were received without adequate data security.

**COUNT II**
**NEGLIGENCE PER SE**
**On Behalf of the Class**

97.     Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

98.     23andMe's duties arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by business, such as 23andMe, of failing to employ reasonable measures to protect and secure PII/PGI.

99.     23andMe's duties also arise from California's Genetic Information Privacy Act, Cal. Civ. Code §§ 56.18 *et seq.* ("CGIPA"), which requires direct-to-consumer genetic testing companies such as 23andMe to, *inter alia*, "[i]mplement and maintain reasonable security procedures and practices to protect a consumer's genetic data against unauthorized access, destruction, use, modification, or disclosure." Cal. Civ. Code § 56.18(d)(1).

100.    23andMe's violation of Section 5 of the FTCA and the CGIPA constitutes negligence per se.

101.    Plaintiffs and Class members are within the class of persons that Section 5 of the FTCA and the CGIPA were each intended to protect.

102.    The harm occurring as a result of the Data Breach is the type of harm Section 5 of the FTCA and the CGIPA were intended to guard against. The FTC has pursued enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair practices or deceptive practices, caused the same type of harm that has been suffered by Plaintiffs and Class members as a result of the Data Brach. The CGIPA is specifically intended to "safeguard the privacy, confidentiality, security, and integrity" of the genetic information of customers of direct-to-consumers genetic testing companies.

103.     It was reasonably foreseeable to 23andMe that its failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class members' PII/PGI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiffs' and Class members' PII/PGI to unauthorized individuals.

104.     The injury and harm that Plaintiffs and Class members suffered was the direct and proximate result of 23andMe's violations of Section 5 of the FTCA and the CGIPA. Plaintiffs and Class members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased and imminent risk of identity theft—risk justifying or necessitating expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII/PGI; (iii) breach of the confidentiality of their PII/PGI; (iv) deprivation of the value of their PII/PGI, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risk of identity theft they face and will continue to face; and (vi) overpayment for the services that were received without adequate data security.

**COUNT III**
**BREACH OF IMPLIED CONTRACT**
**On Behalf of the Class**

105.     Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

106.     In connection with the dealings Plaintiffs and Class members had with 23andMe, Plaintiffs and Class members entered into implied contracts with 23andMe.

107.     Pursuant to these implied contracts, Plaintiffs and Class members provided 23andMe with their PII/PGI, directly or indirectly, in order for 23andMe to provide services or products. In exchange, 23andMe agreed to, among other things, and Plaintiffs and Class members understood that 23andMe would: (1) provide services or products to Plaintiffs and Class members; (2) take reasonable measures to protect the security and confidentiality of Plaintiffs' and Class members' PII/PGI; and (3) protect Plaintiffs' and Class members' PII/PGI in compliance with federal and state laws, regulations, and industry standards.

108.     The protection of PII/PGI was a material term of the implied contracts between Plaintiffs and Class members, on the one hand, and 23andMe, on the other hand. Indeed, 23andMe was clear in its representations in its Privacy Policy, and on that basis of those representations Plaintiffs understood that, 23andMe supposedly respects and is committed to protecting customer privacy.

109.     Had Plaintiffs and Class members known that 23andMe would not adequately protect its customers' and former customers' PII/PGI, they would not have provided 23andMe with their PII/PGI.

110.     Plaintiffs and Class members performed their obligations under the implied contracts when they provided 23andMe with their PII/PGI, either directly or indirectly.

111.     23andMe breached its obligations under its implied contracts with Plaintiffs and Class members in failing to implement and maintain reasonable security measures to protect and secure their PII/PGI and in failing to implement and maintain security protocols and procedures to protect Plaintiffs' and Class members' PII/PGI in a manner that complies with applicable laws, regulations, and industry standards.

112.     23andMe's breach of its obligations of the implied contracts with Plaintiffs and Class members directly resulted in the Data Breach and the injuries that Plaintiffs and all other Class members have suffered from the Data Breach.

113.     Plaintiffs and all other Class members were damaged by 23andMe's breach of implied contracts because: (i) they paid—directly or indirectly—for data security protection they did not receive; (ii) they face a substantially increased and imminent risk of identity theft—a risk justifying or necessitating expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII/PGI was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII/PGI has been breached; (v) they were deprived of the value of their PII/PGI, for which there is a well-established national and international market; and (vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risk of identity theft they face and will continue to face.

**COUNT IV**
**UNJUST ENRICHMENT**
**On Behalf of the Class**

114.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

115.    This claim is pleaded in the alternative to the breach of implied contract claim.

116.    Plaintiffs and Class members conferred a monetary benefit upon 23andMe in the form of monies paid for services or products to 23andMe.

