ADRMOP,RELATE

# U.S. District Court
## California Northern District (San Francisco)
## CIVIL DOCKET FOR CASE #: 3:23-cv-05717-EMC

Doe v. 23andMe, Inc.
Assigned to: Judge Edward M Chen
Relate Case Case: 3:23-cv-05147-EMC
Cause: 28:1332 Diversity-(Citizenship)

Date Filed: 11/06/2023
Jury Demand: Plaintiff
Nature of Suit: 190 Contract: Other
Jurisdiction: Diversity

**Plaintiff**

**John Doe**
*Individually and on Behalf of All Others*
*Similarly Situated*

represented by **Dorothy P. Antullis**
Robbins Geller Rudman & Dowd LLP
225 NE Mizner Boulevard, Suite 720
Boca Raton, FL 33432
(561) 750-3000
Email: dantullis@rgrdlaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nicolle B. Brito**
Robbins Geller Rudman & Dowd LLP
225 NE Mizner Boulevard, Suite 720
Boca Raton, FL 33432
(561) 750-3000
Fax: (561) 750-3364
Email: NBrito@rgrdlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexander Charles Cohen**
Robbins Geller Rudman & Dowd LLP
225 NE Mizner Boulevard, Suite 720
Boca Raton, FL 33432
(561) 750-3000
Email: acohen@rgrdlaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Howard Theodore Longman**
Stull, Stull & Brody
6 East 45th Street
New York, NY 10017
212-687-7230
Email: hlongman@longman.law
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsey Taylor**
Robbins Geller Rudman & Dowd LLP
225 NE Mizner Boulevard, Suite 720
Boca Raton, FL 33432
(561) 750-3000
Fax: (561) 750-3364
Email: ltaylor@rgrdlaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Stuart Andrew Davidson**
Robbins Geller Rudman & Dowd LLP
225 NE Mizner Boulevard, Suite 720
Boca Raton, FL 33432
(561) 750-3000
Fax: (561) 750-3364
Email: sdavidson@rgrdlaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Taeva Cantor Shefler**
Robbins Geller Rudman & Dowd LLP
Post Montgomery Center, Suite 1800
San Francisco, CA 94104
(415) 288-4545
Email: TShefler@rgrdlaw.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**23andMe, Inc.**

| Date Filed | # | Docket Text |
|---|---|---|
| 11/06/2023 | 1 | CLASS ACTION COMPLAINT and Demand for Jury Trial against 23andMe, Inc. (Filing fee $ 402, receipt number ACANDC-18811755.). Filed by John Doe. (Attachments: # 1 Civil Cover Sheet) (Brito, Nicolle) (Filed on 11/6/2023) (Entered: 11/06/2023) |
| 11/06/2023 | 2 | Proposed Summons. (Brito, Nicolle) (Filed on 11/6/2023) (Entered: 11/06/2023) |
| 11/06/2023 | 3 | MOTION for Leave to Proceed Under a Pseudonym filed by John Doe. Responses due by 11/20/2023. Replies due by 11/27/2023. (Brito, Nicolle) (Filed on 11/6/2023) (Entered: 11/06/2023) |
| 11/07/2023 | 4 | Case assigned to Magistrate Judge Alex G. Tse.<br><br>Counsel for plaintiff or the removing party is responsible for serving the Complaint or Notice of Removal, Summons and the assigned judge's standing orders and all other new case documents upon the opposing parties. For information, visit *E-Filing A New Civil Case* at http://cand.uscourts.gov/ecf/caseopening. |

| | | |
|---|---|---|
| | | Standing orders can be downloaded from the court's web page at www.cand.uscourts.gov/judges. Upon receipt, the summons will be issued and returned electronically. A scheduling order will be sent by Notice of Electronic Filing (NEF) within two business days. Consent/Declination due by 11/21/2023. (ark, COURT STAFF) (Filed on 11/7/2023) (Entered: 11/07/2023) |
| 11/17/2023 | 5 | WAIVER OF SERVICE Returned Executed filed by John Doe. Service waived by 23andMe, Inc. waiver sent on 11/16/2023, answer due 1/16/2024. (Brito, Nicolle) (Filed on 11/17/2023) (Entered: 11/17/2023) |
| 11/20/2023 | 6 | CONSENT/DECLINATION to Proceed Before a US Magistrate Judge by John Doe.. (Brito, Nicolle) (Filed on 11/20/2023) (Entered: 11/20/2023) |
| 11/20/2023 | 7 | NOTICE of Appearance by Taeva Cantor Shefler (Shefler, Taeva) (Filed on 11/20/2023) (Entered: 11/20/2023) |
| 11/21/2023 | 8 | MOTION for leave to appear in Pro Hac Vice *for Dorothy P. Antullis* ( Filing fee $ 317, receipt number BCANDC-18857399.) filed by John Doe. (Attachments: # 1 Certificate of Good Standing)(Antullis, Dorothy) (Filed on 11/21/2023) (Entered: 11/21/2023) |
| 11/21/2023 | 9 | MOTION for leave to appear in Pro Hac Vice *for Stuart A. Davidson* ( Filing fee $ 317, receipt number ACANDC-18857622.) filed by John Doe. (Attachments: # 1 Certificate of Good Standing)(Davidson, Stuart) (Filed on 11/21/2023) (Entered: 11/21/2023) |
| 11/21/2023 | 10 | MOTION for leave to appear in Pro Hac Vice *for Alexander Cohen* ( Filing fee $ 317, receipt number ACANDC-18857847.) filed by John Doe. (Attachments: # 1 Certificate of Good Standing)(Cohen, Alexander) (Filed on 11/21/2023) (Entered: 11/21/2023) |
| 11/21/2023 | 11 | MOTION for leave to appear in Pro Hac Vice *for Dorothy P. Antullis* ( Filing fee $ 317, receipt number ACANDC-18858018.) filed by John Doe. (Attachments: # 1 Certificate of Good Standing)(Antullis, Dorothy) (Filed on 11/21/2023) (Entered: 11/21/2023) |
| 11/22/2023 | 12 | MOTION for leave to appear in Pro Hac Vice *for Lindsey H. Taylor* ( Filing fee $ 317, receipt number ACANDC-18861306.) filed by John Doe. (Attachments: # 1 Certificate of Good Standing)(Taylor, Lindsey) (Filed on 11/22/2023) (Entered: 11/22/2023) |
| 11/22/2023 | 13 | CLERK'S NOTICE OF IMPENDING REASSIGNMENT TO A U.S. DISTRICT COURT JUDGE: The Clerk of this Court will now reassign this case to a District Judge because a party has not consented to the jurisdiction of a Magistrate Judge. You will be informed by separate notice of the district judge to whom this case is reassigned.<br><br>ALL HEARING DATES PRESENTLY SCHEDULED BEFORE THE CURRENT MAGISTRATE JUDGE ARE VACATED AND SHOULD BE RE-NOTICED FOR HEARING BEFORE THE JUDGE TO WHOM THIS CASE IS REASSIGNED.<br><br>*This is a text only docket entry; there is no document associated with this notice.* (shy, COURT STAFF) (Filed on 11/22/2023) (Entered: 11/22/2023) |
| 11/22/2023 | 14 | **ORDER REASSIGNING CASE. Case reassigned using a proportionate, random, and blind system pursuant to General Order No. 44 to Judge Rita F. Lin for all further proceedings. Magistrate Judge Alex G. Tse no longer assigned to case, Notice: The assigned judge participates in the Cameras in the Courtroom Pilot Project. See General Order No. 65 and http://cand.uscourts.gov/cameras.. Signed by Clerk on 11/22/2023. (Attachments: # 1 Notice of Eligibility for Video Recording)(ark, COURT STAFF) (Filed on 11/22/2023) (Entered: 11/22/2023)** |
| 11/27/2023 | 15 | **ORDER by Judge Rita F. Lin Granting 8 Motion for Pro Hac Vice as to Dorothy P. Antullis.. (cl, COURT STAFF) (Filed on 11/27/2023) (Entered: 11/27/2023)** |