117.    23andMe accepted or had knowledge of the benefits conferred upon it by Plaintiffs and Class members. 23andMe also benefitted from the receipt of Plaintiffs' and Class members' PII/PGI, as this was used in providing products and services.

118.    As a result of 23andMe's conduct, Plaintiffs and Class members suffered actual damages in an amount equal to the difference in value between their payments made with reasonable data privacy and security practices and procedures that Plaintiffs and Class members paid for, and those payments without reasonable data privacy and security practices and procedures that they received.

119.    23andMe should not be permitted to retain the money belonging to Plaintiffs and Class members because 23andMe failed to adequately implement the data privacy and security procedures that Plaintiffs and Class members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

120.    23andMe should be compelled to provide for the benefit of Plaintiffs and Class members all unlawful proceeds received by it as a result of the conduct and Data Breach alleged herein.

**COUNT V**
**VIOLATION OF THE CALIFORNIA CONSUMER PRIVACY ACT**
**Cal. Civ. Code §§ 1798.100 *et seq.* ("CCPA")**
**On behalf of the California Subclass**

121.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

122.    The CCPA states that a "business that collects a consumer's personal information shall implement reasonable security procedures and practices appropriate to the nature of the personal

information to protect the personal information from unauthorized or illegal access, destruction, use, modification, or disclosure in accordance with Section 1798.81.5." Cal. Civ. Code § 1798.100(e).

123.    Section 1798.150(a)(1) of the CCPA provides: "Any consumer whose nonencrypted or nonredacted personal information, as defined [by the CCPA] is subject to an unauthorized access and exfiltration, theft, or disclosure as a result of the business' violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information may institute a civil action for" statutory or actual damages, injunctive or declaratory relief, and any other relief the court deems proper.

124.    The CCPA defines "personal information" to include an individual's name in combination with medical information or genetic data. Cal. Civ. Code § 1798.81.5(d)(1)(A).

125.    The CCPA defines "genetic data" as "any data, regardless of its format, that results from the analysis of a biological sample of an individual, or from another source enabling equivalent information to be obtained, and concerns genetic material. Genetic material includes, but is not limited to, deoxyribonucleic acids (DNA), ribonucleic acids (RNA), genes, chromosomes, alleles, genomes, alterations or modifications to DNA or RNA, single nucleotide polymorphisms (SNPs), uninterpreted data that results from analysis of the biological sample or other source, and any information extrapolated, derived, or inferred therefrom." Cal. Civ. Code § 1798.81.5(d)(5).

126.    The CCPA defines "medical information" as "any individually identifiable information, in electronic or physical form, regarding the individual's medical history or medical treatment or diagnosis by a health care professional." Cal. Civ. Code § 1798.81.5(d)(2).

127.    California Subclass members, including Plaintiff Schutz, are each a "consumer" as defined by Cal. Civ. Code § 1798.140(i) because they are each a "natural person who is a California resident, as defined in Section 17014 of Title 18 of the California Code of Regulations."

128.    Defendant is a "business" as defined by Cal. Civ. Code § 1798.140(d)(1)(A) because, *inter alia*, it "had annual gross revenues in excess of twenty-five million dollars ($25,000,000) in the preceding calendar year."

129.    Plaintiff Schutz's PII/PGI was subject to unauthorized access and exfiltration, theft, or disclosure because of Defendant's inadequate security measures.

130.    Plaintiff Schutz's PII/PGI was in nonencrypted and nonredacted form, allowing criminals full access to it.

131.    The Data breach occurred as a result of 23andMe's failure to implement and maintain reasonable security procedures and practices appropriate to the nature of the information it collected and stored. Defendant failed to implement reasonable security procedures to prevent unauthorized access of Plaintiff Schutz's and California Subclass members' PII/PGI as a result of a cyberattack.

132.    Plaintiffs will provide written notice to Defendants pursuant to Civil Code § 1798.150(b), identifying the specific provisions of the CCPA Plaintiff alleges Defendants have or are violating. Although a cure is not possible under the circumstances, if as expected Defendants are unable to cure or do not cure the violation within 30 days of receipt, Plaintiff will amend this complaint to pursue actual or statutory damages as permitted by Civil Code § 1798.150(a)(1)(A).

133.    Defendant's violation of this title was willful, intentional, or reckless.

134.    As a result of Defendant's failure to implement and maintain reasonable security procedures and practices that resulted in the Data Breach, Plaintiff seeks damages, injunctive and declaratory relief, and any other relief as deemed appropriate by the Court.

**COUNT VI**
**VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW**
**Cal. Bus. & Prof. Code §§ 17200 *et seq.* ("UCL")**
**On behalf of the California Subclass**

135.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

136.    The UCL prohibits any "unlawful," "fraudulent," or "unfair" business act or practice and any false or misleading advertising, as those terms are defined by the UCL and relevant case law. By virtue of the above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach, Defendant engaged in unlawful, unfair and fraudulent practices within the meaning, and in violation of, the UCL.