| 11/27/2023 | 16 | **ORDER by Judge Rita F. Lin Granting 9 Motion for Pro Hac Vice as to Stuart A. Davidson. (cl, COURT STAFF) (Filed on 11/27/2023) (Entered: 11/27/2023)** |
|---|---|---|
| 11/27/2023 | 17 | **ORDER by Judge Rita F. Lin Granting 10 Motion for Pro Hac Vice as to Alexander C. Cohen. (cl, COURT STAFF) (Filed on 11/27/2023) (Entered: 11/27/2023)** |
| 11/27/2023 | 18 | **ORDER by Judge Rita F. Lin Granting 12 Motion for Pro Hac Vice as to Lindsey H. Taylor. (cl, COURT STAFF) (Filed on 11/27/2023) (Entered: 11/27/2023)** |
| 11/28/2023 | 19 | **Judicial Referral for Purpose of Determining Relationship of Cases re 23-cv-5717 RFL with 23-cv-5147 EMC. Signed by Judge Rita F. Lin on 11/27/2023. (tmi, COURT STAFF) (Filed on 11/28/2023) (Entered: 11/28/2023)** |
| 11/30/2023 | 20 | **ORDER RELATING CASES. Signed by Judge Edward M. Chen on 11/30/2023. (vla, COURT STAFF) (Filed on 11/30/2023) (Entered: 11/30/2023)** |
| 12/01/2023 | 21 | **ORDER REASSIGNING CASE. Case reassigned to Judge Edward M Chen for all further proceedings. Judge Rita F. Lin no longer assigned to case, Notice: The assigned judge participates in the Cameras in the Courtroom Pilot Project. See General Order No. 65 and http://cand.uscourts.gov/cameras.. Signed by Clerk on 12/1/2023. (Attachments: # 1 Notice of Eligibility for Video Recording)(ark, COURT STAFF) (Filed on 12/1/2023) (Entered: 12/01/2023)** |
| 12/01/2023 | 22 | **Initial Case Management Scheduling Order with ADR Deadlines: Notice: The assigned judge participates in the Cameras in the Courtroom Pilot Project. See General Order No. 65 and http://cand.uscourts.gov/cameras.**<br><br>**Case Management Statement due by 1/30/2024. Initial Case Management Conference set for 2/6/2024 01:30 PM in San Francisco, Courtroom 05, 17th Floor. (Attachments: # 1 Notice of Eligibility for Video Recording) (gba, COURT STAFF) (Filed on 12/1/2023) (Entered: 12/01/2023)** |
| 12/04/2023 | 23 | **Order by Judge Edward M Chen GRANTING 3 MOTION FOR LEAVE TO PROCEED UNDER A PSEUDONYM.(vla, COURT STAFF) (Filed on 12/4/2023) (Entered: 12/04/2023)** |
| 12/08/2023 | 24 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC-18918420.) filed by John Doe. (Attachments: # 1 Supplement NY Bar Certificate of Good Standing)(Longman, Howard) (Filed on 12/8/2023) (Entered: 12/08/2023) |
| 12/08/2023 | 25 | **Order by Judge Edward M Chen GRANTING 24 Motion for Pro Hac Vice as to Howard Longman.(vla, COURT STAFF) (Filed on 12/8/2023) (Entered: 12/08/2023)** |
| 12/20/2023 | 26 | Application for Refund, Receipt Number ACANDC-18858018 by John Doe. (Antullis, Dorothy) (Filed on 12/20/2023) (Entered: 12/20/2023) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 12/21/2023 07:21:24 | | |
| **PACER Login:** | lindsaykschuyler | **Client Code:** | 178849.010700 |
| **Description:** | Docket Report | **Search Criteria:** | 3:23-cv-05717-EMC |
| **Billable Pages:** | 4 | **Cost:** | 0.40 |

1  ROBBINS GELLER RUDMAN
       & DOWD LLP
2  DOROTHY P. ANTULLIS
   STUART A. DAVIDSON
3  LINDSEY H. TAYLOR
   NICOLLE B. BRITO
4  ALEXANDER C. COHEN
   225 NE Mizner Boulevard, Suite 720
5  Boca Raton, FL  33432
   Telephone:  561/750-3000
6  561/750-3364 (fax)

7

   Attorneys for John Doe and the Class
8
   [Additional counsel on signature page.]
9
                    UNITED STATES DISTRICT COURT
10
                 NORTHERN DISTRICT OF CALIFORNIA
11

   JOHN DOE, Individually and on Behalf of All  )  Case No.
12 Others Similarly Situated,                    )
                                                 )  CLASS ACTION COMPLAINT AND
13                          Plaintiff,           )  DEMAND FOR JURY TRIAL
                                                 )
14         vs.                                   )
                                                 )
15 23andMe, Inc.,                                )
                                                 )
16                          Defendant.           )
                                                 )
17 _____

18

19

20

21

22

23

24

25

26

27

28

1    Plaintiff John Doe ("Plaintiff" or "Plaintiff Doe"), individually and on behalf of all those

2    similarly situated ("Class" or "Class members"), brings this Class Action Complaint

3    ("Complaint") against Defendant 23andMe, Inc. ("23andMe," the "Company," or "Defendant")

4    and alleges upon personal knowledge as to his own actions and investigation of counsel, and upon

5    information and belief as to all other matters, as follows:

6    1.    Plaintiff brings this action ("Action") on behalf of all persons who are, in whole or

7    in part, descended from Ashkenazi Jews, whose personally identifiable information ("PII") was

8    taken in a data breach or hack of the systems of Defendant commencing in or about August 2023

9    (the "Data Breach" or "Hack").

10    2.    This case does not arise from a typical data breach. Rather, this case involves a Data

11    Breach or Hack in which the hackers specifically targeted a religious group, Ashkenazi Jews, and

12    then posted their ancestry and PII for sale.  The danger to the Class, consisting of Ashkenazi Jews,

13    is especially imminent given the global rise in antisemitism currently abounding in the United

14    States and all over the world. And, as alleged below, the Hack or Data Breach was a direct result

15    of a loophole in 23andMe's systems that allowed this hack to occur.

16    3.    This Hack, enabled by 23andMe's negligence or recklessness, was exacerbated by

17    23andMe's failure, to date, to provide sufficient and timely notice to Ashkenazi Jews, that their

18    PII in particular was targeted and is now available on the dark web as part of a scheme to victimize

19    Ashkenazi Jews.

20    4.    On October 6, 2023, Defendant first posted a notice on its website informing

21    customers of the Data Breach. Specifically, Defendant stated that it has recently learned of

22    suspicious activity in its database and in particular in its DNA Relatives feature, and that

23    information from its DNA Relative feature had been "compiled" without the account users'

24    authorization. It further stated "threat actors" were able to gain access to certain accounts such as

25    those where the user employed a recycled log in or a log in that had been hacked in another data

26    breach. Defendant disclosed that it was engaged in an investigation of the Hack.

27

28

CLASS ACTION COMPLAINT                                                                    - 1 -

5. Notably, this initial notice said nothing about whether the profiles of descendants of Ashkenazi Jews had been targeted by the Hackers, disabling those affected from taking immediate action.

6. In fact, as Defendant knew or should have known, hackers had already posted an initial data sample of such information on the platform BreachForums.

7. Specifically, in an October 1 post, the Hackers offered "the most valuable data you'll ever see" from 23andMe. The Hackers claimed that they had 1 million data points exclusively about Ashkenazi Jews.[1] The BreachForum post indicated that they also had the PII of hundreds of thousands of users of Chinese descent.

8. Moreover, the Hackers had already begun selling what they claimed were 23andMe profiles for between $1 and $10 per account, depending upon the number of profiles being purchased.[2] 23andMe subsequently confirmed the legitimacy of the data.

9. Nevertheless, in its October 9, 2023 updated notice, 23andMe merely stated that its investigation was continuing, and that it had engaged third-party forensic experts for assistance as well as that it was working with federal law enforcement officials. It encouraged users to take precautions including resetting their passwords and using multi-factor authentication.

10. About this time, Defendant sent out an email that indicated the types of information that were subject to the Hack including information that users provide to fill out their DNA Relative profile. That information included: (a) the customer's ancestry reports and matching DNA segments showing their genetic ancestry, *i.e.* the percentage of their DNA that is attributable to their Ashkenazi Jewish heritage; (b) their DNA relatives' display names; (c) the predicted relationship and percentage of DNA shared with their relative matches; (d) birth location and profile picture; (e) birth year; and (f) a link to their family tree.

---

[1] Lilly Hay Newman, *23andMe User Data Stolen in Targeted Attack on Ashkenazi Jews*, Wired (Oct. 6, 2023), https://www.wired.com/story/23andMe-credential-stuffing-data-stolen/; *23andMe Cyberbreach Exposes DNA Data, Potential Family Ties*, Dark Reading (Oct. 6, 2023), https://www.darkreading.com/attacks-breaches/23andMe-cyberbreach-exposed-dna-data-family-ties.

[2] *Id.*

11. On October 20, 2023, Defendant again updated its notice, again merely stating that it had disabled some of the features within the DNA Relatives tools as an additional precautionary measure to protect the privacy of its customers.

12. On the same day, a hacker, going by the handle "Golem" made a second dump of PII from 23andMe on the dark web.

13. Although Defendant's public statements seem to lay the blame for the Hack on its customers' reuse of previously hacked passwords, technology experts have indicated that the Hack was due to a loophole in the Company's web design.

14. As one commentator noted, a researcher revealed that 23andMe had a significant loophole in its website design, allowing anyone to view a user's profile by entering a profile ID into the URL.[3] As the commentator stated, "[t]his is a glaring oversight for a company dealing with such sensitive data."[4]

15. Defendant's negligence or recklessness in allowing this loophole was particularly inexcusable given that a similar genetic testing company, 1Health.io, had just been fined by with the Federal Trade Commission ("FTC") in the amount of $75,000 for failing to secure sensitive data.

16. The Hack of genetic material of Class members, descendants of Ashkenazi Jews, is especially dangerous and compromises the security of Class members at a time when antisemitic acts are at the highest level since World War II, and Jews have just experienced their greatest massacre since the Holocaust. The *Wall Street Journal*, for instance, recently posted an editorial entitled "The Global War on the Jews," noting that antisemitism is surging on a worldwide basis.[5]

---

[3] Tom Donovan, *23andMe Data Breach*, The Final Hop (Oct. 6, 2023), https://www.thefinalhop.com/23andMe-data-breach.