137.    In the course of conducting its business, 23andMe committed "unlawful" business practices by, *inter alia*, knowingly failing to design, adopt, implement, control, direct, oversee, manage, monitor and audit appropriate data security processes, controls, policies, procedures, protocols, and

- 24 -

software and hardware systems to safeguard and protect Plaintiffs' and Class members' PII/PGI, and by violating the statutory and common law alleged herein, including, *inter alia*, the CCPA, Section 5 of the FTCA, the CGIPA, and Article I, Section 1 of the California Constitution (California's constitutional right to privacy). Plaintiffs and Class members reserve the right to allege other violations of law by 23andMe constituting other unlawful business acts or practices. 23andMe's above-described wrongful actions, inaction, omissions, and want of ordinary care are ongoing and continue to this date.

138.    Defendant's above-described wrongful actions, inaction, omissions, want of ordinary care, misrepresentations, practices, and non-disclosures also constitute "unfair" business acts and practices in violation of the UCL in that Defendant's wrongful conduct is substantially injurious to consumers, offends legislatively-declared public policy, and is immoral, unethical, oppressive, and unscrupulous. Defendant's practices are also contrary to legislatively declared and public policies that seek to protect PII/PGI and ensure that entities who solicit or are entrusted with personal data utilize appropriate security measures, as reflected by laws such as the CCPA, Article I, Section 1 of the California Constitution (California's constitutional right to privacy), the CGIPA, and Section 5 of the FTCA. The gravity of Defendant's wrongful conduct outweighs any alleged benefits attributable to such conduct. There were reasonably available alternatives to further Defendant's legitimate business interests other than engaging in the above-described wrongful conduct.

139.    The UCL also prohibits any "fraudulent business act or practice." Defendant's nondisclosures and misrepresentations regarding the security of Plaintiffs' and Class members' PII/PGI and their inadequate data security were false, misleading, and likely to deceive the consuming public in violation of the UCL.

140.    The injury and harm that Plaintiffs and Class members suffered was the direct and proximate result of Defendant's violations of the UCL. Plaintiffs and Class members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft—risk which justifies or necessitates expenditures for protective and remedial services, for which they are entitled to compensation; (ii) improper disclosure of their PII/PGI; (iii) breach of the confidentiality of their PII/PGI; (iv) deprivation of the value of their PII/PGI, for which there is a well-established national and international market; (v) lost time and money

incurred to mitigate and remediate the effects of the Data Breach, including the increased risk of identity theft they face and will continue to face; and (vi) overpayment for the services that were received without adequate data security.

141.    Unless restrained and enjoined, Defendant will continue to engage in the above-described wrongful conduct and more data breaches will occur. Plaintiffs, therefore, on behalf of themselves, Class members, and the general public, also seek restitution and an injunction prohibiting Defendant from continuing such wrongful conduct, and requiring Defendant to modify its corporate culture and design, adopt, implement, control, direct, oversee, manage, monitor and audit appropriate data security processes, controls, policies, procedures protocols, and software and hardware systems to safeguard and protect the PII/PGI entrusted to it, as well as all other relief the Court deems appropriate, consistent with Bus. & Prof. Code § 17203.

**COUNT VII**
**VIOLATION OF OREGON'S GENETIC PRIVACY LAW**
**Or. Rev. Stat. §§ 192.531 *et seq.* ("OGPL")**
**On behalf of the Oregon Subclass**

142.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

143.    "[A]n individual's genetic information and DNA sample are private and must be protected, and an individual has a right to the protection of that privacy." ORS § 192.537(1). "Any person authorized . . . by an individual . . . to obtain, retain or use an individual's genetic information or any DNA sample must maintain the confidentiality of the information or sample and protect the information or sample from unauthorized disclosure or misuse." *Id.*

144.    The OGPL forbids the disclosure of "the identity of an individual upon whom a genetic test has been performed or the identity of a blood relative of the individual, or to disclose genetic information about the individual or a blood relative of the individual in a manner that permits identification of the individual" except in certain enumerated circumstances. ORS § 192.539(1). This prohibition applies "to any redisclosure by any person after another person has disclosed genetic information or the identity of an individual upon whom a genetic test has been performed, or has disclosed genetic information or the identity of a blood relative of the individual." ORS § 192.539(2).

145.     23andMe's above-described conduct and misrepresentations of its security practices and procedures constitutes a "knowing violation based on a fraudulent misrepresentation" of ORS § 192.537 and § 192.539, for which Plaintiffs and Class members are entitled to the greater of their actual damages or $15,000 in statutory damages for each violation of ORS § 192.537 and the greater of their actual damages or $150,000 in statutory damages for each violation of ORS § 192.539. ORS § 192.541(2)(d), (3)(d).