[4] *Id.*

[5] *The Global War on the Jews*, Wall St. J. (Oct. 30, 2023), https://www.wsj.com/articles/israel-hamas-jews-pogroms-russia-u-s-europe-germany-anti-semitism-1a74109c?mod=Searchresults_pos1&page=1.

1  This is occurring at a time when the State of Israel is at war with the terrorist organization Hamas

2  (the "Israel-Hamas War").

3       17.     The hacked PII exposes Class members to potential hate crimes and antisemitic

4  incidences and may be used by hate groups, including white supremacy and neo-Nazi groups, to

5  target Jews, and places Class members in imminent danger.

6       18.     The fact that the Hacker goes by the handle "Golem", a Hebrew word meaning a

7  shapeless mass and referring to a clay figure that is brought to life in times of peril to the Jewish

8  people, indicates that the Hack may have been politically and/or racially motivated and was

9  seemingly specifically deemed to target those of Jewish descent to compromise their security.[6]

10      19.     Golem is quoted as stating that he was tempted to post even more "Zionist" related

11  PII in response to the deadly blast of a Gazan hospital for which Israel was originally (and

12  mistakenly) blamed.[7]

13      20.     The text of the Golem's post advertising the new leak described it as being "Great

14  Britain-Originated" data that contained "samples from hundreds of families, including . . . . [the]

15  Rothschilds," a well-known Jewish family that is the subject of antisemitic conspiracy theories,

16  further demonstrating that the Hack has a direct and deleterious effect on those of Jewish ancestry.

17      21.     Plaintiff and Class members have suffered and will continue to suffer injury as a

18  direct and proximate result of 23andMe's negligent, reckless or intentional conduct, including:

19          (a)     the decrease in their physical security and the imminent dangers to which

20  they are now exposed in this climate of rising antisemitism, and will have to expend out of pocket

21  costs to increase security measures and ensure that they are protected;

22          (b)     increased concern that further PII will be exposed in response to the rampant

23  antisemitism which has arisen in response to the actions taken by Israel in the Israel-Hamas War;

24

25  [6]   Scott Ikea, *Second Leak From 23andMe Data Breach Includes 4 Million More Genetic
    *Profiles*, CPO Magazine (Oct. 25, 2023), https://www.cpomagazine.com/cyber-security/second-
26  leak-from-23andme-data-breach-includes-4-million-more-genetic-profiles/.

27  [7]   Eric Geller, *23andMe Data Breach Worsens, With Millions of New Records Leaked*, The
    Messenger (Oct. 18, 2023), https://themessenger.com/tech/23andme-data-breach-genetic-testing-
28  hacker-leak.

(c) increased emotional distress that they can now be identified as of Jewish descent, and thus subjected to antisemitic acts;

(d) out of pocket losses associated with preventing, detecting and remediating identify theft or other unauthorized uses of their PII;

(e) the lost or diminished value of their PII, which is a form of property;

(f) opportunity costs associated with attempting to mitigate the actual consequences of the Hack or Data Breach;

(g) the loss of the benefit of their bargain for Defendant's services,

(h) the invasion of their privacy; and

(i) the theft of their PII and loss of privacy rights.

22. As a direct and proximate result of 23andMe's breach of confidence and failure to protect their PII, Plaintiff and Class members have been injured by facing ongoing, imminent, impending threats of hate and identity theft crimes, fraud, scams, and other misuses of their PII; ongoing monetary loss and economic harm; loss of value of privacy and confidentiality of the stolen PII; illegal sales of the compromised PII; loss of the benefit of their bargain, mitigation expenses and other injuries. Plaintiff and Class members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

## I.     Jurisdiction and Venue

23. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1332 of the Class Action Fairness Act of 2005 because: (a) there are 100 or more putative Class members; (b) the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs; and (c) there is minimal diversity because Plaintiff and Defendant are citizens of different states.

24. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367.

25. This Court has personal jurisdiction over Defendant because the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District. Defendant's principal place of business is also located in this District.

26. Venue in this District is proper in this Court pursuant to 18 U.S.C. §1391(b)(1) because Defendant resides in this District.

## II. Parties

27. Plaintiff is an individual who is a citizen of the State of New Jersey and is an Ashkenazi Jew, who is descended from Holocaust survivors.

28. Plaintiff was a user of Defendant's services and received two email notices ("Notices") from Defendant on October 10 and October 13, 2023, informing him that he was identified as having been impacted by the Hack, although the Notice neglected to inform Plaintiff that the Hack was part of a seemingly politically motivated, and antisemitic scheme by certain threat actors, to intimidate and endanger descendants of Ashkenazi Jews.

29. Plaintiff suffered actual injury and is continuing to suffer actual and imminent danger as a consequence of this seemingly antisemitic and politically motivated Hack, including: (a) now having his identity as an Ashkenazi Jew made public during a time period when the incidences of antisemitism are rampant, particularly because of the ongoing Israel-Hamas War, thereby placing him and others in the Class in a particularly dangerous and precarious situation; and (b) from having his PII compromised as a result of the Data Breach, including, but not limited to: (i) damage to and diminution in the value of Plaintiff's PII, a form of property that 23andMe obtained from Plaintiff; (ii) loss of the benefit of his bargain for Defendant's services; (iii) violation of Plaintiff's privacy rights; and (iv) present and increased risk arising from the identity theft and fraud.

30. As a result of the Data Breach, Plaintiff has spent and, going forward, anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach. As a result of the Data Breach, Plaintiff is and will continue to be at increased risk of hate crimes, and identity theft and fraud for years to come.

CLASS ACTION COMPLAINT                                                                 - 6 -

31.     23andMe, Inc. is a Delaware corporation registered with the California Secretary of State, with its principal place of business and headquarters located at 223 North Mathilda Venue, Sunnyvale, California 94086.

**III.   Background**

    A.     **23andMe**

32.     Defendant is a home-based genetics testing company that commenced in about 2006. It operates through either a website or application, in which customers create an account and then purchase a DNA testing kit.

33.     Customers sign up for a particular package, such as the basic ancestry service, the health and ancestry service or the full membership.  They then receive a genetic testing kit, through which they take their own saliva samples, place them in a tube, and mail the sample back to the testing company.

34.     From there, a laboratory isolates the DNA, runs genetic tests and interprets the results providing customers with both information about their genetics, and their health, depending upon the package they choose.

35.     23andMe's Ancestry Services has about 12 million members. Customers with a basic package receive an analysis of their ancestry percentages, informing them of the percentages of their ancestry, and where in the world their DNA is from, out of over 2,750 regions. They also receive an ancestry report, giving the customer a granular view of their ancestry backgrounds, including curated content on the history, food, and popular travel destinations connected to their DNA.

36.     If a customer purchases the optional DNA Relative Finder, 23andMe will go further and take the customer's DNA and match it to their DNA relatives in the 23andMe database, enabling the customer to connect with those who have some percentage or overlap of the same DNA. Through the DNA Relative Finder, customers can uncover unknown relatives and build a family tree.

37.     Ancestral History traces a customer's ancestry timeline, informing them of the number of generations back that their family fell into certain categories or the groups or regions from which the customer is descended, with one example being Ashkenazi Jewish.

38.     Given the sensitivity of the information provided by customers, 23andMe's Privacy Statement specifically represents and assures customers that their private information will be protected.

39.     On its website, in bold print, 23andMe specifically represents to its customers that "Your privacy comes first," and states:

> When you explore your DNA with 23andMe, you entrust us with important personal information. That's why, since day one, protecting your privacy has been our number one priority. We're committed to providing you with a safe place where you can learn about your DNA knowing your privacy is protected.

40.     It reiterates this representation in its Privacy Statement under "Security Measures," explaining:

> We implement physical, technical, and administrative measures aimed at preventing unauthorized access to or disclosure of your Personal Information. Our team regularly reviews and improves security practices to help ensure the integrity of our systems and your Personal Information.

41.     In the section entitled "How is my Personal Information Protected?" Defendant assures customers that it takes all necessary steps to prevent unauthorized access to PII, against stating:

> 23andMe takes seriously the trust you place in us. To prevent unauthorized access or disclosure, to maintain data accuracy, and to ensure the appropriate use of information, 23andMe uses a range of physical, technical, and administrative measures to safeguard your Personal Information, in accordance with current technological and industry standards. In particular, all connections to and from our website are encrypted using Secure Socket Lays (SSL) technology.

B.     **The Data Breach**

42.     Despite its representations that it would keep customer information safe, in August 2023, 23andMe suffered a major hack of the PII of millions of its customers, including and most particularly Ashkenazi Jews and those of Chinese descent.

43.     On October 6, 2023, 23andMe made its first posting on its website, disclosing:

We recently learned that certain 23andMe customer profile information that he opted into sharing through our DNA Relatives feature, was compiled from individual 23andMe.com accounts without the account users' authorization.

After learning of suspicious activity, we immediately began an investigation. While we are continuing to investigate this matter, we believe threat actors were able to access certain accounts in instances where users recycled login credentials – that is, usernames and passwords that were used on 23andMe.com were the same as those used on other websites that have been previously hacked.

We believe that the threat actor may have then, in violation of our Terms of Service, accessed 23andMe.com accounts without authorization and obtained information from certain accounts, including information about users' DNA Relatives profiles, to the extent a user opted into that service.