146.     Alternatively, 23andMe's above-described conduct constitutes a "knowing or reckless violation" of ORS § 192.537 and § 192.539, for which Plaintiffs and Class members are entitled to the greater of their actual damages or $10,000 in statutory damages for each violation of ORS § 192.537 and the greater of their actual damages or $100,000 in statutory damages for each violation of ORS § 192.539. ORS § 192.541(2)(c), (3)(c).

147.     Alternatively, 23andMe's above-described conduct constitutes a "negligent violation" of ORS § 192.537 and § 192.539, for which Plaintiffs and Class members are entitled to the greater of their actual damages or $500 in statutory damages for each violation of ORS § 192.537 and the greater of their actual damages or $5,000 in statutory damages for each violation of ORS § 192.539. ORS § 192.541(2)(b), (3)(b).

148.     Alternatively, should the Court find that 23andMe did not knowingly or negligently cause the Data Breach, the Data Breach remains "an inadvertent violation" of ORS § 192.537 and § 192.539, for which Plaintiffs and Class members are entitled to the greater of their actual damages or $100 in statutory damages for each violation of ORS § 192.537 and the greater of their actual damages or $1,000 in statutory damages for each violation of ORS § 192.539. ORS § 192.541(2)(a), (3)(a).

149.     Plaintiffs seek actual or statutory damages, injunctive and declaratory relief, their costs and fees, and any other relief as deemed appropriate by the Court.

**COUNT VIII**
**VIOLATION OF THE ILLINOIS GENETIC INFORMATION PRIVACY ACT**
**410 ILCS 513/1 *et seq.* ("IGIPA")**
**On behalf of the Illinois Subclass**

150.     Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

151.    Under the IGIPA, "genetic testing and information derived from genetic testing is confidential and privileged and may be released only to the individual tested and to persons specifically authorized . . . by that individual to receive the information." 410 ILCS 513/15(a).

152.    The IGIPA further states "[n]o person may disclose . . . the identity of any person upon whom a genetic test is performed or the results of a genetic test in a manner that permits identification of the subject of the test" except in certain enumerated circumstances. 410 ILCS 513/30(a).

153.    23andMe's above-described conduct constitutes an "intentional and reckless violation" of the IGIPA. As such, Plaintiffs and Class members are entitled to recover the greater of "liquidated damages of $15,000 or actual damages" for each violation, as well as their fees and costs. 410 ILCS 513/40(a)(2).

154.    Alternatively, 23andMe's above-described conduct constitutes a negligent violation of the IGIPA. As such, Plaintiffs and Class members are entitled to recover the greater of "liquidated damages of $2,500 or actual damages" for each violation, as well as their fees and costs. 410 ILCS 513/40(a)(1).

155.    Plaintiffs seek actual or statutory damages, injunctive and declaratory relief, their costs and fees, and any other relief as deemed appropriate by the Court.

## **PRAYER FOR RELIEF**

Plaintiffs, individually, and on behalf of all other members of the Class, respectfully request that the Court enter judgment in their favor and against Caesars as follows:

A.    certifying the Class and Subclasses as requested herein, designating Plaintiffs as Class Representatives, and appointing Plaintiffs' counsel as Class Counsel;

B.    awarding Plaintiffs and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C.    awarding Plaintiffs and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiffs, on behalf of themselves and the Class, seek appropriate injunctive relief designed to prevent Caesars from experiencing another data breach by adopting and implementing best data security practices to safeguard PII and to provide or extend credit monitoring services and similar services to protect against all types of identity theft;

D.     awarding Plaintiffs and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E.     awarding Plaintiffs and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F.     awarding Plaintiffs and the Class such other favorable relief as allowable under law.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury of all claims in this Class Action Complaint so triable.

Respectfully submitted,

DATED:  October 30, 2023

**KAPLAN FOX & KILSHEIMER LLP**

By: /s/ *Laurence D. King*
        Laurence D. King

Laurence D. King (SBN 206423)
Matthew B. George (SBN 239322)
Blair E. Reed (SBN 316791)
1999 Harrison Street, Suite 1560
Oakland, CA 94612
Telephone:  415-772-4700
Facsimile:  415-772-4707
Email: *lking@kaplanfox.com*
           *mgeorge@kaplanfox.com*
           *breed@kaplanfox.com*

**BARNOW AND ASSOCIATES, P.C.**
Ben Barnow*
Anthony L. Parkhill*
205 West Randolph Street, Suite 1630
Chicago, IL 60606
Telephone:  312-621-2000
Facsimile:  312-641-5504
Email: *b.barnow@barnowlaw.com*
           *aparkhill@barnowlaw.com*

*pro hac vice forthcoming

*Attorneys for Plaintiffs and the Proposed Class*