44.     23andMe then went on to falsely assure customers that it was committed to safety and security stating:

Committed to Safety and Security

23andMe is committed to providing you with a safe and secure place where you can learn about your DNA knowing your privacy is protected. We are continuing to investigate to confirm these preliminary results. We do not have any indication at this time that there has been a data security incident within our systems, or that 23andMe was the source of the account credentials used in these attacks.

At 23andMe, we take security seriously. We exceed industry data protection standards and have achieved three different ISO certifications to demonstrate the strength of our security program. We actively and routinely monitor and audit our systems to ensure that your data is protected. When we receive information through those processes or from other sources claiming customer data has been accessed by unauthorized individuals, we immediately investigate to validate whether this information is accurate. Since 2019 we've offered and encouraged users to use multi-factor authentication (MFA), which provides an extra layer of security and can prevent bad actors from accessing an account through recycled passwords.

45.     23andMe recommended to customers that they change their passwords, and take other actions.

46.     23andMe updated its online notice again on October 9 and October 20, 2023, each time noting that it was in the midst of an ongoing investigation, and urging customers to change their passwords and use multi-factor authentication. On November 6, 2023, 23andMe began requiring the use of 2-step verification for customers to access their accounts.

47.     Notably, none of the website notices or updates informed Ashkenazi Jews or those of Chinese descent that their PII had been specifically targeted, and that their information was being sold on the dark web, putting them in danger.

CLASS ACTION COMPLAINT                                                    - 9 -

48.   On about October 10, 2023, 23andMe first sent out an email notice (the "October 10 Notice") to those customers whose PII had been hacked, including Plaintiff Doe.

49.   In the October 10 Notice, 23andMe admitted that "certain profile information – which a customer creates and chooses to share with his genetic relatives in the DNA Relatives feature – was accessed from individual 23andMe.com accounts." The October 10 Notice further states that, this access was done "without the account users' authorization." 23andMe further explained that it was engaged in an on-going investigation and that it believed that the threat actors had used passwords that had been subject to earlier hacks of other platforms.

50.   Similar to the online Notice, the October 10 Notice said nothing about the fact that the Hack was apparently politically and/or racially motivated and that Ashkenazi Jews and those of Chinese descent had been targeted and that their information was already being sold on the dark web.

51.   23andMe disseminated another notice a few days later, on about October 13, 2023 (the "October 13 Notice"). The October 13 Notice disclosed to customers that the their profile information had been part of the Data Breach, including and most importantly, the analysis of their ancestry and ancestry report and matching DNA segments, their DNA relatives and the percentage of DNA shared with their matches, their name and state of residence, their DNA Relative display names, their birth year, and how recently they had logged in – in other words, all the information that someone seeking to perpetrate a hate crime against an individual would need to identify them as Jewish or Chinese, and track them down.

52.   While 23andMe attempted to blame the victims for the Hack, stating in the online Notice and the October 10 Notice that it was due to the reuse of already compromised passwords, commentators and technology experts have laid the blame for the Hack on 23andMe, explaining that it was due to a loophole in its web design that allowed a Hacker to use compromised passwords to get into the website.

### C.  The Hack Was a Foreseeable Risk of Which Defendant Was on Notice

53.  It is well known that PII is a valuable commodity and a frequent, intentional target of cyber criminals and hackers. Companies that collect such information, including Defendant, are well aware of the risk of being targeted by hackers and cybercriminals.

54.  In 2021, for instance, there was a record 1,862 data breaches surpassing both 2020's total of 1,108 and the previous record of 1,506 set in 2017.[8]

55.  Genetic or ancestry material is particularly valuable as hackers can sell that material to insurance companies, sell it on the "low down" or in this case, use to threaten members of particular racial or religious groups, as disclosed by their genetic testing.[9]

56.  Several genetic testing entities have been the subject of well publicized hacks or data breaches, of which Defendant was or should have been aware, particularly given its previously mentioned representation that it "regularly reviews and improves security practices to help ensure the integrity of our systems and your Personal Information."

57.  As stated above, several months ago, 1Health.io, another genetics testing company, was fined by the FTC in the amount of $75,000 for failing to secure sensitive data. In 2021, DNA Diagnostic Center, a DNA testing entity, was fined $400,000 for a data breach that affected 2,100,000 customers.[10] And in 2018, hackers breached the accounts of 92 million customers of MyHeritage, although the hackers never reached actual genetic data.[11]

---

[8]  Bree Fowler, Data breaches break record in 2021, CNET (Jan. 24, 2022), https://www.cnet.com/news/privacy/record-number-of-data-breaches-reported-in-2021-new-report-says/.

[9]  Angela Chen, *Why a DNA data breach is much worse than a credit card leak*, Center for Genetics and Society (June 6, 2018), https://www.geneticsandsociety.org/article/why-dna-data-breach-much-worse-credit-card-leak.

[10]  Apurva Venkat, *DNA Diagnostic Center fined $400,000 for 2021 data breach*, CSO (Feb. 21, 2023), https://www.csoonline.com/article/574597/dna-diagnostic-center-fined-400-000-for-2021-data-breach.html.

[11]  Angela Chen, *supra* n.9.

58.     Therefore, 23andMe was well aware that it could be subject to a hack, and that the genetic and ancestral information that it maintained was valuable and attractive to hackers, but yet it failed to take steps to close the loophole on its website that would have prevented the Hack.

59.     Since that time, the data for Ashkenazi Jews has appeared on the dark web. An NBC Report on October 7, 2023, states that NBC news had a list of 999,999 people who allegedly used 23andMe, that was being shared on the internet.

60.     The database, which showed up on the dark web, included the first and last names of Jewish customers, their sex, and 23andMe's evaluation of where their ancestors came from. The database was entitled, "Ashkenazi DNA Data of Celebrities," although most of the people in the database were not famous and, according to NBC News, appears to be sorted to have only included people with Ashkenazi heritage.[12]

D.      **23andMe Is Under Investigation**

61.     Given the apparent political and antisemitic nature of the Hack, and threats from the Hacker named Golem in the aftermath, 23andMe is now under Congressional and state investigation.

62.     On October 20, 2023, Senator Bill Cassidy, the Ranking Member of the Senate Committee on Health, Education, Labor and Pensions, sent a letter to Ann Wojcicki, 23andMe's Chief Executive Officer (the "October 20 Letter") noting his concern regarding the Hack and requesting the production of certain information pertaining to it.[13]

63.     In the October 20 Letter, Senator Cassidy stated that he was particularly concerned with the "unauthorized disclosure of 1.3 million customers' information being posted on the dark

---

[12]    Emily, *US: 23andMe user data targeting Ashkenazi Jews leaked online*, FluTrackers.com (Oct. 12, 2023), http://flutrackers.com/forum/forum/united-states/980352-us023abdne-user-data-targeting-ashkenazi-jews-leaked-online.

[13]    *Ranking Member Cassidy Raises Concerns over 23andMe Data Leaks, Potential Targeting of Minority Groups*, U.S. Senate Committee on Health, Education Labor & Pensions (Oct. 20, 2023), https://www.help.senate.gov/ranking/newsroom/press/ranking-member-cassidy-raises-concerns-over-23andme-data-leaks-potential-targeting-of-minority-groups.

1   web, including one million customers identified as people of Ashkenazi Jewish descent and 300

2   thousand [sic] customers identified as people of Chinese heritage."[14]

3        64.    Senator Cassidy further stated that the disclosed data included name, sex, birth year,

4   location, photos, health information and genetic ancestry results, and that this information was

5   shared online as a database entitled "Ashkenazi DNA Data of Celebrities." *Id*. He noted the danger

6   in which that disclosure placed those Ashkenazi Jews whose information had been disclosed, citing

7   to one poster who claimed, "Crazy, this could be used by Nazis," which is particularly concerning

8   given the "increasing rates of global antisemitism and anti-Asian hate, which can be leveraged to

9   draw higher prices for the information and increase the threat from potential evildoers." He noted

10  that the records were selling for between $1 and $10 each. *Id*.

11       65.    The October 20 Letter further explained that the Hack could have implications far

12  beyond that incident and gave the Company until November 3 to answer a number of pertinent

13  questions including how only a few compromised user accounts could provide hackers with

14  information for hundreds of personal accounts, and what the Company was doing to compensate

15  affected users.

16       66.    On about October 30, 2023, the Connecticut Attorney General, William Tong, sent

17  Jacquie Cooke, 23andMe's General Counsel and Privacy Officer, a similar letter entitled "Data

18  Breach" (the "October 30 AG Letter") pertaining to how the Hack affected Connecticut residents.[15]

19       67.    In the October 30 AG Letter, General Tong also noted his concern that a hack

20  targeting Jewish and Asian customers was particularly dangerous given the antisemitic and anti-

21  Asian rhetoric and violence in recent years. *Id*. at 1. General Tong further stated that 23andMe was

22  required to but had failed to comply with Connecticut's notice requirements and may well have

23  violated the Connecticut Data Privacy Act. *Id*. at 2.

24

25  ─────────────────────

    [14]  *Id.*

26  [15]  Letter to Jacquie Cooke, General Counsel and Privacy Officer, 23andMe Inc. from William
Tong, Attorney General, Office of the Attorney General Connecticut (Oct. 30, 2023),
27  https://portal.ct.gov/-/media/AG/Press_Releases/2023/10-30-2023-William-Tong--23andMe-Inc-
Inquiry-Letter-final-002.pdf.
28

CLASS ACTION COMPLAINT                   - 13 -

68.     General Tong similarly posed a number of poignant questions to 23andMe, including whether the Company intended to comply with Connecticut's notice requirement and what kind of safeguards it had in place to prevent "credential stuffing" and requested responses by November 13, 2023.

E.     **Facts Pertinent to Plaintiff Doe**

69.     Plaintiff Doe first registered with 23andMe in September 2017, in order to discover any genetic diseases to which he may be subject as an Ashkenazi Jew, in relation to his determination to have children.

70.     At that time, he signed up for the 23andMe package (ancestry and health information) and opted for the DNA Relative Finder.

71.     Plaintiff Doe proceeded to provide 23andMe with his saliva sample, believing that his genetic make-up, and his ancestry would be protected by Defendant given its representations respecting the security of information provided to it.

72.     Thereafter, Plaintiff Doe received his ancestry analysis, disclosing that a significant percentage of his ancestry is Ashkenazi Jewish, which is consistent with the fact that he is descended from Holocaust survivors from Europe.

73.     Ashkenazi Jews, for the most part, are descended from Central and Eastern European countries. About half of all Jewish people are Ashkenazi.

74.     He also obtained a list of the names of his DNA Relatives, the percentage of DNA that he shares with each one, and his relationship to him, *e.g.*, second cousin.

75.     Plaintiff also received reports regarding various potential illnesses, and conditions from which he could suffer given his ancestry as an Ashkenazi Jew.

76.     Thereafter, Plaintiff continued to maintain his DNA Relative Finder option, which was periodically updated, and in October 2021, he paid for an additional health related service enabling him to receive certain health related reports under a 23andMe+ account.

77.     On October 10, 2023, Plaintiff received an email Notice from 23andMe disclosing that the Company had suffered an unauthorized intrusion and that records from his DNA Relatives feature had been taken. The October 10 Notice recommended that customers change their

password or use a multi-factor authorization, but did not otherwise disclose who was targeted or that their information might have already been disclosed on the dark web. 23andMe again touted that security and privacy are its highest priorities, and that it routinely monitors and audits its systems.

78.     Plaintiff received another email Notice on October 13, 2023. This October 13 Notice indicated that the information that Plaintiff had provided to 23andMe for use in the DNA Relatives feature had been taken and provided hyperlinks to the information and the profile information that Plaintiff had provided to the DNA Relative profile.

79.     As both the October 20 Letter from Senator Cassidy and the October 30 Letter from General Tong indicated, the Hack and disclosure of genetic and ancestry information for those of Ashkenazi Jewish and Chinese descent is particularly dangerous given the rampant antisemitism and anti-Asian rhetoric and violence seen recently.

80.     In response to the Hack, religious houses of worship have expressed concern and have increased their security. The Jewish Federation of San Antonio, for instance, is looking into the matter and has offered to provide assistance to any of its members.[16]

F.     **23andMe had a Duty to Plaintiff and the Class Members**

81.     At all relevant times, 23andMe had a legal and equitable duty to Plaintiff and the Class members to properly secure their PII, encrypt and maintain such information using industry standard methods, train its employees, utilize available technology to defend its systems from invasion, act reasonably to prevent foreseeable harm to Plaintiff and the Class members, and to ***promptly*** notify Plaintiff and the Class members when Defendant became aware that their PII was compromised.

82.     Defendant's duty to use reasonable security measures arose as a result of the special relationship that existed between 23andMe and Plaintiff and the Class members. The special

---

[16]  **Error! Hyperlink reference not valid.**Jonathan Cotto, *Jewish community concerned after 23andMe data stolen, exposing genetic data of millions*, KSAT.com (Oct. 10, 2023), https://www.ksat.com/news/local/2023/10/10/jewish-community-concerned-after-23andMe-data-stolen-exposing-genetic-data-of-millions/.

relationship arose because Plaintiff and Class members entrusted 23andMe with their PII when they were customers.

83. Defendant had the resources necessary to prevent the Data Breach but neglected to adequately invest in security measures, despite its obligation to protect such information. Accordingly, Defendant breached its common law, statutory, and other duties owed to Plaintiff and Class members.

84. Security standards commonly accepted among businesses that store PII using the internet include:

      (a)    Maintain a firewall configuration;

      (b)    Maintaining appropriate design, systems, and controls to limit user access to certain information as necessary;

      (c)    Monitoring for suspicious or irregular traffic to servers;

      (d)    Monitoring for suspicious credentials use to access servers;

      (e)    Monitoring for suspicious or unknown users;

      (f)    Monitoring for suspicious or irregular server requests;

      (g)    Monitoring for server requests for PII;

      (h)    Monitoring for server requests for VPNs; and

      (i)    Monitoring for server requests from Tor exit nodes.

G. **23andMe Failed to Comply with FTC Guidelines**

85. Federal and State governments have established security standards and issued recommendations to mitigate the risk of data breaches and the resulting harm to consumers and financial institutions. The FTC has issued numerous guides for business highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[17]

---

[17] Federal Trade Commission, *Start with Security: a Guide for Business, Lessons Learned from FTC Cases*, https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited Nov. 3, 2023).

86. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business. The guidelines note businesses should protect the personal consumer and consumer information that they keep, as well as properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct security problems.

87. The FTC recommends that businesses:

(a) Identify all connections to the computers where you store sensitive personal information.

(b) Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks.

(c) Do not store sensitive consumer data on any computer with an internet connection unless it is essential for conducting his business.

(d) Scan computers on his network to identify and profile the operating system and open network services. If services are not needed, he should be disabled to prevent hacks or other potential security problems. For example, if email service or an internet connection is not necessary on a certain computer, a business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine.

(e) Pay particular attention to the security of his web applications – the software used to give information to visitors to his websites and to retrieve information from them. Web applications may be particularly vulnerable to a variety of hacker attacks.

(f) Use a firewall to protect his computers from hacker attacks while it is connected to a network, especially the internet.

(g) Determine whether a border firewall should be installed where the business' network connects to the internet. A border firewall separates the network from the internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored. Set access controls – settings that determine which devices and traffic get through the firewall – to allow only trusted devices with a legitimate business need to access the

network. Since the protection a firewall provides is only as effective as its access controls, he should be reviewed periodically.

        (h)    Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of the day.

        (i)    Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from his system to an unknown user. If large amounts of information are being transmitted from a business' network, the transmission should be investigated to make sure it is authorized.

88.    The FTC has brought enforcement actions against businesses for failing to protect consumer and consumer data adequately and reasonably, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §45. Orders resulting from these actions further clarify the measures businesses must take to meet his data security obligations.

89.    Because Plaintiff and the Class members entrusted Defendant with their PII, Defendant had, and still has, a duty to Plaintiff and the Class members to keep their PII secure.

90.    Plaintiff and the Class members reasonably expected that when they provided their PII to 23andMe, it would safeguard their PII.

91.    23andMe was at all times fully aware of its obligation to protect the personal and financial data, including that of Plaintiff and Class members. 23andMe was also aware of the significant repercussions if it failed to do so.

92.    23andMe's failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential data – including Plaintiff's and the Class members' first, middle, and last names, addresses, and genetic information and ancestry – constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. §45.

### H. The Data Breach has Caused Concrete Injuries to Plaintiff and the Class

93. Plaintiff and the Class members reasonably expected that 23andMe would provide adequate security protections for their PII, and Plaintiff and the Class members provided Defendant with sensitive personal information as a result.

94. Defendant's poor data security deprived Plaintiff and Class members of the benefit of their bargain and now has put them in danger. Plaintiff and other Class members understood and expected that, as part of that relationship, they would receive data security, when in fact Defendant did not provide the expected data security. Accordingly, Plaintiff and Class members received data security services that were of a lesser value than what they reasonably expected. As such, Plaintiff and Class members suffered pecuniary injury.

95. Cybercriminals intentionally attack and exfiltrate PII to exploit it. Thus, Plaintiff and the Class members are now, and for the rest of their lives will be, at a heightened and substantial risk of hate crimes and other issues, as a consequence of the Hack. Plaintiff and Class members have also incurred (and will continue to incur) damages in the form of, *inter alia*, loss of privacy and costs of engaging adequate monitoring and identity theft protection services.

96. The Hackers are already selling Plaintiff's and the Class members' information on the dark web, which not only jeopardizes Plaintiff and the Class members and could subject them to hate crimes and violence, but also to other issues including identity fraud, problems with insurance companies and obtaining insurance, and problems with obtaining employment.

97. Given Defendant's failure to timely provide notice, moreover, Plaintiff and other Class members were prevented from taking actions to protect themselves from these harms, such as the harm of being identified as Jewish during this troubling climate.

98. Accordingly, as a direct and/or proximate result of 23andMe's wrongful actions and/or inaction and the resulting Data Breach, Plaintiff and Class members have been placed at an imminent, immediate, and continuing increased risk of hate crimes, identity theft and identity fraud. Even data that has not yet been exploited by cybercriminals bears a high risk that the

1  Hackers, who now possess Plaintiff's PII and are presently attempting to sell it on the dark web,

2  will exploit the data at a later date or re-sell it to other possible bad actors.

3        99.    As a result, Plaintiff and Class members have already suffered damages, including

4  an imminent risk that he could be subject to hate crimes and violence.

5  **CLASS ACTION ALLEGATIONS**

6        100.    Plaintiff brings this case as a class action pursuant to Rule 23(b)(1), (b)(2), (b)(3),

7  and (c)(4) of the Federal Rules of Civil Procedure, on his own behalf and as the Class

8  representative on behalf of the following: All persons of Ashkenazi Jewish descent within the

9  United States whose PII was taken and disclosed in the Data Breach.

10        101.    Plaintiff reserves the right to amend the Class definition if further investigation and

11  discovery indicate that the Class definition should be narrowed, expanded, or otherwise modified.

12        102.    Excluded from the Class are governmental entities, Defendant, its officers,

13  directors, agents, and any entity in which Defendant retains a controlling interest; and the affiliates,

14  legal representatives, and employees of Defendant.

15        103.    This action has been brought and may be maintained as a class action under the

16  Federal Rules of Civil Procedure.

17      A.    **Numerosity**

18        104.    <u>Federal Rule of Civil Procedure 23(a)(1)</u>. This Class numbers over one million

19  persons. As a result, joinder of all Class members in a single action is impracticable. Class

20  members may be informed of the pendency of this class action through a variety of means,

21  including, but not limited to, direct mail, email, published notice, and website posting.

22      B.    **Existence and Predominance of Common Questions of Law and Fact**

23        105.    <u>Federal Rule of Civil Procedure 23(a)(2) and (b)(3)</u>. There are questions of fact and

24  law common to the Classes that predominate over any question affecting only individual members.

25  Those questions, each of which may also be certified under Rule 23(c)(4), include, but are not

26  limited to:

27          (a)    Whether Defendant unlawfully used, maintained, lost, or disclosed

28  Plaintiff's and the Class members' PII;

(b)      Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

(c)      Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

(d)      Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

(e)      Whether Defendant owed a duty to Plaintiff and the Class members to safeguard their PII;

(f)      Whether Defendant breached its duty to Plaintiff and the Class members to safeguard their PII;

(g)      Whether unauthorized third parties obtained Plaintiff's and the Class members' PII in the Data Breach;

(h)      Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

(i)      Whether Plaintiff and the Class members suffered legally cognizable damages as a result of Defendant's misconduct including an increase in imminent danger;

(j)      Whether Plaintiff and the Class members suffered legally cognizable damages as a result of Defendant's misconduct;

(k)      Whether Defendant failed to provide an adequate data breach notice; and

(l)      Whether Plaintiff and the Class members are entitled to damages and/or equitable relief.

C.      **Typicality**

106.      <u>Federal Rule of Civil Procedure 23(a)(3)</u>. Plaintiff's claims are typical of those of the Class because Plaintiff's PII, like that of every other Class member, was compromised in the Data Breach and all Class members are subject to the same risk of imminent danger as a result of the Data Breach.

D. **Superiority**

107. <u>Federal Rule of Civil Procedure 23(b)(3)</u>. A class action is the appropriate method for the fair and efficient adjudication of this controversy. The presentation of separate actions by individual Class members could create a risk of inconsistent adjudications, establish incompatible standards of conduct for Defendant, and/or substantially impair or impede the ability of Class members to protect their interests. In addition, it would be impracticable and undesirable for each member of the Class who suffered an economic loss to bring a separate action. The maintenance of separate actions would place a substantial and unnecessary burden on the courts and could result in inconsistent adjudications, while a single class action can determine, with judicial economy, the rights of all Class members.

E. **Adequacy**

108. <u>Federal Rule of Civil Procedure 23(a)(4)</u>. Plaintiff is an adequate representative of the Class because he is a member of the Class and his interests do not conflict with the interests of the Class that he seeks to represent. The interests of the members of the Class will be fairly and adequately protected by Plaintiff and his undersigned counsel.

F. **Declaratory and Injunctive Relief**

109. <u>Federal Rule of Civil Procedure 23(b)(2)</u>. Defendant has acted or refused to act on grounds generally applicable to Plaintiff and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the members of the Class as a whole.

110. Additionally, the Class may be certified under Rule 23(b)(1) and/or (b)(2) because:

(a) The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for Defendant;

(b) The prosecution of separate actions by individual members of the Class would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other members of the Class not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

(c)     Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the members of the Class as a whole.

## CAUSES OF ACTION

## COUNT I

**Violation of California's Unfair Competition Law ("UCL") – Unlawful and Unfair Business Practices (Cal. Bus. & Prof. Code §17200, *et seq.*)**

111.    Plaintiff realleges and incorporates by reference paragraphs 1 through 110 above as if fully set forth herein.

112.    As discussed above, 23andMe's acts, practices, and omissions at issue in this matter, particularly those related to data security, were directed and emanated from its headquarters in Sunnyvale, California.  Moreover, under Defendant's Terms of Use, California law applies to all Class members.

113.    As customers, Plaintiff and the Class members entrusted 23andMe with their PII.

114.    By reason of the conduct alleged herein, Defendant engaged in unlawful and unfair practices within the meaning of the UCL. The conduct alleged herein is a "business practice" within the meaning of the UCL.

115.    Defendant stored the PII of Plaintiff and the Class members in Defendant's electronic information databases. Defendant knew or should have known it did not employ reasonable, industry standard, and appropriate security measures that complied with federal regulations and that would have kept Plaintiff's and the other Class members' PII secure and prevented the loss or misuse of Plaintiff's and the other Class members' PII. 23andMe did not disclose to Plaintiff and Class members that its data systems were not secure and misrepresented just the opposite, that, in fact, such information was secure and that customers' privacy and security were of paramount importance.

116.    Plaintiff and Class members relied upon Defendant's misrepresentations and were entitled to assume, and did assume, Defendant would take appropriate measures to keep their PII safe when they complied with commercial protocols and divulged their PII to Defendant,

1 consistent with Defendant's representations. Defendant did not disclose at any time that Plaintiff's

2 and the Class members' PII was vulnerable to hackers because Defendant's data security measures

3 were inadequate, and Defendant was the only one in possession of that material information, which

4 it had a duty to disclose.

5     117.   Defendant violated the UCL by misrepresenting, both by affirmative conduct,

6 affirmative misrepresentations and by omission, the safety of its many systems and services,

7 specifically the security thereof, and his ability to safely store Plaintiff's and Class members' PII.

8     118.   Defendant also violated the UCL by failing to implement reasonable and

9 appropriate security measures or follow industry standards for data security, and by failing to

10 immediately notify Plaintiff and the other Class members of the Data Breach and to provide

11 adequate notice. If Defendant had complied with these legal requirements, Plaintiff and the other

12 Class members would not have suffered the damages related to the Data Breach.

13     119.   Further, as alleged here in this Complaint, 23andMe engaged in unlawful and unfair

14 business practices in the conduct of business transactions, in violation of the UCL, by and

15 including its:

16     (a)   failure to maintain adequate computer systems and data security practices

17 to safeguard PII;

18     (b)   failure to disclose that its computer systems and data security practices were

19 inadequate to safeguard PII from theft;

20     (c)   failure to timely and accurately disclose the Data Breach to Plaintiff and

21 Class members; and

22     (d)   its making of misrepresentations about the safety of its website and Plaintiff

23 and Class members' PII.

24     120.   23andMe knew or should have known that its data security practices were

25 inadequate to safeguard the PII of Plaintiff and Class members, deter hackers, and detect a breach

26 within a reasonable time, and that the risk of a data breach was highly likely.

27     121.   As a direct and proximate result of 23andMe's violation of the UCL, Plaintiff and

28 Class members have suffered damages, and are susceptible to damages, including an increased

CLASS ACTION COMPLAINT     - 24 -

1    risk of hate crimes, danger and violence from antisemitic groups, and from identity theft, which

2    may take months if not years to discover and detect, given the far-reaching, adverse and

3    detrimental consequences of identity theft and loss of privacy. The nature of other forms of

4    economic damage and injury may take years to detect, and the potential scope can only be assessed

5    after a thorough investigation of the facts and events surrounding the theft mentioned above.

6       122.   **Defendant engaged in unfair business practices under the "balancing test."**

7    The harm caused by Defendant's actions and omissions, as described in detail above, greatly

8    outweighs any perceived utility. Indeed, Defendant's failure to follow basic data security protocols

9    and misrepresentations to consumers about Defendant's data security cannot be said to have had

10   any utility at all. Thus, for example, there was no utility in using inadequate data security systems

11   and protocols. Likewise, there was no utility in Defendant telling the Class that it used "physical,

12   technical, and administrative measures aimed at preventing unauthorized access to or disclosure

13   of your Personal Information," and that it "regularly reviews and improves security practices to

14   help ensure the integrity of our systems and your Personal Information," when neither was true.

15   And, there was no utility, other than perhaps to Defendant itself, in unreasonably waiting to

16   disclose the Data Breach even though Defendant had contemporaneous knowledge it was

17   happening. All of these actions and omissions were clearly injurious to Plaintiff and the Class

18   members, directly causing the harms alleged below.

19       123.   **Defendant engaged in unfair business practices under the "tethering test."**

20   Defendant's actions and omissions, as described in detail above, violated fundamental public

21   policies expressed by the California Legislature. *See, e.g.*, Cal. Civ. Code §1798.1 ("The

22   Legislature declares that . . . all individuals have a right of privacy in information pertaining to

23   them. . . . The increasing use of computers . . . has greatly magnified the potential risk to individual

24   privacy that can occur from the maintenance of personal information."); Cal. Civ. Code

25   §1798.81.5(a)(1) ("It is the intent of the Legislature to ensure that personal information about

26   California residents is protected."); Cal. Bus. & Prof. Code §22578 ("It is the intent of the

27   Legislature that this chapter [including the Online Privacy Protection Act] is a matter of statewide

28   concern."). Defendants' acts and omissions, and the injuries caused by them are thus "comparable

1    to or the same as a violation of the law[.]" *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular*

2    *Telephone Co.*, 20 Cal. 4th 163, 187 (1999).

3         124.    Plaintiff and the Class members suffered injury in fact and lost money or property

4    as the result of Defendant's unfair business practices. In addition, their PII was taken and is in the

5    hands of those who will use it for their own advantage, or is being sold for value, making it clear

6    that the hacked information is of tangible value. Further, Plaintiff and the Class members have lost

7    the benefit of their bargain and purchased services they otherwise would not have, or paid more

8    for supposedly secure services than they would have, had they known the truth regarding

9    Defendant's inadequate data security.

10        125.    As a result of Defendant's unlawful and unfair business practices and violations of

11   the UCL, Plaintiff and the members of the Class are entitled to restitution, disgorgement of

12   wrongfully obtained profits, and injunctive relief.

13                                          **COUNT II**

14                                         **NEGLIGENCE**

15        126.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 110 above

16   as if fully set forth herein.

17        127.    As part of the regular course of its business operations, Defendant gathered and

18   stored the PII of Plaintiff and Class members.

19        128.    Plaintiff and the Class were entirely dependent on Defendant to use reasonable

20   measures to safeguard their PII and were vulnerable to the foreseeable harm of a security breach

21   should Defendant fail to safeguard their PII.

22        129.    By collecting and storing this data in its computer property, sharing it, and using it

23   for commercial gain, Defendant assumed a duty of care to use reasonable means to secure and

24   safeguard their computer property – and Class members' PII held within it – to prevent disclosure

25   of the information, and to safeguard the information from theft. Defendant's duty included a

26   responsibility to implement processes by which it could detect a breach of its security systems in

27   a reasonably expeditious period of time and to give prompt notice to those affected in the case of

28   a Data Breach.

CLASS ACTION COMPLAINT                                                                        - 26

130.     Defendant owed a duty of care to Plaintiff and the Class to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the PII.

131.     Defendant's duty also arose under Section 5 of the FTC Act, 15 U.S.C. §45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect PII by companies such as 23andMe. Various FTC publications and data security breach orders further form the basis of Defendant's duty. In addition, individual states have enacted statutes based upon the FTC Act that also created a duty.

132.     Plaintiff and the Class are within the class of persons that the FTC Act was intended to protect.

133.     The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of his failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

134.     Defendant gathered and stored the PII of Plaintiff and the Class as part of its business of soliciting its services to its clients, which solicitations and services affect commerce.

135.     Defendant violated the FTC Act by failing to use reasonable measures to protect the PII of Plaintiff and Class members and by not complying with applicable industry standards.

136.     Defendant breached its duties to Plaintiff and the Class under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and/or data security practices to safeguard their PII, and by failing to provide prompt notice without reasonable delay.

137.     Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and those who sought to use its services, which is recognized by laws and regulations, including, but not limited to, the FTC Act, as well as common law. Defendant was in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Plaintiff and the Class, or minimize the Data Breach.

138.    Defendant's multiple failures to comply with applicable laws and regulations, and the violation of Section of 5 of the FTC Act constitutes negligence *per se*.

139.    Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential PII.

140.    Defendant had full knowledge of the sensitivity of the PII, the types of harm that Plaintiff could and would suffer if the PII was wrongfully disclosed, and the importance of adequate security.

141.    Plaintiff and the Class members were the foreseeable victims of any inadequate safety and security practices. Plaintiff and the Class had no ability to protect their PII that was in Defendant's possession.

142.    Defendant was in a special relationship with Plaintiff and the Class with respect to the Hacked PII because the aim of Defendant's data security measures was to benefit Plaintiff by ensuring that his PII would remain protected and secure. Only Defendant was able to ensure that its systems were sufficiently secure to protect Plaintiff's and other Class members' PII. The harm to Plaintiff and the Class from its exposure was highly foreseeable to Defendant.

143.    Defendant owed Plaintiff and other Class members a common law duty to use reasonable care to avoid causing foreseeable risk of harm to Plaintiff and the Class when obtaining, storing, using, and managing his PII, including acting to reasonably safeguard such data and providing notification to Plaintiff and the Class of any breach in a timely manner so that appropriate action could be taken to minimize losses.

144.    Defendant had duties to protect and safeguard the PII of Plaintiff and other Class members from being vulnerable to compromise by taking common-sense precautions when dealing with highly sensitive PII. Additional duties that Defendant owed Plaintiff and the Class include:

(a)     Exercising reasonable care in designing, implementing, maintaining, monitoring, and testing Defendant's networks, systems, protocols, policies, procedures, and

practices to ensure that PII was adequately secured from impermissible release, disclosure, and publication;

(b)      To protect Plaintiff's and the Class' PII in its possession by using reasonable and adequate security procedures and systems; and

(c)      To promptly notify Plaintiff and the Class of any breach, security incident, unauthorized disclosure, or intrusion that affected or may have affected their PII.

145.     Only Defendant was in a position to ensure that its systems and protocols were sufficient to protect the PII that had been entrusted to them.

146.     Defendant breached its duties of care by failing to adequately protect Plaintiff and the Class's PII. Defendant breached its duties by:

(a)      Failing to exercise reasonable care in obtaining, retaining, securing, safeguarding, protecting, and deleting the PII in its possession;

(b)      Failing to protect the PII in its possession using reasonable and adequate security procedures and systems;

(c)      Failing to adequately and properly audit, test, and train its employees regarding how to properly and securely transmit and store PII;

(d)      Failing to consistently enforce security policies aimed at protecting Plaintiff's and the Class' PII;

(e)      Failing to mitigate the harm caused to Plaintiff and the Class;

(f)      Failing to implement processes to quickly detect data breaches, security incidents, or intrusions; and

(g)      Failing to promptly notify Plaintiff and other Class members of the Data Breach that affected their PII.

147.     Defendant's willful failure to abide by these duties was wrongful, reckless, and grossly negligent in light of the foreseeable risks and known threats.

148.     23andMe, through its actions and/or omissions, unlawfully breached its duties to Plaintiff and the Class by failing to implement industry protocols and exercise reasonable care in

protecting and safeguarding the PII of Plaintiff and the Class during the time the PII was within Defendant's possession or control.

149. Defendant's failure to provide timely and clear notification of the Data Breach to Plaintiff and the Class prevented Plaintiff and the Class from taking meaningful, proactive steps to securing their PII and mitigating damages.

150. Defendant's wrongful actions, inaction, and omissions constituted (and continue to constitute) common law negligence.

151. As a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiff and the Class have suffered and will suffer injury, including, but not limited to: (a) danger of hate crimes and violence, (b) the loss of the opportunity to choose how their PII is used; (c) the compromise, publication, and/or theft of their PII; (d) out-of-pocket expenses associated with the prevention, detection, and recovery from hate crimes and unauthorized use of their PII; (e) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (f) the continued risk to their PII, which remain in Defendant's possession, and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in his continued possession; (g) the loss of their benefit of their bargain for Defendant's services; and (h) future costs.

152. As a direct and proximate result of Defendant's negligence, Plaintiff, and members of the Class have suffered (and will continue to suffer) other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

153. Additionally, as a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiff and members of the Class have suffered and will suffer the continued risks of exposure of their PII, which remains in Defendant's possession, and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

154. Plaintiff and members of the Class have suffered injury and are entitled to actual damages in amounts to be proven at trial.

## COUNT III

### Breach of Implied Contract

155. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 110 above as if fully set forth herein.

156. Plaintiff and Class members were required to provide their PII to Defendant as a condition of receiving services provided by Defendant.

157. Plaintiff and Class members provided PII to Defendant in exchange for services. In exchange, Defendant promised to protect their PII from unauthorized disclosure.

158. At all relevant times Defendant promulgated, adopted, and implemented written a Privacy Policy whereby it expressly promised Plaintiff and Class members that it would only disclose PII under certain circumstances, none of which relate to the Data Breach.

159. On information and belief, Defendant further promised to comply with industry standards and to make sure that Plaintiff's and Class members' PII would remain protected.

160. Implicit in the agreement between Plaintiff, Class members, and Defendant to provide PII, was the latter's obligation to: (a) use such PII for business purposes only, (b) take reasonable steps to safeguard that PII, (c) prevent unauthorized disclosures of the PII, (d) provide Plaintiff and Class members with prompt and sufficient notice of any and all unauthorized access and/or theft of their PII, (e) reasonably safeguard and protect the PII of Plaintiff and Class members from unauthorized disclosure or uses, (f) retain the PII only under conditions that kept such information secure and confidential.

161. Defendant required Plaintiff and Class members to provide their PII as part of its regular business practices.

162. When Plaintiff and Class members provided their PII to Defendant as a condition of the consumer relationship, implied contracts were created with Defendant. As such, Defendant agreed to reasonably protect such information.

163.     Plaintiff and Class members entered into the implied contracts with the reasonable expectation and belief that Defendant's data security practices complied with relevant laws and regulations and were consistent with industry standards.

164.     Plaintiff and Class members believed that 23andMe would use part of the monies paid to Defendant under the implied contracts or the monies obtained from the benefits derived from the PII they provided to fund adequate and reasonable data security practices.

165.     Plaintiff and the Class members would not have entrusted their PII to Defendant in the absence of the implied contract between them and Defendant to keep his information reasonably secure. Plaintiff and Class members would not have entrusted their PII to Defendant in the absence of its implied promise to monitor its computer systems and networks to ensure that it adopted reasonable data security measures. The safeguarding of Plaintiff's and Class members' PII was critical to realize the intent of the parties.

166.     Plaintiff and Class members fully performed their obligations under the implied contracts with Defendant.

167.     Defendant breached its implied contracts with Plaintiff and Class members by failing to safeguard and protect their PII.

168.     As a direct and proximate result of Defendant's breaches of the implied contracts, Plaintiff and Class members sustained damages.

169.     Plaintiff and Class members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach, including the loss of the benefit of the bargain.

170.     Plaintiff and Class members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (a) strengthen its data security systems and monitoring procedures; (b) submit to future annual audits of those systems and monitoring procedures; and (c) immediately provide adequate long term credit monitoring to all Plaintiff and Class members.

**COUNT IV**

**Unjust Enrichment**

171.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 110 above as if fully set forth herein.

172.    Plaintiff and Class members conferred a monetary benefit upon Defendant in the form of purchasing products from Defendant, and in connection thereto, by providing their PII to Defendant with the understanding that Defendant would pay for the administrative costs of reasonable data privacy and security practices and procedures. Specifically, they were required to provide Defendant with their PII. In exchange, Plaintiff and Class members should have received adequate protection and data security for such PII held by Defendant.

173.    Defendant knew Plaintiff and Class members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the PII of Plaintiff and Class members for business purposes.

174.    Acceptance of the benefit under these facts and circumstances make it inequitable for Defendant to retain that benefit without payment of the value thereof. Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class members' PII. This is evidenced by Defendant's mentions of multifactor authentication and its terms of service and eventual adoption of same on November 6, 2023.

175.    Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant calculated to increase its own profits at the expense of Plaintiff and Class members by utilizing cheaper, ineffective security measures. Plaintiff and Class members thus suffered as a direct and proximate result of Defendant's decision to prioritize profits over the requisite data security.

176.    Under the principles of equity and good conscience, Defendant should not be permitted to retain money belonging to Plaintiff and Class members, because Defendant failed to implement appropriate data management and security measures mandated by industry standards.

177.    Defendant acquired the PII through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

178. If Plaintiff and Class members knew that Defendant had not secured their PII, they would not have agreed to provide their PII to Defendant.

179. Plaintiff and Class members have no adequate remedy at law.

180. As a direct and proximate result of Defendant's conduct, Plaintiff and Class members have suffered and will continue to suffer other forms of injury and/or harm.

181. For the benefit of Plaintiff and Class members, Defendant should be compelled to disgorge proceeds that it unjustly received from them into a common fund or constructive trust.

## COUNT V

## Invasion of Privacy

182. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 110 above as if fully set forth herein.

183. Plaintiff and Class members had a legitimate expectation of privacy in their PII and were entitled to the protection of this information against disclosure to unauthorized third parties.

184. Defendant owed a duty to Plaintiff and Class members, to keep their PII confidential.

185. Defendant failed to protect, and allowed unknown and unauthorized third parties to access, the PII of Plaintiff and Class members.

186. The PII that was publicized during the Data Breach was highly sensitive, private, and confidential, as it included various PII.

187. Defendant acted with reckless disregard for the privacy of Plaintiff and Class members rising to the level of: (a) an intentional intrusion by Defendant; (b) into a matter that Plaintiff and Class members have a right to keep private (*i.e.*, their PII); and (c) which is highly offensive to a reasonable person.

188. Defendant acted knowingly when it permitted the Data Breach to occur; it had actual knowledge that its information security practices were inadequate and insufficient.

189. Defendant was aware of the potential of a data breach and failed to adequately safeguard its systems and implement appropriate policies to prevent the unauthorized release of Plaintiff's and Class members' data and PII.

190.   Defendant acted with such reckless disregard as to the safety of Plaintiff's and Class members' PII to rise to the level of intentionally allowing the intrusion upon Plaintiff's and Class members' seclusion.

191.   The unauthorized release to, custody of, and examination by unauthorized third parties of the PII of Plaintiff and Class members is highly offensive to a reasonable person.

192.   Plaintiff and Class members have been damaged by the invasion of their privacy in an amount to be determined at trial.

## COUNT VI

### Declaratory Judgment

193.   Plaintiff re-alleges and incorporates by reference paragraphs 1 through 110 above as if fully set forth herein.

194.   Under the Declaratory Judgment Act, 28 U.S.C. §2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

195.   An actual controversy has arisen in the wake of Defendant's Data Breach regarding its present and prospective common law and other duties to reasonably safeguard its customers' PII and whether Defendant is currently maintaining data security measures adequate to protect Plaintiff and the Class members from further data breaches that compromise their PII.

196.   Plaintiff alleges that Defendant's data security measures remain inadequate. Plaintiff and the Class members will continue to suffer injury as a result of the compromise of their PII, and remain at imminent risk that further compromises their PII will occur in the future.

197.   Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

(a)   23andMe continues to owe a legal duty to secure its users' PII and to timely notify consumers of a data breach under the common law, Section 5 of the FTC Act, and various state statutes; and

(b)     23andMe continues to breach this legal duty by failing to employ reasonable measures to secure Plaintiff's and Class members' PII.

198.     The Court also should issue corresponding prospective injunctive relief requiring that 23andMe employ adequate security protocols consistent with law and industry standards to protect consumers' PII.

199.     If an injunction is not issued, Plaintiff and the Class members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Defendant. The risk of another such breach is real, immediate, and substantial. If another breach at 23andMe occurs, Plaintiff and the Class members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

200.     The hardship to Plaintiff and the Class members if an injunction does not issue exceeds the hardship to 23andMe if an injunction is issued. Among other things, if another massive data breach occurs at 23andMe, Plaintiff and the Class members will likely be subjected to fraud, identify theft, and other harms described herein. On the other hand, the cost to 23andMe of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and 23andMe has a preexisting legal obligation to employ such measures.

201.     Issuance of the requested injunction will not do a disservice to the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at 23andMe, thus eliminating the additional injuries that would result to Plaintiff and the millions of individuals whose PII would be further compromised.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the other members of the Class alleged herein, respectfully request that the Court enter judgment in his favor and against Defendant as follows:

A.     For an Order certifying the Class under Federal Rule of Civil Procedure 23 and naming Plaintiff as the representatives for the Class and Plaintiff's attorneys as Class Counsel;

B. For an Order declaring Defendant's conduct violates the causes of action referenced herein;

C. For an Order finding in favor of Plaintiff and the Class on all counts asserted herein;

D. Ordering Defendant to take all steps to obtain Plaintiff's and the Class members' PII currently on the dark web and to take all steps to prevent the Hackers, including the hacker called Golem, from continuing to offer Plaintiff's and other Ashkenazi Jews' PII on the dark web;

E. For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

F. For prejudgment interest on all amounts awarded;

G. For an Order of restitution and all other forms of equitable monetary relief;

H. For injunctive relief as pleaded or as the Court may deem proper;

I. For an Order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit, and any other expense, including expert witness fees; and

J. Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff and the Class members demand a trial by jury of any and all claims in this Complaint and of any and all issues in this action so triable as of right.

DATED: November 6, 2023

ROBBINS GELLER RUDMAN
    & DOWD LLP
DOROTHY P. ANTULLIS*
STUART A. DAVIDSON*
LINDSEY H. TAYLOR*
NICOLLE B. BRITO
ALEXANDER C. COHEN*
(*pro hac vice* forthcoming)


_s/ Nicolle B. Brito_
NICOLLE B. BRITO
225 NE Mizner Boulevard, Suite 720
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)

CLASS ACTION COMPLAINT

- 37 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THE GRANT LAW FIRM, PLLC
LYNDA J. GRANT*
521 Fifth Avenue, 17th Floor
New York, NY 10175
Telephone:  212/292-4441
212/292-4442 (fax)

LONGMAN LAW, P.C.
HOWARD T. LONGMAN*
354 Eisenhower Parkway, Suite 1800
Livingston, NJ  07039
Telephone:  973/994-2315
973/994-2319 (fax)

Attorneys for John Doe and the Class

*pro hac vice forthcoming

CLASS ACTION COMPLAINT